IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Applicant, | ) ) |
| v. | ) CIVIL ACTION NO. ) |
| NIKE, INC., | ) ) |
| Respondent. | ) ) ) |

**MEMORANDUM IN SUPPORT OF APPLICATION
FOR AN ORDER TO SHOW CAUSE WHY THE EEOC'S
<u>ADMINISTRATIVE SUBPOENA SHOULD NOT BE ENFORCED</u>**

Title VII of the Civil Rights Act of 1964 (Title VII) authorizes the U.S. Equal Employment Opportunity Commission (EEOC) to investigate charges of unlawful employment discrimination and, when necessary, subpoena information relevant to an investigation. The EEOC is before this Court to enforce an administrative subpoena against Respondent NIKE, Inc. NIKE failed to produce subpoenaed information required for the agency's investigation into claims filed by EEOC Commissioner (now Chair) Andrea R. Lucas alleging that NIKE discriminated against White individuals based on their race. The subpoena seeks relevant information, is not indefinite, was not issued for an illegitimate purpose, and is not unduly burdensome. The Court should therefore require NIKE to show cause why the EEOC's administrative subpoena should not be enforced and, after providing NIKE an opportunity to be heard, direct NIKE to comply with the EEOC's subpoena in full.

**I.  Factual Background**

On May 24, 2024, then-Commissioner Lucas issued a Charge of Discrimination against NIKE, alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. The charge alleged that since at least 2020, NIKE

> engag[ed] in a pattern or practice of disparate treatment against White employees, applicants, and training program participants in hiring, promotion, demotion, or separation decisions (including selection for layoffs); internship programs; and mentoring, leadership development, and other career development programs.

Exhibit A (Charge of Discrimination). The charge identified multiple alleged unlawful employment practices, including NIKE's use of "race-based workforce representation quotas"; selecting employees for separation and layoff based, in whole or in part, on race; providing access to training, development opportunities, and mentoring based, in whole or in part, on race; and failing to interview, hire, or promote, and classifying or otherwise discriminating against prospective and / or current employees and internship candidates based, in whole or in part, on race. The charge identified certain programs and public statements by NIKE as examples of potentially discriminatory employment practices and identified the class of aggrieved individuals as "all White employees, former employees, prospective employees, and current and prospective training program applicants and participants who have been, continue to be, or may be in the future adversely affected by the unlawful employment practices complained of" in the charge.

As part of its investigation, the Commission sent Requests for Information to NIKE on December 16, 2024; February 18, 2025; and June 6, 2025. Exhibit B (Requests for Information). The requests sought information related to the charge allegations, including but not limited to information regarding (1) NIKE's organizational structure; (2) programs NIKE utilized to increase the representation of racial and ethnic minorities in its U.S. workforce; (3) the effect of minority representation on executive compensation; (4) employee layoffs in 2024; and (5)

2

employee demographic and pay data provided to select NIKE executives. NIKE responded with extensive objections and assertions of compliance with Title VII. NIKE provided some narrative responsive information and documents, but it failed to provide all information requested.

On September 30, 2025, David Davis, Director of the EEOC's St. Louis District Office, issued Subpoena No. SL-25-08 to NIKE. Exhibit C (Subpoena). The subpoena sought:[1]
(1) information showing NIKE's organizational structure from June 1, 2019 to the present; (2) information related to layoffs in NIKE's U.S. Corporate workforce from January 1, 2024 to the present; (3) documents related to NIKE's use of racial or ethnic minority worker data as a factor in setting executive compensation from June 1, 2019 to the present; (4) data, if maintained, regarding the employment of racial or ethnic minority employees within NIKE's U.S. Corporate workforce from June 1, 2019 to the present; (5) information regarding NIKE's "Diverse Slates" process and its use from June 1, 2018 to the present; (6) consideration, application, and selection information for sixteen employment-related programs utilized by NIKE; and (7) information related to NIKE's use of "representation data" as referred to in its FY20 Impact Report.

On October 7, 2025, NIKE filed a petition to revoke or modify the subpoena pursuant to 29 C.F.R. § 1601.16. Exhibit D (NIKE Petition). On January 5, 2026, the Commission issued its Determination on the petition, modifying some of the subpoena requests and directing NIKE to comply with the modified subpoena by January 26, 2026. Exhibit E (Determination). On January 26, NIKE submitted a narrative response to the subpoena with accompanying documents and

---

[1] EEOC subpoenas may seek both information a respondent has previously failed to produce and information that has not been previously requested. EEOC Compliance Manual (BL) § 24.4(b). Nothing in 29 U.S.C. § 161, incorporated into Title VII by 42 U.S.C. § 2000e-9, requires otherwise.

3

data.[2] Exhibit F (NIKE Response). While NIKE objected to all the subpoena requests, it produced some responsive information and stated that it was continuing to collect other information that it would produce as it was gathered. With respect to at least one category of information, NIKE stated that it was unable to locate any responsive documents. But for seven requests, NIKE did not provide full information, did not indicate that it would produce the requested information in the future, and did not indicate that responsive information does not exist. With respect to those requests, NIKE failed to comply with the subpoena.

## II.     NIKE Failed to Comply with the EEOC's Subpoena

NIKE failed to provide, either wholly or in part, information required by seven subpoena requests.[3] In subpoena request No. 2, the EEOC sought:

> **For each layoff of employees in Respondent's U.S. Corporate workforce from January 1, 2024 to the present, identify:**
>
> **a. The date each layoff was implemented;**
> **b. The departments and positions subjected to the layoff;**
> **c. For each position subjected to the layoff, the specific criteria and / or factors used to evaluate and select employees for layoff; and**
> **d. The names and job titles of the individuals who selected employees for layoff.**

In response, NIKE generally complied with subparts a. and b. but did not comply with subparts c. or d. Exhibit F (NIKE Response) at 5-7. The documents NIKE produced purportedly show "all of the U.S. Corporate restructures and reductions in force that have been managed through NIKE's Organization Transformation Solutions ("OTS") team from January 1, 2024 to January 9, 2026." NIKE stated that the OTS team "provided activation support for group

---

[2] NIKE submitted a revised response on January 27 to correct errors in Bates numbers, but its response was deemed received by the January 26 deadline.

[3] There are three other subpoena requests where NIKE has not yet fully complied but states that it will. To ensure NIKE produces all responsive information, the Court should order NIKE to fully comply with the entire subpoena.

4

terminations or restructures that, as a general matter, involve 10 or more employees position attribute changes (*e.g.*, a termination or lateral job change)." NIKE also produced a report which purports to show all "U.S. Corporate employees whose separations were coded as 'Reduction in Force' from January 1, 2024 to January 15, 2026", with information that includes each employee's department or "company", job title, and job category. None of this information tells the EEOC the criteria or factors used by NIKE to evaluate and select employees for layoff, nor does it identify who selected employees for layoff, as requested by subparts c. and d.

In subpoena request No. 3, the EEOC sought:

**For each layoff identified in response to Request 2 above, produce:**

a. **All documents related to implementation of the layoff, including but not limited to documents describing the layoff's purpose, scope, selection criteria, guidelines, and instructions to individuals selecting employees for layoff;**
b. **All staffing plans, restructuring plans, and similar documents related to the layoff;**
c. **All documents created during the process of evaluating and selecting employees for layoff, including but not limited to notes, memoranda, charts, tables, and lists;**
d. **For all employees in the departments and positions subjected to the layoff, all documents showing the relevant performance metrics and other criteria used to evaluate and select employees for layoff;**
e. **All communications with employees selected for layoff regarding their selection;**
f. **All documents regarding severance packages, rehire eligibility, and other options for benefits or alternative employment opportunities for employees selected for layoff; and**
g. **All public statements by Respondent regarding the layoff.**

NIKE's response generally complied with subparts a. and g. but did not fully comply with the remaining subparts. Exhibit F (NIKE Response) at 8-10. NIKE states that it "agrees to produce . . . on a rolling basis: employee FAQs and conversation and activation readiness materials and scripts (if any exist) related to" the relevant layoffs. While it is unclear that such documents would fully comply with subpart a., it appears they would be a start. And NIKE states that after "a reasonable and diligent search" it "has been unable to locate documents related to

5

any press releases relating to" the relevant layoffs. This appears to generally satisfy subpart g., though other "public statements" that were not "press releases" would be responsive and have not been produced. But NIKE did not produce staffing or restructuring plans or similar documents (subpart b.) or documents created or used during the process of evaluating and selecting employees for layoff, including performance metrics or other criteria (subparts c. and d.). And while NIKE produced relevant Worker Adjustment and Retraining Notification ("WARN") notices and Older Workers Benefit Protection Act ("OWBPA") disclosure statements, NIKE has failed to produce all other responsive communications and documents provided to employees selected for layoff, as described in subparts e. and f.

Subpoena request No. 5 directs NIKE to "**Produce all documents relating to Respondent's use of employment of racial or ethnic minority workers as a factor in setting executive compensation from June 1, 2019, to the present.**" In response, NIKE stated that its "People & Planet modifier" was the only metric responsive to this request, and it produced various documents that refer to the "People & Planet modifier." Exhibit F (NIKE Response) at 13-15. But NIKE failed to provide any documents describing how the "People & Planet modifier" would be calculated or derived. It seems unlikely that this modifier had a name and was mentioned in various corporate documents, but that no documents exist explaining how such a modifier would be calculated or on what data it would rely.

Subpoena request No. 6 seeks, "**To the extent Respondent has tracked or maintained data regarding the employment of racial or ethnic minority employees within its U.S. Corporate workforce, produce that data from June 1, 2019, to the present.**" In response, NIKE produced EEO-1 Component Data Collection / Employer Information Report data for 2023 and 2024—information it had already provided to the EEOC as required by 29 C.F.R. §

6

1602.7. NIKE also produced an "FY24 NIKE, Inc. Representation by the Numbers Report." Exhibit F (NIKE Response) at 15-17. EEO-1 data reports provide limited data and almost certainly do not represent the full data NIKE tracked. For example, the 2024 "Representation by Numbers Report" is more responsive, showing "Racial and Ethnic Representation (U.S. Only, Corporate Workforce)", including "Overall Representation" and "Director+ Representation", broken down by various racial categories. But this report reflects only FY2024 data, and it is not clear that this report includes all the "data regarding the employment of racial or ethnic minority employees within its U.S. Corporate workforce" that NIKE tracked for that year. NIKE produced no data prior to 2023 or after 2024, as required by the subpoena.

Subpoena request No. 8 directs NIKE to "**Produce all job vacancies where "Diverse Slates"[4] was utilized from June 1, 2018, to the present.**" NIKE failed to provide any information in response to this request and simply stated that its "Diverse Slates practices" and guidelines are not "currently in effect". Exhibit F (NIKE Response) at 19-20. In response to subpoena request No. 7, NIKE stated that its "Diverse Slates guidelines applied to U.S. based Global Grade 50+ above roles at NIKE." Exhibit F (NIKE Response) at 19. While this information provides a partial answer to request No. 8, it does not identify the actual job vacancies where the "Diverse Slates" guidelines were used during the requested time period.

Subpoena request Nos. 10 and 11 sought information regarding **"individuals who applied to, were considered for, were accepted to / selected for, or were rejected from / not selected for"** sixteen programs purporting to provide mentoring, leadership development, skills development, or other similar opportunities. NIKE failed to provide any responsive information.

---

[4] NIKE defines "Diverse Slate" as "a pool of qualified candidates that consists of at least two women and one U.S. Racial and/or Ethnic Minority". Exhibit F (NIKE Response) at 18.

7

Exhibit F (NIKE Response) at 23-27.

### III. Argument

In an EEOC subpoena enforcement proceeding, a district court's narrow role is to "satisfy itself that the charge is valid and that the material requested is 'relevant' to the charge . . . cognizant of the 'generous' construction that courts have given the term 'relevant.'" *McLane Co., Inc. v. EEOC*, 581 U.S. 72, 76 (2017) (citation modified). "If the charge is proper and the material requested is relevant, the district court should enforce the subpoena unless the employer establishes that the subpoena is 'too indefinite,' has been issued for an 'illegitimate purpose,' or is unduly burdensome." *McLane Co.*, 581 U.S. at 77 (citation modified); *accord EEOC v. Technocrest Sys., Inc.*, 448 F.3d 1035, 1038-39 (8th Cir. 2006). "A district court is not to use an enforcement proceeding as an opportunity to test the strength of the underlying complaint." *McLane Co.*, 581 U.S. at 76. "A charge is valid regardless of the strength of its evidentiary foundation. In fact, 'any effort by the court to assess the likelihood that the Commission would be able to prove the claims made in the charge would be reversible error.'" *EEOC v. Schwan's Home Serv.*, 644 F.3d 742, 747 (8th Cir. 2011) (quoting *Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984)) (citation modified); *see also EEOC v. BASF Corp.*, No. 4:02MC00354 SNL, 2003 WL 21219038, at *4 (E.D. Mo. Mar. 25, 2003) ("It is unnecessary for the EEOC to establish [a] violation prior to the issuance of a subpoena . . . . This Court would usurp the EEOC's statutory authority were it to require a showing greater than relevance and materiality.") (citation modified). Moreover, a court should not use a subpoena enforcement action to order a compromise between the EEOC and the employer under investigation where the information sought is broadly relevant. *See Technocrest*, 448 F.3d at 1040 (holding that district court abused its discretion in partially quashing EEOC's subpoena, noting that the lower court "indicated that the EEOC's requests were overreaching and that the court desired to reach a compromise").

8

Here, the EEOC is investigating a valid charge of discrimination and has subpoenaed information relevant to the allegations in that charge. The subpoena is not too indefinite, was not issued for an illegitimate purpose, and is not unduly burdensome. For these reasons, the Court should enforce the EEOC's subpoena.

### A. The EEOC is investigating a valid charge of discrimination.

Title VII requires that discrimination charges be in writing, under oath or affirmation, and in a form prescribed by the EEOC. 42 U.S.C. § 2000e–5(b). EEOC regulations mandate that each charge include "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(3); *see also Schwan's*, 644 F.3d at 747 ("A charge is sufficient under the regulations when it identifies the parties and generally describes the action or practices the claimant challenges.") In *Shell Oil*, the Supreme Court examined these requirements as applied to Commissioner-filed charges alleging a pattern or practice of discrimination violating Title VII. 466 U.S. at 73. The Court identified four factors to consider:

> Insofar as [she] is able, the Commissioner should identify the groups of persons that [she] has reason to believe have been discriminated against, the categories of employment positions from which they have been excluded, the methods by which the discrimination may have been effected, and the periods of time in which [she] suspects the discrimination to have been practiced.

*Shell Oil Co.*, 466 U.S. at 73. The *Shell Oil* factors are applied pragmatically. *EEOC v. Quad/Graphics, Inc.*, 63 F.3d 642, 647 (7th Cir. 1995). "[T]he key inquiry must be whether the allegations in the charge, when assessed against these four factors, fulfill the legislative and regulatory command that the charging Commissioner identify as precisely as possible the appropriate area of inquiry to determine whether there is a violation of the Act." *Id.*

The charge here satisfies these requirements. It identifies the groups affected by and

9

methods of discrimination (e.g., White employees, applicants, and training program participants affected by employment decisions such as hiring, promotion, terms and conditions, demotion, or separation); the type of discrimination (i.e., race discrimination in violation of Title VII); and the time frame in which the alleged discrimination took place (i.e., NIKE's fiscal year 2020 and continuing thereafter). While the charge does not identify individual victims, it describes them as "all White employees, former employees, prospective employees, and current and prospective training program applicants and participants who have been, continue to be, or may be in the future adversely affected by the [alleged] unlawful employment practices . . . ." The charge need not identify unascertained aggrieved persons or categories of employment positions affected. *See Shell Oil Co.*, 466 U.S. at 71, 73 (rejecting a requirement the charge specify "the persons injured, when and how," and finding that "[i]dentification of the job classifications at issue may be preferable, but it is not mandatory"); *Quad/Graphics,* 63 F.3d at 648 (Commissioner charge was not deficient for failing to identify affected job categories where employer maintained several thousand job titles).

### B. The subpoena seeks relevant information.

The concept of relevancy during an EEOC investigation is broader than during litigation. *EEOC v. Centura Health*, 933 F.3d 1203, 1207 (10th Cir. 2019). Title VII grants the EEOC access to "any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). "Courts have generously construed the term 'relevant' and have afforded the Commission access to virtually any material that might cast light on the allegations against the employer." *Technocrest*, 448 F.3d at 1038 (quoting *Shell Oil Co.*, 466 U.S. at 68-69) (citation modified). *Accord Schwan's*, 644 F.3d at 747; *EEOC v. Konica Minolta*

10

*Bus. Sols. U.S.A., Inc.*, 639 F.3d 366, 369 (7th Cir. 2011); *EEOC v. Dillon Cos.*, 310 F.3d 1271, 1274 (10th Cir. 2002); *see also U.S. v. Whispering Oaks Res. Care Fac., LLC*, 673 F.3d 813, 818 (8th Cir. 2012) ("the question of an administrative subpoena's relevance is not a question of evidentiary relevance" and "a subpoena should be enforced when the evidence sought by the subpoena is not plainly incompetent or irrelevant to any lawful purpose of the agency in the discharge of its duties") (citations modified). "In this and other areas, where an agency is tasked with investigation, we defer to an agency's own appraisal of what is relevant so long as it is not obviously wrong." *Shell Oil Co.*, 466 U.S. at 68-69 (citation modified). The EEOC may make "executive judgments about . . . what information to gather in the course of an investigation," including determining what information is relevant. *EEOC v. Blinded Veterans Ass'n*, 128 F. Supp. 3d 33, 45 (D.D.C. 2015) (citing *EEOC v. Keco Indus., Inc.*, 748 F.2d 1097, 1100 (6th Cir. 1984) ("[T]he nature and extent of an EEOC investigation into a discrimination claim is a matter within the discretion of that agency.")).

      Here, the EEOC seeks information directly relevant to the allegations that NIKE subjected White employees, applicants, and training program participants to disparate treatment based on race in various employment decisions, including layoffs, internship programs, and mentoring, leadership development, and other career development programs. The information related to employee layoffs sought in request Nos. 2 and 3 is directly relevant to the agency's investigation of whether NIKE may have considered race in conducting those layoffs. With respect to request No. 5, NIKE admits that its "People & Planet modifier" was a means by which workforce race or ethnicity data could influence executive compensation; full information regarding this "modifier" is facially relevant to whether NIKE directed or motivated company executives to use race in making employment decisions.

11

Similarly, employee race and ethnicity data tracked by the company, as sought by request No. 6, is relevant to the EEOC's investigation of whether NIKE made employment decisions based on race. *See McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1258 (10th Cir. 1988) ("statistics alone may be used to establish a prima facie case of racial discrimination in a disparate treatment case") (citing *Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 307-308 (1977)). Moreover, to the extent that NIKE has already tracked this information, it is far more efficient to require NIKE to produce existing data reports, rather than producing all employee data for a number of years.

NIKE admits that in 2018, it began using a "Diverse Slates process" to create candidate pools that included at least two women and one "U.S. Racial and/or Ethnic Minority" for certain jobs. Given that this process on its face considers the race or ethnicity of certain job candidates, a list of vacancies where "Diverse Slates" was used, as sought by request No. 8, is relevant to the EEOC's investigation into whether this practice denied equal employment opportunities based on race. And information about individuals who were considered for and selected or not selected for participation in one of sixteen mentorship, leadership, or development-related programs, as sought by request Nos. 10 and 11, is likely to shed light on whether NIKE's use of these programs was itself discriminatory or whether they caused or resulted in disparate treatment based on race.

Just as "relevance" is interpreted broadly in enforcing an EEOC subpoena, the relevant temporal scope is also broad. "It is not uncommon for the EEOC to receive information concerning events that took place up to three or four years before the date when the discrimination allegedly took place. . . . Evidence of hiring and promotion practices prior to the time of the charge provide context to allow the EEOC to determine whether alleged

discrimination actually took place." *EEOC v. New Prime, Inc.*, No. 02-3072-CV-S-3-ECF, 2002 WL 1377789, at *4 (W.D. Mo. May 28, 2002) (quoting *EEOC v. Roadway Exp., Inc.*, 261 F.3d 634, 642 (6th Cir. 2001) (citation modified). Here, the charge alleges that NIKE may have engaged in discriminatory employment practices since 2020, and three subpoena requests seek information prior to that date: request No. 8 seeks information going back to June 2018 (jobs vacancies where "diverse slates" was utilized), and request Nos. 5 and 6 seek information going back to June 2019 (NIKE's use of race/ethnicity data as a factor in setting executive compensation and race/ethnicity data tracked by NIKE). Such information is relevant to establish the purpose and effect of NIKE's later policies and "might cast light on" the allegations. *See Shell Oil*, 466 U.S. at 68-69 n.20 (conduct prior to the effective date of Title VII could be relevant to establish the purpose and effect of current policies). Moreover, the EEOC's investigative authority is not limited to the applicable statute of limitations. *See, e.g., EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001) ("A party may not defeat agency authority to investigate with a claim that could be a defense if the agency subsequently decides to bring an action against it."); *EEOC v. Roadway Exp., Inc.*, 750 F.2d 40, 42 (6th Cir. 1984) (affirming district court's enforcement of two EEOC administrative subpoenas despite employer's argument that the charge was untimely, because a subpoena enforcement action "is not the proper time to litigate the merits of a claim, either procedurally or substantively").

### C. The subpoena is not too indefinite.

An administrative subpoena "can be too indefinite if its demands are overly vague or amorphous." *Walsh v. Alight Sols. LLC*, 44 F.4th 716, 724 (7th Cir. 2022). "In other words, the information or materials requested by the agency must be sufficiently specific." *EEOC v. Sinclair*, 2024 WL 3970874, at *4 (S.D. Fl. Aug. 9. 2024). Here, the EEOC's subpoena clearly

and specifically identifies the information sought, and it is not vague or amorphous.

### D.  The EEOC did not issue the subpoena for an illegitimate purpose.

The purpose of the EEOC's subpoena is legitimate: to obtain information relevant to the agency's investigation of allegations of race discrimination in employment. The allegations themselves are not illegitimate, as Title VII prohibits any unlawful employment practice based on race, including discriminatory treatment of White individuals. *Ames* v. *Ohio Dept. of Youth*, 605 U.S. 303, 310 (2025) ("the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group" and Title VII provides the "same protections for every 'individual'"). And the agency "need not show it ha[s] reason to believe the respondent ha[s] violated federal law" to establish that that its investigation "is for a legitimate purpose authorized by Congress". *Whispering Oaks Res. Care Fac., LLC*, 673 F.3d at 818 (citations modified). Moreover, as set forth above, the areas of inquiry are wholly related to the allegations in the charge and are not a so-called "fishing expedition". *See Schwan's*, 644 F.3d at 747 (noting that a "subpoena cannot, however, wander into wholly unrelated areas") (citation modified); *BASF*, 2003 WL 21219038, at *2 (noting an example of a "fishing expedition" as a subpoena seeking discovery of employee sex information in an investigation of alleged race discrimination). There is nothing in the EEOC's subpoena to suggest that it is "acting in bad faith or that enforcing . . . the subpoena would result in an abuse of the court's process." *Technocrest*, 448 F.3d at 1039.

### E.  The subpoena is not unduly burdensome.

"In order to quash a subpoena on the grounds of burdensomeness, the employer carries the 'difficult burden' of showing that the demands of compliance would hinder normal business operations or unduly disrupt a respondent's business." *BASF*, 2003 WL 21219038, at *4 (citation

14

modified). NIKE cannot meet that burden here. The undue burden standard in the administrative subpoena context is particularly exacting, requiring a showing that, "in light of the company's normal operating costs" compliance with the subpoena "would threaten its normal business operations. In the absence of such a threat, the subpoena is enforceable." *EEOC v. Maryland Cup Corp.*, 785 F. 2d 471, 479 (4th Cir. 1986); *see also Quad/Graphics*, 63 F.3d at 648-49 (employer failed to show undue burden because it failed to show compliance with subpoena would threaten normal business operations); *EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993) (employer failed to demonstrate that subpoena was unduly burdensome where it did not offer any specific estimate of cost involved or show how compliance would impact normal operations of employer).

A subpoena is also not unduly burdensome simply because it seeks information that may be confidential or proprietary or trade secret. The Supreme Court rejected this argument and noted that Title VII already safeguards confidentiality by prohibiting disclosure of information obtained by the Commission except in limited circumstances and imposing criminal penalties on agency personnel for its violation. *Univ. of Pa. v. EEOC*, 493 U.S. 182, 192 (1990); *accord EEOC v. St. Louis Dev. Disabilities Treatment Ctr.*, 118 F.R.D. 484, 487 (E.D. Mo. 1987). Moreover, Section 83.4(e) of the EEOC's Compliance Manual and the Freedom of Information Act, 5 U.S.C. § 552(b), provide mechanisms by which a respondent may designate confidential trade secret, commercial, or financial information for additional protection. Refusal to provide relevant information "thwarts the EEOC's efforts to carry out the manifest intent of the Congress." *EEOC v. City of Orange, Tex.*, 905 F. Supp. 381, 382–83 (E.D. Tex. 1995) (enforcing EEOC subpoena and ordering the production of tapes despite state law designed to protect their confidentiality).

**IV.     Conclusion**

In the Civil Rights Act of 1964, Congress granted the EEOC authority to investigate allegations of race discrimination in employment. A crucial component of the EEOC's investigative authority is its ability to subpoena relevant information. In this case, NIKE has failed to comply with an EEOC subpoena authorized by the Act and issued in accordance with the limits set forth by the Supreme Court in 1984 in *Shell Oil*. The EEOC therefore urges the Court to issue an Order to Show Cause and enforce the agency's subpoena.

>Respectfully submitted,
>
>s/ Andrea G. Baran
>ANDREA G. BARAN, MO Bar #46520
>Regional Attorney
>St. Louis District Office
>1222 Spruce St., Rm. 8.100
>St. Louis, MO 63103
>Phone: (314) 798-1914
>andrea.baran@eeoc.gov
>
>ATTORNEY FOR APPLICANT EQUAL
>EMPLOYMENT OPPORTUNITY COMMISSION