EXHIBIT D

**IN THE UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**ST. LOUIS DISTRICT OFFICE**

IN THE MATTER OF:

*Lucas v. NIKE, Inc.*

Charge No. 551-2024-04996

Subpoena No. SL-25-08

## NIKE, INC.'S PETITION TO REVOKE OR MODIFY SUBPOENA

Pursuant to 29 C.F.R. § 1601.16(b), NIKE, Inc. ("NIKE" or "the Company"), by and through its undersigned counsel, King & Spalding LLP, respectfully petitions the General Counsel and/or the issuing Director of the Equal Employment Opportunity Commission ("EEOC" or "Commission") to revoke or modify Subpoena No. SL-25-08 (the "Subpoena").[1] The Subpoena, attached hereto as **Attachment A**, was served on NIKE on October 1, 2025 in connection with Charge No. 551-2024-04996, filed by then-Commissioner, now-Acting Chair Andrea R. Lucas on May 24, 2024 (the "Charge"). *See* **Attachment B**.

As a preliminary matter, the EEOC's Compliance manual generally prescribes the exhaustion of meet-and-confer efforts before the EEOC resorts to administrative subpoenas to compel production of information otherwise obtainable through informal requests for information ("RFIs"). *See* EEOC Compliance Manual (Vol. 1) § 24.1 ("Manual"). In contravention of this policy, the EEOC did not exhaust the meet-and-confer process with NIKE regarding its responses

---

[1] The arguments set forth herein are based upon facts known to NIKE at the time of submission, is based on NIKE's understanding of the allegations presented in the Charge and requests in the Subpoena and is subject to supplementation as additional facts become available or in the event the Commissioner or Investigator provides further information as to the Charge or the Subpoena. NIKE is providing this information, which it considers to be confidential, with the understanding that the Commission will maintain it in confidence, use it exclusively in its investigation of the above Charge, and not disclose it to anyone outside the Commission without NIKE's express written consent pursuant to the requirements under the Freedom of Information Act, 5 U.S.C. § 552, et seq., and other statutes including, without limitation, 18 U.S.C. § 1905. This disclosure of information, including any Attachments, to the Commission is for purposes of its investigatory proceedings and is not and should not be considered a waiver of attorney-client privilege or work-product privilege, which NIKE maintains.

to RFIs *and* the EEOC included in the Subpoena brand new requests for information not encompassed in its prior requests. There is no basis for this improper escalation. NIKE therefore requests that the EEOC revoke the Subpoena, issue reasonable and narrowly tailored RFIs for relevant materials newly requested in the Subpoena, and engage in substantive dialogue concerning NIKE's response to RFIs in accordance with the Manual.

Setting aside the EEOC's failure to meet and confer, the Subpoena is facially invalid and must be revoked because the underlying Charge violates federal law and policy and is invalid, impermissibly vague and overbroad, and largely time-barred.

Finally, in addition to the foregoing, the Subpoena must be revoked because its itemized requests are unduly burdensome, vague, overbroad, disproportionate to the needs of the investigation, seek irrelevant and time-barred information, and constitute an impermissible fishing expedition. Compelling NIKE to comply with the Subpoena would essentially require NIKE—a multinational company employing approximately 80,000 people—to inquire into and gather ***all*** information and documentation regarding the specific circumstances of literally *every* employee separation for the ***last two years***.[2] The Subpoena further demands that NIKE provide ***all*** information and documents related to ***all*** individuals (not limited to applicants or current or former NIKE employees) who were selected or not selected for 16 "programs" identified in the Subpoena (some, for the first time in the EEOC's investigation). Personnel decisions can involve multiple stakeholders across NIKE, each of whom may have responsive documents or information related to those decisions. Gathering the information the EEOC seeks would require thousands of hours of labor and would substantially impair NIKE's business operations. This is unreasonable and

---

[2] The majority of the Subpoena requests are not limited to a specific geographic location (e.g., U.S. or global) or type of employee. Moreover, the term "U.S. Corporate workforce" in Request No. 2 is undefined.

2

unjustified under any circumstance, but particularly here given the infirmities of the Charge, the apparent lack of any specific aggrieved individuals, the EEOC's failure to meet and confer regarding the requests, and the time-barred status of "relevant" time periods defined in the Subpoena.

For the foregoing reasons, among others elaborated below, the Subpoena must be revoked.[3]

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    NIKE Responds to the Commissioner's Charge

On May 24, 2024, Acting Chair Lucas issued a Commissioner's Charge against NIKE, alleging that the Company "may have violated and may be continuing to violate Title VII [of the Civil Rights Act of 1964 ("Title VII")] by engaging in a pattern or practice of disparate treatment against White employees, applicants, and training program participants in hiring, promotion, demotion, or separate decisions (including selection for layoffs); internship programs; and mentoring, leadership development, and other career development programs." **Attachment B**.[4]

The Charge followed a request to the EEOC from America First Legal ("AFL"), a partisan organization that pursues litigation against corporate diversity, equity, and inclusion practices. Around the time the Charge was filed, AFL had filed more than 100 such actions[5] and submitted

---

[3] While NIKE submits this Petition to timely preserve its rights, arguments, claims, defenses, and positions, NIKE is willing and available to meet and confer with the EEOC regarding the Subpoena requests and produce a reasonable scope of responsive, non-privileged and non-confidential documents and information on a mutually agreed upon date.

[4] The regulations state that "[a] Commissioner who has issued a subpoena shall abstain from reviewing a petition concerning that subpoena." 29 C.F.R. § 1601.6(2). Because the Charge underlying the Subpoena was issued by then-Commissioner, now Acting Chair Andrea R. Lucas, Acting Chair Lucas is prohibited from participating in material aspects of the EEOC's investigation into the Charge or any decision on a Petition to Revoke. *See* EEOC, Commissioner Charges, https://www.eeoc.gov/commissioner-charges ("Do Commissioners participate in the investigation or determination of Commissioner charges? No. Once a Commissioner charge is assigned to a field office, the field office conducts the investigation the same way it conducts other charge investigations. Commissioners do not participate in the investigation, settlement, determination, or conciliation of a Commissioner charge.") (emphasis added).

[5] *See* Robert Draper, *America First Legal, a Trump-Aligned Group, Is Spoiling for a Fight*, New York Times (Mar. 21, 2024), https://www.nytimes.com/2024/03/21/us/politics/stephen-miller-america-first-legal.html.

more than 30 letters urging the EEOC to investigate major corporations.[6] The Charge issued by Acting Chair Lucas closely mirrors AFL's request and appears to be based substantially on its assertions.

On August 13, 2024, NIKE submitted a position statement with supporting exhibits, requesting that the EEOC dismiss the Charge in its entirety on various grounds, including because the Charge lacks sufficient factual support for a claim of either pattern-or-practice or disparate-impact discrimination. *See* **NIKE Position Statement dated Aug. 13, 2024 ("Position Statement")**.[7] NIKE's position statement further emphasized that pursuit of the Charge would directly conflict with the EEOC's own public statements, guidance, amicus briefs, and Strategic Enforcement Plan, all of which have supported diversity, equity, inclusion, and accessibility ("DEIA") initiatives. ***Id.* at 5–8**. Investigating NIKE for implementing policies that align with the EEOC's previously endorsed policies would violate well-established legal doctrines that prohibit government agencies from penalizing entities for reasonably relying on their published guidance. Indeed, under 42 U.S.C. § 2000e-12(b) and 29 C.F.R. § 1601.93, the EEOC is expressly barred from pursuing enforcement actions against employers who have acted in good faith reliance on its official interpretations. Courts have affirmed that, in reverse discrimination cases, Title VII insulates employers from liability when their decisions are based on EEOC guidance. *See, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 423 n.17 (1975) (noting that good-faith reliance on EEOC opinion conveys complete immunity in Title VII actions); *Plott v. Gen. Motors Corp.,*

---

[6] Riddhi Setty & Tatyana Monnay, *Conservative Duo Fights Against DEI One Bias Claim at a Time (1)*, Bloomberg News (June 6, 2024, 5:02 PM EDT), https://news.bloomberglaw.com/business-and-practice/conservative-duo-wants-to-take-down-dei-one-bias-claim-at-a-time.

[7] The documents cited in the Petition are part of the EEOC's records and files and can be accessed through the EEOC Respondent Portal.

*Packard Elec. Div.*, 71 F.3d 1190, 1194–95 (6th Cir. 1995) (holding that an employer did not violate Title VII where it attempted in good faith to comply with an EEOC conciliation agreement).

**B.    NIKE Responds to the EEOC's First Request for Information**

On December 16, 2024, the EEOC issued its first Request for Information ("First RFI"), seeking (1) documentation demonstrating that the Company's training, development, and mentoring opportunities are accessible to all employees regardless of race, and (2) details regarding NIKE's Amplify program. *See* **First RFI dated Dec. 16, 2024**.

NIKE submitted a substantive response on December 23, 2024, which included relevant internal policies, Impact Reports from 2018 through 2023, and a sworn declaration from the Company's Chief Diversity Equity and Inclusion Officer. *See* **NIKE Response to First RFI dated Dec. 23, 2024**.

**C.    The EEOC Offers, NIKE Accepts, and Then the EEOC Unilaterally Rescinds a Settlement Agreement Without Explanation**

On January 2, 2025, Annalie Greer, Enforcement Manager and Investigator at the EEOC's Seattle Field Office, emailed NIKE's counsel a proposed settlement agreement. *See* **Email from A. Greer to B. Kelley dated Jan. 2, 2025**. Among other provisions, the agreement stated that NIKE would not engage in discrimination or retaliation against any individual for opposing unlawful practices or participating in EEOC proceedings. The agreement further stated that, in reliance on NIKE's commitments, the EEOC would terminate its investigation and refrain from using the Charge or its allegations as the basis for any Title VII litigation. The agreement listed the Director of the Seattle Field Office, Elizabeth M. Cannon, as the EEOC's signatory.

On January 9, 2025, NIKE returned a signed copy of the agreement, accepting all terms without modification. *See* **Proposed Negotiated Agreement Executed by NIKE dated Jan. 9, 2025**. On January 13, 2025, Investigator Greer confirmed receipt and indicated the agreement had

been submitted for review. *See* **Email from A. Greer to B. Kelley dated Jan. 13, 2025**. NIKE reasonably understood that the matter had been resolved.

Then, on February 18, 2025, newly assigned EEOC investigator Ahlam Abdellatif informed NIKE's counsel that the investigation had been transferred to the San Francisco District Office, that Investigator Greer was no longer overseeing the matter, and that the settlement agreement had been withdrawn. To date, the EEOC has provided no explanation for this unilateral rescission of the settlement agreement it had proposed.

### D.    NIKE Responds to the EEOC's Subsequent Requests for Information

On the same day the EEOC rescinded its own proposed terms of settlement, Investigator Abdellatif issued a second Request for Information ("Second RFI"). This request included 10 distinct items, many with multiple subparts, seeking extensive documentation and data. Topics covered included NIKE's organizational structure, internal policies, DEIA programs, job descriptions, executive compensation, layoff procedures, discrimination complaints, and demographic/pay data shared with executives. *See* **Second RFI dated Feb. 18, 2025**.

NIKE responded on May 6, 2025, with a comprehensive 26-page submission accompanied by hundreds of pages of supporting documents. *See* **NIKE Response to Second RFI dated May 6, 2025**.

On June 6, 2025, Investigator Abdellatif issued a third Request for Information ("Third RFI") to NIKE. Including subparts, the Third RFI comprised 30 distinct items, requesting identification of and interviews with individuals "most knowledgeable" about a wide range of topics, including NIKE's DEIA programs, interactions with the Office of Federal Contract Compliance Programs ("OFCCP"), affirmative action plans, representation targets, hiring practices, executive compensation practices, and the sharing of demographic and pay data. *See* **Third RFI dated June 6, 2025**.

Despite the scope and complexity of the request, the EEOC provided NIKE <u>only seven days to respond</u>, setting a deadline of June 13, 2025. On the morning of June 10, 2025, NIKE requested a 30-day extension to allow for a thorough and accurate response. After receiving no reply, NIKE followed up the next day. Late on June 11, 2025, Investigator Abdellatif denied the extension request.

On June 13, 2025, NIKE submitted a 21-page response to the Third RFI. In its submission, NIKE reiterated its good-faith cooperation throughout the investigation and raised concerns that the Third RFI revisited previously addressed and objectionable topics, expanded the scope of the inquiry without clear authority or justification, and imposed burdens disproportionate to the nature of the underlying Charge. *See* **NIKE Response to Third RFI dated June 13, 2025**. NIKE requested to meet and confer with the EEOC to clarify the purpose and scope of the requests and to resolve outstanding issues. ***Id.***

### E.    The EEOC Transfers the Investigation to a Third Office and Investigator

On June 18, 2025, the EEOC notified NIKE that the investigation had been transferred once again—this time to the St. Louis District Office—and that a new investigator, Rebecca Conway, had been assigned to oversee the Charge. Curiously, Investigator Conway is based in the Charlotte District Office, making her assignment to a St. Louis District Office investigation atypical.

On June 26, 2025, NIKE participated in a teleconference with Investigators Abdellatif and Conway. NIKE initially understood the meeting to be a meet and confer regarding the scope of the Third RFI and prepared accordingly. During the call, however, Investigator Conway confessed she was not yet familiar with the case. The EEOC investigators did not engage with NIKE's request that the scope of the Third RFI be narrowed, did not address the objections NIKE had raised in its

previous submissions, and failed to offer a meaningful response to NIKE's questions regarding the rescission of the proposed settlement agreement.

On July 10, 2025, NIKE submitted a supplemental response to the Third RFI. NIKE expressed concerns with the investigation's procedural irregularities, including the protracted length of the investigation and the transfer among three separate EEOC offices, each located in a different geographic region and staffed by different investigators. *See* **NIKE Suppl. Response to Third RFI dated July 10, 2025**. NIKE further objected to the transfer to the St. Louis District Office, as no potential witnesses reside or work in Missouri, and the programs and practices allegedly under review did not originate in that jurisdiction. *Id.*

### F.    NIKE Receives the Instant Subpoena

On October 1, 2025, having received no communication from the EEOC since July 10, 2025, NIKE was served with the instant Subpoena from St. Louis District Director David Davis.[8] Some of the Subpoena requests overlap with previous requests made through three separate RFIs, including requests to which NIKE comprehensively responded. But the Subpoena also expands the scope of the investigation, seeking brand new categories of documents and information that the EEOC never previously requested in its 17-month investigation.

Considering that the Charge has been pending since May 2024 and that NIKE has already substantively responded to multiple RFIs over the course of the EEOC's lengthy investigation, these new Subpoena requests highlight the procedural irregularities of the EEOC's conduct— including, but not limited to, its failure to meet and confer prior to issuing the Subpoena. This is an abusive, burdensome, and improper use of the EEOC's authority.

---

[8] Oddly, the Subpoena directs NIKE to produce its responses to Investigator Abdellatif (based in the San Francisco District Office) at the St. Louis District Office, despite the investigation purportedly having been transferred to Investigator Conway (based in the Charlotte District Office).

## II.   <u>LEGAL STANDARD FOR EEOC SUBPOENAS</u>

In investigating alleged unlawful employment practices, the EEOC is authorized to inspect and copy "any evidence of any person being investigated or proceeded against that relates to unlawful employment practices . . . and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). However, the EEOC's subpoena power is "not unlimited." *EEOC v. Schwan's Home Serv.*, 644 F.3d 742, 746 (8th Cir. 2011). Courts have consistently held that the Commission must demonstrate that its investigation serves a legitimate purpose and that the requested materials are relevant to that purpose. *See EEOC v. Technocrest Sys., Inc.*, 448 F.3d 1035, 1038–39 (8th Cir. 2006). Judicial enforcement of a subpoena is improper where it "would amount to an abuse of the court's process.'" *Id.* (quoting *EEOC v. Peat, Marwick, Mitchell & Co.*, 775 F.2d 928, 930–31 (8th Cir. 1985)). *See generally McLane Co. v. EEOC*, 581 U.S. 72, 76–77 (2017) (prior to enforcing an EEOC subpoena, the district court "should satisfy itself that the charge is valid and that the material requested is relevant to the charge" and should not enforce the subpoena if it "has been issued for an illegitimate purpose" (cleaned up)).

While the concept of "relevance" is broad and includes materials that may cast light on the allegations under investigation, the EEOC is not permitted to use its subpoena power to "wander into wholly unrelated areas." *Schwan's Home Serv.*, 644 F.3d at 747 (internal quotation marks omitted). Courts also consider equitable factors such as reasonableness and oppressiveness when evaluating the enforceability of a subpoena. *See McLane Co.*, 581 U.S. at 77 (noting that "the district court should enforce the subpoena unless the employer establishes that the subpoena is 'too indefinite'" or "unduly burdensome"); *id.* ("[T]he disclosure sought shall not be unreasonable." (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950))); *Fresenius Med. Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008) ("A subpoena is properly enforced if . . . the

9

information sought is not unreasonable." (citing *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 226 (8th Cir. 1984))); *United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012); *see also EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 760 (11th Cir. 2014) ("A district court also 'may weigh such equitable criteria as reasonableness and oppressiveness in issuing a subpoena for documents.'" (quoting *EEOC v. Packard Elec. Div., Gen. Motors Corp.*, 569 F.2d 315, 318 (5th Cir. 1978))).

Whether a subpoena is unduly burdensome requires a balancing of hardships and benefits, taking into account the scope of the request, the relevance of the information, and the burden imposed on the responding party. *See McLane*, 581 U.S. at 81 (noting that "[t]he decision whether evidence sought is relevant requires the district court to evaluate the relationship between the particular materials sought and the particular matter under investigation—an analysis 'variable in relation to the nature, purposes and scope of the inquiry,'" and "the decision whether a subpoena is overly burdensome turns on the nature of the materials sought and the difficulty the employer will face in producing them," which "inquiries are 'generally not amenable to broad *per se* rules'; rather, they are . . . 'fact-intensive, close calls'" (citations omitted)); *Royal Caribbean Cruises*, 771 F.3d at 763; *see also EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002) ("What is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question."); *EEOC v. Ford Motor Credit Co.*, 26 F.3d 44, 47 (6th Cir. 1994) ("Essentially, this court's task is to weigh the likely relevance of the requested material to the investigation against the burden to Ford of producing the material.").

## III. SUBPOENA NO. SL-25-08 IS INVALID AND MUST BE REVOKED

Before addressing its specific objections to each individual request in the Subpoena, NIKE asserts the following general objections, which apply to the Subpoena in its entirety. Applying the

standards set forth above, the Subpoena should be revoked because (A) the Subpoena was premature and the EEOC failed to follow proper procedures in issuing the Subpoena; (B) the Charge underlying the Subpoena is invalid and violates federal policy; (C) the Subpoena requests documents concerning conduct that occurred outside the applicable limitations period; (D) the Subpoena and the underlying Charge constitute an improper fishing expedition and seek documents and information that are neither relevant to the Charge nor reasonably calculated to lead to the discovery of admissible evidence; (E) the Subpoena is overbroad, unreasonable, and unduly burdensome; (F) the Subpoena improperly seeks privileged information as well as confidential and proprietary information without adequate justification; (G) enforcement of the Subpoena or any further action on the underlying Charge would constitute an impermissible change in position by the agency and would violate NIKE's due-process right to fair notice; and (H) the EEOC's investigation has been tainted by procedural irregularities and improper forum shopping.

### A.    The Subpoena Is Premature and Was Issued in Breach of the EEOC's Own Compliance Manual

The EEOC's failure to meet and confer with Respondent regarding its objections and prior responses to several RFIs prior to issuing the Subpoena represents a pronounced departure from the EEOC's longstanding guidelines and customs. NIKE respectfully requests that the Subpoena be revoked on the grounds that the EEOC failed to follow the procedural requirements outlined in Section 24.1 of its Compliance Manual ("Manual"), which expressly contemplates that rational employers will raise legitimate objections to RFIs and directs investigators to engage in a dialogue to understand and attempt to resolve any reluctance to provide information. EEOC Compliance Manual (Vol. 1) § 24.1(a). This includes:

- Clarifying the EEOC's role as an objective and neutral fact-finder;

11

- Explaining the relevance of and need for the requested data;

- Exploring alternative formats or sources for the information; and

- Reevaluating the necessity of the information as the investigation progresses.

*Id.* The Manual further makes clear that subpoenas are disfavored discovery devices because of their expense. *Id*. § 24.1 ("Ordinarily, use subpoenas only after other investigative methods have been attempted . . . . Subpoenas are often more expensive than diligent pursuit of the evidence by other means . . . ."). The Manual directs investigators to pursue a subpoena only as a last resort:

> If the respondent persists in its refusal, the supervisor may make a second, more formal written request. However, upon a review with the legal unit, it may be agreed that a second request is unnecessary, **as when the respondent has unequivocally refused to produce and is clearly aware of EEOC's authority**. If a second request is sent, it should cite EEOC's investigative and subpoena authority; describe the evidence sought and EEOC's efforts to date to obtain it; set a date for submission of the evidence; and explain that failure to comply will result in issuance of a subpoena. If all or most of the data is not provided within the prescribed timeframe, and conditions for exercise of the direct suit option do not apply, make a written subpoena request to the District Director.

*Id*. § 24.1(d) (emphasis added and cross-references omitted).

The formal guidance prepared and affirmed by the EEOC is binding on the agency and prevents enforcement contrary thereto. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations . . . ."); *cf. EEOC v. Schwan's Home Serv.*, 707 F. Supp. 2d 980, 986 (D. Minn. 2010) ("[T]he EEOC 'must demonstrate . . . that the agency has satisfied its own procedural requirements . . . .'" (quoting *EEOC v. United Parcel Serv.*, No. 06-MC-42, 2006 WL 3712941, at *2 (D. Minn. Sept. 1, 2006))). Courts have found the Compliance Manual to be the EEOC's formal guidance and have held it is binding on EEOC employees. *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (referring to the Compliance Manual as "binding on EEOC staff"); *see also Texas*, 933 F.3d at 441 (same).

By the standard articulated in the EEOC's Manual, there is no basis for this Subpoena. NIKE has never "unequivocally refused" to cooperate with the EEOC's investigation; on the contrary, in response to the EEOC's three separate RFIs, NIKE provided substantive responses, documents, and a declaration. At no point did the EEOC take the position that NIKE's responses or productions to date were deficient. NIKE further attempted to engage in good faith dialogue with the EEOC during a teleconference with Investigators Abdellatif and Conway on June 26, 2025. NIKE intended the meeting to serve as a substantive meet and confer regarding the RFIs. The meeting, however, functioned merely as a status update because the primary investigator lacked sufficient knowledge of the investigation or RFIs to engage in any of the dialogue prescribed by the Manual. When NIKE submitted its supplemental response to the Third RFI two weeks later, NIKE expressly invited the EEOC to meet and confer further, but the EEOC never responded. *See* **NIKE Suppl. Response to Third RFI dated July 10, 2025**. NIKE heard nothing further from the EEOC concerning this matter until it received the Subpoena.

Furthermore, the Subpoena seeks documents and information that the EEOC ***never*** previously requested from NIKE. Requesting information for the first time via the Subpoena process contravenes the agency's guidance that subpoenas should only be used "after other investigative methods have been attempted." EEOC Compliance Manual (Vol. 1) § 24.1; *cf. EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 675 (8th Cir. 2012) ("Where the scope of its pre-litigation efforts are limited . . . the EEOC may not use discovery in the resulting lawsuit as a fishing expedition to uncover more violations." (cleaned up)).

Because the EEOC has refused to make a first attempt at other investigative methods to obtain the requested information or to explore any possible avenues of compromise, the Subpoena is premature and should be revoked pending NIKE's response to an RFI that requests the

documents and information sought for the first time in this Subpoena, as well as a proper meet and confer regarding the scope of the requests and NIKE's objections.

**B.    The Subpoena Must Be Revoked Because the Underlying Charge Upon Which It Is Based Is Invalid**

"[T]he existence of a charge that meets the requirements set forth in § 706(b), 42 U.S.C. § 2000e-5(b), is a jurisdictional prerequisite to judicial enforcement of a subpoena issued by the EEOC." *Shell Oil Co.*, 466 U.S. at 65. The statute imposes "requirements pertaining to the form and content of charges" and requires charges to comply with EEOC regulations. *Id.* at 67 (quoting § 2000e-5(b)). This threshold validity requirement applies with equal force to commissioner charges. *Id.* at 67–74 (applying these requirements, including those imposed by regulation in 29 C.F.R. § 1601(a)(3), to a commissioner's charge); *see also, e.g.*, *EEOC v. Bellemar Parts Indus.*, 865 F.2d 780, 781 (6th Cir. 1989) (failure of commissioner's charge to name correct subsidiary warranted refusal to enforce subpoena against that subsidiary; charge referred to an employer—implying a single entity—and alleged discrimination that had begun four years before establishment of subsidiary); *EEOC v. K-Mart Corp.*, 694 F.2d 1055, 1064 (6th Cir. 1982) (compliance with § 706(b) and 29 C.F.R. § 1601.12(a)(3) must be evident on face of charge). A pattern-or-practice charge must identify (1) the groups of persons that the Commissioner has reason to believe have been discriminated against, (2) the categories of employment positions from which those persons have been excluded, (3) the methods by which the discrimination may have been effected, and (4) the periods of time in which the Commissioner suspects the discrimination to have occurred. *Shell Oil Co.*, 466 U.S. at 73.

Here, the Charge fails because (a) the Charge is fatally vague and overbroad, including as to the aggrieved persons, relevant categories of employment positions, and methods of purported

14

discrimination, and (b) the Charge relies on a disparate impact theory of liability in direct contravention of Executive Branch policy articulated by the President that binds the EEOC.

**(1)      The Charge Is Fatally Vague and Overbroad**

Here, the Charge underlying the instant Subpoena is fatally vague and overbroad.

*First*, to the extent the Charge contains any facts at all, it describes legitimate employment practices that are consistent with EEOC guidance. The Charge fails to identify any aggrieved persons or assert any non-conclusory allegations that NIKE intentionally discriminated against employees, applicants, and training program participants based on race.

*Second*, the Charge is extremely broad in scope, purporting to cover a group of aggrieved individuals consisting of "all White employees, former employees, prospective employees, and current and prospective training program applicants and participants," and purporting to cover virtually every category of employment decision made by NIKE over more than five years. **Attachment B** at 1–3. In a pattern-or-practice investigation like this one, the less specific the Charge is "in describing the alleged unlawful conduct," the more important "it becomes to specifically identify aggrieved persons," and the EEOC has not done so here. *EEOC v. PMT Corp.*, 40 F. Supp. 3d 1122, 1129–30 (D. Minn. 2014) (quoting *EEOC v. Original Honeybaked Ham Co. of Ga.,* 918 F. Supp. 2d 1171, 1180 (D. Colo. 2013)) (permitting complaint to proceed because of the detail with which it described "the alleged discriminatory conduct").

*Third*, the Charge fails to identify any "categories of employment positions from which" anyone purportedly has "been excluded." *Shell Oil Co.*, 466 U.S. at 73.

The absence of any specific factual allegations or even a single aggrieved individual necessarily invites impermissible "fishing expeditions," rendering the Charge invalid. *See United Air Lines, Inc*., 287 F.3d at 653; *EEOC v. Quick Shop Markets, Inc.*, 396 F. Supp. 133, 136 (E.D.

15

Mo.) ("Fishing expeditions per se are not authorized."), *aff'd*, 526 F.2d 802 (8th Cir. 1975). *See* **Position Statement, at 10**. NIKE is a company that employs approximately 80,000 individuals worldwide and 36,000 in the United States. **Attachment C**, **October 7, 2025, Declaration of Michelle McCray ("McCray Decl."), ¶ 6**. Yet the Charge implicates virtually every single employment-related decision (hiring, promotion, demotion, or separation) and program (internship, mentorship, leadership development, and career development) involving non-White employees, former employees, prospective employees, and current and prospective training program applicants and participants for a period of up to *six years*.[9] The EEOC is empowered to investigate actual, concrete claims of employment discrimination, not to conduct roving audits of a company's every employment decision to satisfy the politicized demands of unrelated outside groups, like AFL. *See* 42 U.S.C. § 2000e-5(b); *Shell Oil Co.*, 466 U.S. at 65 (noting that, "[i]n construing the EEOC's authority to request judicial enforcement of its subpoenas, we must strive to give effect to Congress' purpose in establishing a linkage between the Commission's investigatory power and charges of discrimination," including "Congress' desire to prevent the Commission from exercising unconstrained investigative authority"). For the foregoing reasons, the Charge fails the basic requirements that it identify aggrieved persons, the employment positions at issue, and the methods of discrimination. *Shell Oil Co.*, 466 U.S. at 73. Because the Charge is therefore invalid, the EEOC lacks jurisdiction to investigate it, and the Subpoena must be revoked.

---

[9] The relevant time periods for the Subpoena requests are arbitrary and unclear, raising questions about the temporal scope of the Charge itself. Certain requests do not identify a relevant time period (Request Nos. 7, 9, 11, 12); one request covers the period from June 1, 2018 to the present—a period of over 7 years (Request No. 8); and several others seek information from June 1, 2019 to the present (Request Nos. 1, 5, 6, 10).

16

**(2)      The EEOC's Pursuit of a Disparate Impact Claim Violates Federal Policy**

The Charge is based primarily on a disparate impact theory of discrimination. However, the EEOC's continued pursuit of such claims is now contrary to controlling federal policy. On April 23, 2025, President Trump issued Executive Order 14281, titled *Restoring Equality of Opportunity and Meritocracy*, which declares disparate impact liability unconstitutional and mandates that all federal agencies—***including the EEOC***—deprioritize and withdraw enforcement actions based on that theory.[10] The Executive Order directs the EEOC Chair to reassess all pending investigations, civil suits, and enforcement actions that rely on disparate impact liability, and to take appropriate action to terminate or modify such matters. In response, the EEOC issued an internal memorandum instructing staff to administratively close all pending charges based solely on disparate impact allegations by September 30, 2025.

The EEOC's continued pursuit of this Charge violates controlling federal policy and relies on a disparate impact theory of liability that the federal government has deemed unconstitutional. Under these circumstances, enforcement of the Subpoena is improper, and the Subpoena must be revoked.

**C.      The Subpoena Is Invalid to the Extent It Inquires Into Time-Barred Conduct or Claims Pre-Dating November 26, 2023**

Many of the Subpoena's requests seek documents and information dating as far back as 2018 and 2019. However, under Title VII, only claims arising within 180[11] days prior to the filing of the Charge are considered timely. *See* 42 U.S.C. § 2000e-5(e)(1); 29 C.F.R. § 1601.13. The

---

[10] *See* Exec. Order 14281, "Restoring Equality of Opportunity and Meritocracy" (Apr. 23, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/04/restoring-equality-of-opportunity-and-meritocracy/.

[11] The EEOC's own regulations confirm that the 300-day extended period applies only to charges arising in jurisdictions with a Fair Employment Practices Agency ("FEPA"). *See* 29 C.F.R. § 1601.13(a)-(b). The Commissioner's Charge originated from EEOC headquarters and not from within a FEPA jurisdiction. Moreover, subsection (e), which governs Commissioner's Charges, does not incorporate the 300-day extension. *See id.* § 1601.13(e). Therefore, the applicable limitations period for the Charge is 180 days.

17

strict limitations period in Title VII applies equally to a Charge filed by a commissioner. *See EEOC v. Joe's Stone Crabs, Inc*., 296 F.3d 1265, 1271-72 (11th Cir. 2002) (noting that the "appropriate temporal reach" of disparate treatment claims brought by the EEOC pursuant to a Commissioner's Charge required the EEOC "to show acts of intentional discrimination injuring each of the . . . claimants that occurred" within the charging period); *EEOC v. FAPS, Inc*., Civ. No. 10-3095, 2014 WL 4798802, at *24 (D.N.J. Sept. 26, 2014) ("Furthermore, just as nothing in the statute indicates that an EEOC commissioner is exempt from the procedural requirements of Section 706, 'nothing in the statute indicates that Congress intended to allow the EEOC to revive otherwise stale individual damage claims.' Like any limitations period, the timely charge requirement incorporates other policy and fairness considerations; specifically 'this procedure services an important purpose: it provides repose for employers and prevents them from having to defend against long-stale claims.'" (cleaned up)) (quoting *EEOC v. Bloomberg L.P*., 751 F. Supp. 2d 628, 645 (S.D.N.Y. 2010))). Because the Charge was issued on May 24, 2024, any claims based on allegedly discriminatory acts occurring before November 26, 2023, are time-barred and therefore irrelevant to the EEOC's investigation. *See, e.g*., *EEOC v. Ocean City Police Dep't*, 820 F.2d 1378, 1380 (4th Cir. 1987) (en banc), *cert. granted, judgment vacated on other grounds*, 486 U.S. 1019 (1988) ("We think that requiring a subpoena to be based on a timely charge best gives effect to the Congressional policy of limiting EEOC's investigative powers by linking them to valid charges of discrimination. Therefore, we hold that a charge which shows on its face that it is untimely is also an invalid charge incapable of invoking EEOC's investigatory powers.").

Because it seeks documents and information from over five years prior to the statutory cutoff date of November 26, 2023, the Subpoena is facially overbroad in its temporal scope. It also requests materials related to programs that NIKE discontinued years ago, which cannot reasonably

form the basis of any timely claim. For instance, as NIKE informed the EEOC in prior RFI responses, NIKE's Amplify "program" was a one-time initiative the Company implemented in 2018. *See* **NIKE Response to First RFI dated Dec. 23, 2024, at 3**. It was neither designed nor intended to be a recurring program and was discontinued after its initial launch. *Id.* Notwithstanding, the Subpoena requests a broad range of documents and information concerning Amplify.

If the EEOC is unwilling to revoke the Subpoena in its entirety (which it should), at a minimum, the EEOC must modify the Subpoena to limit its temporal scope to beginning November 26, 2023—the only timeframe relevant to the Charge and permissible under Title VII.

### D.     The Subpoena and Charge Constitute an Impermissible Fishing Expedition

As discussed above, when Congress enacted Title VII, it "establish[ed] a linkage between the Commission's investigatory power and charges of discrimination" in order "to prevent the Commission from exercising unconstrained investigative authority." *Shell Oil Co.*, 466 U.S. at 65. In order to respect Congress's intent, courts must ensure that charges of discrimination are not so vague, and the "relevance" requirement is not so broad, as to "render[] that requirement a nullity." *Id.* at 69. "The requirement of relevance, like the charge requirement itself, is designed to cabin the EEOC's authority and prevent 'fishing expedition[s].'" *United Air Lines, Inc.*, 287 F.3d at 653; *K-Mart Corp.*, 694 F.2d at 1066 ("[T]he subpoena cannot be so broadly stated as to constitute a 'fishing expedition.'"); *EEOC v. BASF Corp.*, No. 02-MC-00354, 2003 WL 21219038, at *2 (E.D. Mo. Mar. 25, 2003) ("[T]he EEOC's subpoena power is not limitless, and where the subpoena amounts to a 'fishing expedition' launched in the 'idle hope' that something will be discovered, the subpoena should not be enforced." (quoting *United Air Lines, Inc.*, 287 F.3d at 653)).

Courts have repeatedly declined to enforce similarly broad fishing expeditions that sought evidence of pattern-or-practice discrimination based on an "idle hope" that evidence of pattern-or

practice discrimination would be uncovered. *See, e.g.*, *United Air Lines, Inc.*, 287 F.3d at 653–55 (declining to enforce subpoena for information related to "each and every benefit" provided to United Air Lines' France-based workforce and medical leaves of absence taken by "each United Airlines employee residing abroad" on the grounds that it was vastly disproportionate to the evidence underlying the Charge and unduly burdensome); *EEOC v. Forge Indus. Staffing Inc.*, No. 14-mc-00090, 2014 WL 6673574, at *3 (S.D. Ind. Nov. 24, 2014) ("The relevance requirement is designed to 'prevent fishing expeditions,' and the EEOC must have 'a realistic expectation rather than an idle hope that something may be discovered.'"); *EEOC v. Austal USA, LLC*, Misc. No. 17-00006, 2017 WL 4563078, at *10 & n.10 (S.D. Ala. Aug. 18, 2017), *report and recommendation adopted*, 2017 WL 4562634 (Oct. 12, 2017) (denying enforcement of subpoena seeking information on 89 employees terminated under defendant's attendance policy because the "EEOC in this instance is improperly 'fishing' for evidence of pattern or practice discrimination" rather than seeking information relevant to the individual aggrieved employee identified in the charge).

The classic hallmarks of a fishing expedition are sweeping requests for information, repeated changes in focus, and constant moving of goalposts.  These have all been on display here. In its Second RFI, the EEOC sought documentation regarding NIKE's organizational structure beginning January 1, 2022. *See* **Second RFI dated Feb. 18, 2025, at 2**. Yet in the Subpoena, the EEOC now requests the same category of information from June 1, 2019, to the present— expanding the temporal scope of the request by more than ***two and a half years*** without explanation or justification. *See* **Attachment A**. Similarly, the EEOC has repeatedly changed and expanded the list of NIKE "programs" identified in its information requests—from just *five* programs identified in the Charge, to *nine* identified in pre-Subpoena RFIs, to now *16* identified in the Subpoena. *Compare* **Attachment B**, *and* **Second RFI dated Feb. 18, 2025, at 2 n.1**, *with*

**Attachment A**. And even within the overbroad subject matters arguably covered by the EEOC's Charge and prior information requests, the Subpoena seeks vast swaths of documents and other information that the EEOC has never previously requested or even suggested it was interested in. This is what a fishing expedition looks like.  For these reasons, the Subpoena must be revoked.

### E.    The Scope of the Subpoena Is Overbroad and Unduly Burdensome

The Subpoena must separately be revoked because of the unreasonable burden that compliance would place on NIKE's business operations.

In evaluating the reasonableness of the burden imposed by a subpoena relative to its relevance, courts have cautioned against the application of rigid rules such as requiring an employer to establish that compliance would interfere with its normal business operations. *See, e.g.*, *McLane Co.*, 581 U.S. at 77, 81 (noting that "the district court should enforce the subpoena unless the employer establishes that the subpoena is 'too indefinite'" or "unduly burdensome"); *Royal Caribbean Cruises, Ltd.*, 771 F.3d at 763. "What is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question." *United Air Lines, Inc.*, 287 F.3d at 653 (quoting *FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir. 1980)). Reviewing courts must "weigh such equitable criteria as reasonableness and oppressiveness," which "impl[ies] a balancing of hardships and benefits." *Packard Elec. Div., Gen. Motors Corp.*, 569 F.2d at 318.

The Subpoena's use of vague and expansive terms such as "all," "any," and "related to," renders most requests overly broad and unduly burdensome. Courts have held that such language improperly shifts the burden to the recipient to determine the relevance of documents. *See Builders Ass'n of Greater Chicago v. City of Chicago*, No. 96 C 1122, 2001 WL 1002480, at *8 (N.D. Ill. Aug. 30, 2001) (holding that "extremely broad definition of 'related to' improperly shifts the burden to the subpoena recipient to determine factually and legally whether a document relates to

the subject matter of the lawsuit"); *Frieri v. Sysco Corp.*, No. 16-cv-01432, 2017 WL 3387713, at *11 (S.D. Cal. Aug. 4, 2017) (finding that "overbroad requests for 'all documents' related to the broad categories identified are not proportionate to the needs of the case"). That is the same burden that the EEOC now improperly places on NIKE.

And by requesting "all documents," "all staffing plans, restructuring plans, and similar documents," and "all documents during the process of evaluating and selecting employees" <u>for layoffs</u> (Request No. 3), but also information related to "<u>non-layoff separations</u>" (Request No. 4(q)-(r)), the Subpoena seeks information related to virtually every employment separation at NIKE over an almost two-year period.

The Subpoena makes similarly overbroad requests related to 16 "programs," only nine of which have been previously identified by the EEOC during its 17-month investigation (Request Nos. 9-11). These program-related Requests are perhaps the most problematic category of requests in the Subpoena. Because Request Nos. 9-11 are not limited to a specific geographic location (e.g., U.S.) or type of employee, these requests potentially seek information relating to NIKE's entire global workforce of approximately 80,000 individuals. **McCray Decl., ¶¶ 6, 10(d)**. For example, if a program did not require an application to be considered for the program, to comply with Request No. 10, NIKE would need to provide 17 sub-categories of information for the entire employee population at NIKE because while some employees may have been "selected" for the program, the remainder of the employee population was "not selected." ***Id.*** Additionally, as NIKE has previously informed the EEOC, at least one of the "programs" identified in the Subpoena, the CNEXT Accelerate Program, is not a NIKE-created or NIKE-implemented program. *See* **NIKE Response to Second RFI dated May 6, 2025, at 18**.

The collection of the requested information would be a profoundly time-consuming and burdensome endeavor that would impose a substantial disruption on NIKE's business operations. *See* **McCray Decl., ¶¶ 9–11**. As noted, as of May 2024, when the Charge was filed, NIKE had a global workforce of almost 80,000 employees worldwide. *Id.* **¶ 6**. Across its multiple U.S. entities, NIKE has more than 36,000 U.S. employees, including retail, part-time, and temporary employees. *Id.* Since January 1, 2024, there have been approximately 25,000 hiring decisions and approximately 29,000 employment separations across NIKE U.S. entities. *Id.*

NIKE's matrixed organizational structure complicates NIKE's ability to collect and compile the requested information from a reasonable number of sources. *Id.* **¶¶ 4–5, 7, 10(a)–(c)**. Some basic information related to personnel decisions can be pulled from NIKE's human resources databases and tracking systems. But because employment decisions, like hiring, compensation, promotion, and termination are typically made by the direct supervisor for a particular employee or position—potentially with input by other supervisors, stakeholders and/or partners  across the company, documents relevant to any particular decision may be located in many places. *Id.* **¶¶ 5, 7**. Therefore, given the Requests seek "any" and "all" documents related to these decisions, compliance with a single Subpoena Request would require an onerous and time-consuming process in order to simply identify sources of potentially relevant information.

For example, in order to respond to the Request Nos. 2-4 concerning all "layoff" or "non-layoff" decisions, and because the term "U.S. Corporate workforce" is undefined,[12] NIKE would first need to review documents and information for approximately 29,000 separations. *See id.* **¶¶ 6, 9(a)**. Then, for each relevant separation, NIKE would have to investigate whether the separation constitutes a "layoff" as defined by the Subpoena and compile employee names and titles, identify

---

[12] The Subpoena does not define the term "U.S. Corporate workforce," so for purposes of these estimates, NIKE assumes the Requests could cover all U.S. based employees in any job category.

and interview all decision-makers and involved parties, and gather and review additional documents. *See id.* **¶ 9(b)–(h)**. This process alone could require thousands of hours of NIKE employee time. *See id.* **¶ 9(i)**.

Courts have refused to enforce EEOC requests imposing similar burden. *See, e.g.*, *EEOC v. Morgan Stanley & Co.*, 132 F. Supp. 2d 146, 162 (S.D.N.Y. 2000) (declining to enforce subpoena for "all informal complaints" because "in a company the size of Morgan Stanley, with over 93,000 employees in 500 offices worldwide, attempting to comply with a demand for all 'informal complaints,' even if that term could somehow be clearly defined, would require a massive and unduly burdensome effort to interview practically everyone who works or recently has worked in a supervisory position, in order to determine whether any employees ever questioned the fairness of their treatment"); *Royal Caribbean Cruises, Ltd.*, 771 F.3d at 762 (declining to enforce unduly burdensome subpoena where "RCCL would be required to manually review and cross-reference paper documents relating to thousands of former employees . . . [and] be required to collect records from independent hiring partners concerning thousands of applicants who were not hired"); *Forge Indus. Staffing Inc.*, 2014 WL 6673574, at *8 (holding subpoena imposed undue burden relative to minimal relevance where "Respondent processed 130,000 temporary employee applications" that were "not kept in a central repository, nor electronically in any form," and "[c]ompliance with the subpoena would thus require Respondent to 'manually review each employment application maintained in paper format at each of its office locations,' at an estimated time of '2,166 hours'").

The cost and burden the EEOC seeks to impose on NIKE is particularly unreasonable and oppressive when weighed against the vague and indefinite nature of the Charge, the absence of a single specific aggrieved person, and the fact that the Subpoena seeks information and documents

for time-barred conduct. The Subpoena's broad and vague demands would require NIKE to expend disproportionate efforts to interpret and identify responsive materials, imposing an undue burden not justified by the needs of the investigation. A subpoena of such breadth, threatening to impose almost limitless cost as the EEOC seeks to probe every employment decision about every NIKE employee over a multi-year period, appears improperly calculated "solely to coerce a settlement." *EEOC v. Michael Constr. Co.*, 706 F.2d 244, 251 (8th Cir. 1983). Therefore, this Subpoena does "not have any 'legitimate purpose' and a court would be correct in denying judicial enforcement" thereof. *Id.* For those reasons, the Subpoena must be revoked.

### F.    The Subpoena Improperly Seeks Privileged, Proprietary, and Confidential Information

The Subpoena seeks information protected by the attorney-client privilege, attorney work product doctrine, and other applicable privileges and immunities that bar the EEOC from obtaining the information. *See generally, e.g.*, *EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959 (D.C. Cir. 1999).

The Subpoena also seeks proprietary and confidential information that would be especially burdensome and harmful to produce, as well as private information about current and former NIKE employees and third parties, which NIKE should not be compelled to produce absent a compelling showing of relevance and necessity, and appropriate safeguards. *See, e.g.*, *Buergofol GmbH v. Omega Liner Co.*, No. 22-CV-04112, 2025 WL 1593079, at *2 (D.S.D. June 5, 2025) ("Courts must consider the relative hardship to the non-moving party should the protective order be granted, and balance whether the potential harm to the moving party of unrestricted disclosure of confidential information outweighs the public interest in disclosure." (cleaned up)); *Flat Branch Mortg., Inc. v. Fricke*, No. 23:04143-CV, 2025 WL 1914164, at *5 n.5 (W.D. Mo. Apr. 16, 2025), *report and recommendation adopted*, 2025 WL 1554964 (June 2, 2025) ("[T]he lack of relevancy as examined herein coupled with the proprietary and confidential nature of the documents,

proportionality weighs against the additional production, especially in light of the information that has already been produced or is being produced."); *Warner Chilcott Ltd. v. Express Scripts, Inc.*, No. 17MC250, 2017 WL 4084045, at *2 (E.D. Mo. Sept. 14, 2017) ("While Allergan argues that it has a substantial need for the documents, the Court finds that any need does not outweigh the burden and hardship of producing highly confidential and competitive trade secrets belonging to Express Scripts."); *Poulos v. Summit Hotel Props., LLC*, No. CIV 09-4062, 2010 WL 2640396, at *3 (D.S.D. July 1, 2010) (collecting cases permitting discovery of personnel files only of "employees whose action or inaction has a *direct bearing* on the Plaintiff's claims" (emphasis added)); *Litton Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 530 (E.D. Wis. 1990) ("If it is established that confidential information is being sought, the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information." (cleaned up)). For example, the Subpoena demands: (1) "[a]ll staffing plans, restructuring plans, and similar documents related to the layoff" (Request No. 3(b)); (2) "[a]ll documents regarding severance packages, rehire eligibility and other options for benefits" (Request No. 3(f)); and (3) full names, employee identification numbers, dates of birth, home addresses, mobile phone numbers, and email addresses of former and current employees (Request No. 4). The EEOC has failed to explain how the requested privileged and confidential information is relevant or reasonably calculated to lead to the discovery of admissible evidence.

Accordingly, NIKE objects to the production of such materials, and on these grounds, the Subpoena should be revoked or modified.

G. **Enforcement of the Subpoena and the Underlying Charge Would Represent an Impermissible Change in Position that Would Violate NIKE's Due Process Right to Receive Fair Notice**

As NIKE explained in its Position Statement, and as discussed above, pursuit of the Charge directly conflicts with the EEOC's own public statements, guidance, amicus briefs, and Strategic Enforcement Plan, all of which have supported and encouraged DEIA initiatives. Investigating or taking enforcement action against NIKE for policies that align with the EEOC's previously endorsed positions would violate well-established principles of administrative law, legal rules governing the EEOC, and NIKE's due process right to fair notice. The Supreme Court has stated that government action generally "poses a serious fair-notice problem" where "[a] number of the government's own public guidance documents" seem to contradict the theory later advanced by the government. *Bittner v. United States*, 598 U.S. 85, 102–03 (2023). And more specifically, 42 U.S.C. § 2000e-12(b) and 29 C.F.R. § 1601.93 expressly bar the EEOC from pursuing enforcement actions against employers who acted in good faith reliance on its official interpretations and insulate employers from liability for decisions based on EEOC guidance. *See, e.g., Albemarle Paper Co.*, 422 U.S. at 423 n.17; *Plott*, 71 F.3d at 1194–95. Changing agency positions and interpretations of statutes and implementing regulations leads to "constant uncertainty and convulsive change even when the statute at issue itself remains unchanged." *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 438 (2024) (Gorsuch, J., concurring); *see also In re MCP No. 185*, 124 F. 4th 993, 1000 (6th Cir. 2025).

More generally, an administrative enforcement action violates due process principles "if the statute or regulation under which [punishment] is obtained 'fails to provide . . . fair notice of what is prohibited.'" *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). And at a minimum, the EEOC has for years been "aware that" all kinds of companies have engaged in practices to promote diversity, equity, and inclusion, and "took no steps to advise the public that

27

it believed the practice was questionable" until very recently. *See Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (addressing fair notice of an SEC rule). Therefore, continuing to pursue this investigation and any subsequent enforcement action would violate bedrock principles of both constitutional and administrative law. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568–69 (2025) (stating that "[t]he change-in-position doctrine is administrative law's answer to that problem" discussed above, and "[i]t is unclear what, if any, daylight exists between that conception of 'fair notice' and our change-in-position doctrine"). The EEOC should therefore exercise its authority to revoke the Subpoena.

### H.    The EEOC's Investigation Has Been Tainted by Procedural Deficiencies and Improper Forum Shopping

Over the course of this 17-month investigation, the EEOC violated its own procedures by issuing a Subpoena prior to exhausting the meet-and-confer process, proposing but then revoking terms of a settlement, and transferring the case to three different offices staffed by different investigators, including in locations that bear no proximity or relevance to the locus of NIKE's business operations and employment decisions potentially at issue.

The most recent transfer to the EEOC's St. Louis District office, as well as the ambiguity regarding the currently assigned investigator, are but the latest examples of the many procedural deficiencies that have marred this investigation. It is unclear how NIKE or the subject matter of the Charge has any material nexus to Missouri when no potential witnesses reside or work in Missouri, and the programs and practices allegedly under review did not originate in that jurisdiction.

This transfer serves no legitimate investigative purpose, injects additional delays and unnecessary expenses into an already prolonged and inefficient investigation, and raises concerns that the EEOC plans to engage in improper forum shopping, a strategy strongly disfavored by

courts. *See RLI Ins. Co. v. Tag Steel, Inc.*, No. 06-cv-02270, 2007 WL 2890084, at *3 (D. Colo. Sept. 27, 2007) ("A litigant's efforts to find . . . a particularly favorable forum is the essence [of] the type of forum shopping that is disfavored."). Several courts have denied subpoena enforcement under these circumstances. *See, e.g., NLRB v. Cooper Tire & Rubber Co.*, 438 F.3d 1198 (D.C. Cir. 2006) (dismissing subpoena enforcement action under 29 U.S.C. § 161(2)); *FTC v. W. Gen. Dairies, Inc.*, 432 F. Supp. 31 (N.D. Cal. 1977) (dismissing enforcement action for lack of jurisdiction under analogous provision of Federal Trade Commission Act). The EEOC's conduct undermines the integrity of the investigation and further supports revocation of the Subpoena.

For these reasons, and those articulated above, the EEOC should revoke the Subpoena.

## IV.    SPECIFIC RESPONSES AND OBJECTIONS TO SUBPOENA REQUESTS:

Incorporating the foregoing objections, NIKE further addresses the individual Subpoena requests as follows:

> 1.    *Describe or produce documents that show Respondent's organizational structure from June 1, 2019 to the present, including all structural units (brands, divisions, functional units, design teams, etc.); hierarchical authority between units; dates of changes to unit structure; and the names, job titles, and dates in position of each unit head.*

**Response:**

NIKE objects to this Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of this investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The Request seeks documents showing NIKE's organizational structure for the last six years without regard to the relevance or necessity of this information, and the bulk of the information sought will be irrelevant since the vast majority of NIKE's organization has nothing to do with the allegations of the Charge. This Request amounts to an impermissible

"fishing expedition." *See United Air Lines, Inc.*, 287 F.3d at 653; *accord BASF Corp.*, 2003 WL 21219038, at *2.

NIKE further objects to the temporal scope beginning on June 1, 2019, for the reasons set forth in Section III(C). When the EEOC requested these same documents in its Second RFI, it limited the timeframe to January 1, 2022, through the present. *See* **Second RFI dated Feb. 18, 2025, Req. No. 1**. NIKE further objects to the Request to the extent it seeks information about NIKE's organization outside of the United States. When the EEOC requested these same documents in its Second RFI, it limited the scope to the United States. *Id.* The EEOC's unexplained expansion of the timeframe by two-and-a-half years, and of the geographical scope to cover the entire world, underscores the overbroad, unduly burdensome, arbitrary, and capricious nature of this Request.

NIKE further objects to the extent the EEOC seeks this information by Subpoena even though the EEOC never requested some of this information (information dating back to June 1, 2019 and information about NIKE's organization outside of the United States) through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects to the undefined terms "structural units," "hierarchy," "changes to unit structure," and "unit head" as vague and ambiguous in context.

Subject to and without waiving the foregoing objections, NIKE again refers the EEOC to its publicly available corporate governance site,[13] which contains comprehensive, up-to-date, and authoritative information regarding NIKE's governance structure, including detailed disclosures about its Board of Directors, executive officers, and corporate leadership policies. NIKE also refers

---

[13] Available at https://investors.nike.com/investors/corporate-governance/.

the EEOC to Exhibit 21 to its Form 10-K,[14] which contains current, verified information on NIKE's structure. Additional demands for internal documentation duplicative of publicly available sources are unnecessary and impose undue burden.

Given NIKE's objections and the public availability of the information sought, NIKE asks the EEOC to revoke this Request in its entirety.

> 2.    *For each layoff of employees in Respondent's U.S. Corporate workforce from January 1, 2024 to the present, identify:*
>    a.    *The date each layoff was implemented;*
>    b.    *The departments and positions subjected to the layoff;*
>    c.    *For each position subjected to the layoff, the specific criteria and/or factors used to evaluate and select employees for layoff; and*
>    d.    *The names and job titles of the individuals who selected employees for layoff.*

**Response:**

NIKE objects to this Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of this investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The Request demands detailed information regarding every department and position affected by "layoffs" in NIKE's "U.S. Corporate workforce" over an almost two-year period, as well as the identities of all individuals involved in those decisions, regardless of whether they have any nexus to the allegations in the Charge. This Request is a classic "fishing expedition" whereby the EEOC is working backwards—rather than starting from an employment decision that the EEOC believes may have been discriminatory, the EEOC is seeking information about *every* employment decision in the "idle hope" that evidence of wrongdoing might be uncovered for one of them. *See, e.g.*, *United Air Lines, Inc.*, 287 F.3d at 653; *BASF Corp.*,

---

[14] Available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0000320187/000032018725000047/nke-20250531.htm.

2003 WL 21219038, at *2. Judicial enforcement of this Request would be improper since it "has been made for an illegitimate purpose." *Shell Oil Co.*, 466 U.S. at 72 n.26. Such a sweeping inquiry is not tethered to any specific employment practice alleged to be discriminatory and exceeds the EEOC's investigatory authority.

NIKE further objects to the overbroad and unduly burdensome definition of "Layoff" used in the Subpoena, which encompasses every separation initiated by NIKE due to "business needs," which is not a defined term and is not limited to programmatic reductions in force or group terminations of a certain size that are commonly referred to as "layoffs," but could encompass any individual separation decision, and which could encompass the overwhelming majority of all employment separations at NIKE. In addition, NIKE objects to the term "U.S. Corporate workforce," which is undefined and therefore vague as to the categories of employees targeted by the Request. This Request is thus "too indefinite" to be enforced. *Id.*

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for the reasons stated in Section III(B)(2) above.

NIKE further objects to the extent the EEOC seeks this information by Subpoena even though the EEOC never requested some of this information (subparts (a) and (b) for "each layoff of employees in Respondent's U.S. Corporate workforce from January 1, 2024 to the present") through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects to this Request to the extent it seeks information that is protected from disclosure by the attorney-client privilege and/or the work product doctrine.

NIKE further objects to the Request to the extent it seeks documents containing sensitive employee information, including performance metrics and communications regarding layoff

decisions, and to the extent it encompasses documentation of confidential deliberations and other sensitive business records wholly unrelated to any specific employment decision or alleged discriminatory practice at issue. Disclosure of such materials would infringe on employee privacy rights and implicate confidential business information. NIKE is not obligated to produce such materials absent a compelling showing of relevance and necessity, which the EEOC cannot make, and appropriate safeguards. *See, e.g.*, *Buergofol GmbH*, 2025 WL 1593079, at *2; *Flat Branch Mortg., Inc.*, 2025 WL 1914164, at *5 n.5; *Warner Chilcott Ltd.*, 2017 WL 4084045, at *2; *Poulos*, 2010 WL 2640396, at *3; *Litton Indus., Inc.*, 129 F.R.D. at 530.

Subject to and notwithstanding the foregoing objections, NIKE directs the EEOC to **Bates Nos. NIKE (EEOC 551-2024-04996) 000305–344**.

Given NIKE's objections and its prior production of responsive documents, NIKE asks the EEOC to revoke this Request in its entirety.

3. *For each layoff identified in response to Request 2 above, produce:*
   a. *All documents related to implementation of the layoff, including but not limited to documents describing the layoff's purpose, scope, selection criteria, guidelines, and instructions to individuals selecting employees for layoff;*
   b. *All staffing plans, restructuring plans, and similar documents related to the layoff;*
   c. *All documents created during the process of evaluating and selecting employees for layoff, including but not limited to notes, memoranda, charts, tables, and lists;*
   d. *For all employees in the departments and positions subjected to the layoff, all documents showing the relevant performance metrics and other criteria used to evaluate and select employees for layoff;*
   e. *All communications with employees selected for layoff regarding their selection;*
   f. *All documents regarding severance packages, rehire eligibility, and other options for benefits or alternative employment opportunities for employees selected for layoff; and*
   g. *All public statements by Respondent regarding the layoff.*

**Response:**

NIKE objects to this Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of this investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The Request seeks "all" documents related to the implementation of each layoff since January 1, 2024, including internal communications, business plans, employee performance data, and public statements, without reasonable limitations as to scope and despite the fact that a subset of such documents would suffice to provide the information sought.

NIKE further objects to this subpart (g) of this Request as unduly burdensome because it explicitly demands production of publicly available documents already accessible to the EEOC.

NIKE further objects to definition of the term "Layoff" and the undefined term "U.S. Corporate workforce" for the reasons above, and to the undefined terms and phrases "implementation of the layoff" and "staffing plans, restructuring plans, and similar documents," as vague and ambiguous in context. "All" documents across these broad categories could be construed to cover virtually every document produced by NIKE's human resources organization or even supervisors at every level across the organization, including every document about staffing, employee performance metrics, severance benefits, etc. Such a demand imposes an undue burden on NIKE and is not proportional to the needs of this investigation.

NIKE further objects that this Request is, again, a classic "fishing expedition," in that the underlying Charge reflects no reason for the EEOC to believe that any particular employment decision was discriminatory, so the EEOC seeks every scrap of paper generated in the course of layoffs, including every note, for every single employment decision, in the "idle hope" that evidence of wrongdoing might be uncovered for one of them. *See, e.g.*, *United Air Lines, Inc.,* 287

34

F.3d at 653; *BASF Corp.*, 2003 WL 21219038, at *2. Judicial enforcement of this Request would be improper since it is "too indefinite" and "has been made for an illegitimate purpose." *Shell Oil Co.*, 466 U.S. at 72 n.26. Such a sweeping inquiry is not tethered to any specific employment practice alleged to be discriminatory and exceeds the EEOC's investigatory authority.

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for the reasons stated in Section III(B)(2) above.

NIKE further objects to this Request to the extent it seeks information that is protected from disclosure by the attorney-client privilege and/or the work product doctrine.

NIKE further objects to the Request to the extent it seeks documents containing sensitive employee information, including performance metrics and communications regarding layoff decisions, and to the extent it encompasses documentation of confidential deliberations and competitively sensitive business records wholly unrelated to any specific employment decision or alleged discriminatory practice at issue. Disclosure of such materials would infringe on current and former employees' privacy rights and implicate confidential business information. NIKE is not obligated to produce such materials absent a compelling showing of relevance and necessity, which the EEOC cannot make, and appropriate safeguards. *See, e.g.*, *Buergofol GmbH*, 2025 WL 1593079, at *2; *Flat Branch Mortg., Inc.*, 2025 WL 1914164, at *5 n.5; *Warner Chilcott Ltd.*, 2017 WL 4084045, at *2; *Poulos*, 2010 WL 2640396, at *3; *Litton Indus., Inc.*, 129 F.R.D. at 530.

NIKE further objects to the extent the EEOC seeks this information by Subpoena even though the EEOC never requested this information through an RFI before issuing this Subpoena— a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

4.      *For each layoff identified in response to Request 2 above, produce a sortable database (such as Excel (.xls) or comma delimited file (.csv)), with the first database row containing the field or variable names of the requested information and each subsequent row containing the requested information for each individual, identifying all employees considered or evaluated for potential layoff, including:*

    a.      *First name;*

    b.      *Last name;*

    c.      *Employee number or unique identifier;*

    d.      *Date of birth;*

    e.      *Race / Ethnicity;*

    f.      *Home address;*

    g.      *Mobile phone number;*

    h.      *Email address;*

    i.      *Date of hire;*

    j.      *Department at time of layoff implementation;*

    k.      *Job title at time of layoff implementation;*

    l.      *Whether selected for layoff;*

    m.      *Reason for selection or non-selection for layoff;*

    n.      *Date of layoff (if applicable);*

    o.      *Current department (if applicable);*

    p.      *Current job title (if applicable);*

    q.      *Date of non-layoff separation (if applicable); and*

    r.      *Reason for non-layoff separation (if applicable).*

**Response:**

NIKE objects to this Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of this investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. Specifically, the Request demands detailed information regarding every employee "considered or evaluated for potential layoff," and inasmuch as any reduction in force designed to reduce costs or rationalize a company's headcount could, in theory, affect any employee, this Request could be construed to seek detailed information about *every* employee across NIKE's organization. In fact, because subparts (q) and (r) of this Request seek information related to "non-layoff" separations, every employment separation would fall within the scope of this Request. NIKE further objects to the definition of the term "Layoff" and the undefined term "U.S. Corporate workforce" for the reasons stated above, and NIKE objects to the undefined terms

"considered" and "evaluated" as vague and ambiguous in context. This Request also seeks employees' dates of birth which are not relevant to the claims asserted in the Charge which are based on race (not age) discrimination.

NIKE further objects that this Request appears again to be a classic "fishing expedition," where because the underlying Charge lacks a single aggrieved individual, the EEOC appears to want NIKE to produce a list of employees who were selected for termination, along with their personal contact details, so the EEOC can contact them in the "idle hope" that they will find one who will say that they believe the reason for their separation was discriminatory, even though they never complained to the EEOC or to NIKE. *See, e.g.*, *United Air Lines, Inc.,* 287 F.3d at 653; *BASF Corp.*, 2003 WL 21219038, at *2. This approach is the opposite of a typical EEOC investigation. Judicial enforcement of this Request would be improper since it is "too indefinite" and "has been made for an illegitimate purpose." *Shell Oil Co.*, 466 U.S. at 72 n.26. Such a sweeping inquiry is not tethered to any specific employment practice alleged to be discriminatory and exceeds the EEOC's investigatory authority.

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for reasons stated in Section III(B)(2) above.

NIKE further objects to the extent the EEOC seeks this information by Subpoena even though the EEOC never requested this information through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects to the Request to the extent it seeks sensitive employee information and details of confidential deliberations and other sensitive business information wholly unrelated to any specific employment decision or alleged discriminatory practice at issue. Disclosure of such materials would infringe on current and former employees' privacy rights and implicate

confidential business information. NIKE is not obligated to produce such materials absent a compelling showing of relevance and necessity, which the EEOC cannot make, and appropriate safeguards. *See, e.g.*, *Buergofol GmbH*, 2025 WL 1593079, at *2; *Flat Branch Mortg., Inc.*, 2025 WL 1914164, at *5 n.5; *Warner Chilcott Ltd.*, 2017 WL 4084045, at *2; *Poulos*, 2010 WL 2640396, at *3; *Litton Indus., Inc.*, 129 F.R.D. at 530.

Given NIKE's objections, NIKE asks the EEOC to revoke this Request in its entirety.

5.    *Produce all documents relating to Respondent's use of employment of racial or ethnic minority workers as a factor in setting executive compensation from June 1, 2019, to the present.*

**Response:**

NIKE objects to the Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of the investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The Request seeks "all documents" related to NIKE's alleged use of a particular factor in executive compensation practices, whether or not those documents bear any connection to the allegations in the charge and despite the fact that a subset of such documents would suffice to provide the information sought.

NIKE further objects to the undefined phrases "executive compensation" and "use of employment of racial or ethnic minority workers" as vague and ambiguous in context.

NIKE further objects to the temporal scope beginning on June 1, 2019, for the reasons set forth in Section III(C).

NIKE further objects to the EEOC seeking this information by Subpoena even though the EEOC never requested some of this information through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects that the Request seeks confidential, proprietary, and trade secret information concerning NIKE's executive compensation strategies, internal metrics, market analyses, and Compensation Committee deliberations. NIKE is not obligated to produce such materials absent a compelling showing of relevance and necessity, which the EEOC cannot make, and appropriate safeguards. *See, e.g.*, *Buergofol GmbH*, 2025 WL 1593079, at *2; *Flat Branch Mortg., Inc.*, 2025 WL 1914164, at *5 n.5; *Warner Chilcott Ltd.*, 2017 WL 4084045, at *2; *Poulos*, 2010 WL 2640396, at *3; *Litton Indus., Inc.*, 129 F.R.D. at 530.

NIKE further objects to this Request to the extent it seeks information that is protected from disclosure by the attorney-client privilege and/or the work product doctrine.

To the extent that this Request seeks general information about the structure and procedures used by NIKE in determining executive compensation, such information is already publicly disclosed and available in Respondent's annual proxy statements, SEC filings, and investor relations website. *See, e.g.,* **Bates Nos. NIKE (EEOC 551-2024-04996) 000368–372**. This includes executive compensation philosophies, pay-for-performance strategies, committee oversight responsibilities, and related policies. Additional demands for internal documentation duplicative of publicly available sources are unnecessary and impose undue burden.

Furthermore, as explained in NIKE's previous submissions, Performance-based Restricted Stock Units ("PSUs") are equity awards available to Vice Presidents and above. PSUs are valued using two metrics, a Relative Total Shareholder Return ("rTSR") and a People & Planet Modifier. The rTSR looks at NIKE's stock performance relative to other companies in the S&P 500 over a three-year period. The People and Planet modifier can further increase or decrease the number of units awarded based on achievement of People and Planet goals, which includes a holistic assessment of NIKE's performance with respect to employee engagement and inclusion,

leadership diversity, and sustainability. However, during the applicable limitations period, the rTSR threshold was not met, and, therefore, the People & Planet modifier was not applied. As a result, no compensation was awarded based on the criteria referenced in the Request.

Given NIKE's objections and its prior responses and production of responsive documents, NIKE asks the EEOC to revoke this Request in its entirety.

6.    *To the extent Respondent has tracked or maintained data regarding the employment of racial or ethnic minority employees within its U.S. Corporate workforce, produce that data from June 1, 2019, to the present.*

**Response:**

NIKE objects to the Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of the investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The Request seeks *any* "data regarding the employment of racial or ethnic minority employees within its U.S. Corporate workforce" maintained for more than six years, regardless of whether that data bears any connection to the allegations in the charge.

NIKE further objects to the undefined terms and phrases "regarding the employment of racial and ethnic minority employees" and "U.S. Corporate workforce" as vague and ambiguous in context. Inasmuch as NIKE employs "racial or ethnic minority employees" in the U.S., virtually any data regarding their employment could be construed to fall within the scope of this Request. This Request is fatally unclear as to what the EEOC seeks and "too indefinite" to be enforced. *Shell Oil Co.*, 466 U.S. at 72 n.26.

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for reasons stated in Section III(B)(2) above.

NIKE further objects to the temporal scope beginning on June 1, 2019, for the reasons set forth in Section III(C).

NIKE further objects to this Request to the extent it seeks information that is protected from disclosure by the attorney-client privilege and/or the work product doctrine.

NIKE further objects on the grounds that the Request seeks information that is in the EEOC's possession, custody, and control in the form of EEO-1 reports that the EEOC requires employers to submit to the EEOC annually.

NIKE further objects on the grounds that the data is equally available to the EEOC through a Memorandum of Understanding ("MOU") with the OFCCP. Under this MOU, the EEOC may request relevant information directly from the OFCCP, including information responsive to this request. *See* https://www.eeoc.gov/memorandum-understanding-between-us-department-labor-office-federal-contract-compliance-programs (describing the MOU as a "model for interagency coordination for equal employment opportunity (EEO) programs more broadly").

NIKE further objects to the EEOC seeking this information by Subpoena even though the EEOC never requested this information through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects to disclosing personal information about current and former employees, as this would infringe upon the privacy rights of those individuals.

Given NIKE's objections, NIKE asks the EEOC to revoke this Request in its entirety.

7.  *Describe Respondent's "Diverse Slates" process, including when, why, and how it was implemented; how the process worked when it was implemented; any changes to the process since its implementation and why such changes were made; which positions the process applies to; and who oversees application of the process.*

**Response:**

NIKE objects to the Request on the grounds that it is overbroad, unduly burdensome, and disproportionate to the needs of the investigation, and seeks information that is neither relevant

41

nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge.

NIKE further objects to this Request to the extent it seeks information that is protected from disclosure by the attorney-client privilege and/or the work product doctrine.

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for reasons stated in Section III(B)(2) above.

Subject to and without waiving the foregoing objections, NIKE refers the EEOC to its prior substantive submissions responsive to this Request, including its position statement and its response to the Second RFI.

NIKE's position statement explains NIKE's hiring processes provide access and opportunities for all qualified candidates and do not use race as a consideration when making individual hiring or other employment decisions. *See* **Position Statement, at 14–15**; *see also **id**. **at 2–3**.

NIKE again refers the EEOC to its Code of Conduct, **Bates Nos. NIKE (EEOC 551-2024-04996) 000001–36**, and its Policy on Inclusion and the Prohibition of Discrimination, Retaliation and Harassment in the Workplace, **Bates Nos. NIKE (EEOC 551-2024-04996) 000037–45**. These documents demonstrate that NIKE is committed to providing equal opportunity employment and does not discriminate (or permit discrimination) against employees and applicants for employment based upon race or any other protected classification. NIKE's equal employment opportunity policy applies to all terms and conditions of employment and employment decisions, including in recruitment and hiring.

NIKE also again directs the EEOC to the declaration from Kizmet Mills. *See* **Bates Nos. NIKE (EEOC 551-2024-04996) 000046–47**. Ms. Mills serves as NIKE's Chief Diversity Equity

and Inclusion Officer. In the declaration, Ms. Mills explains: "NIKE's training, development opportunities, and mentoring opportunities are subject to NIKE's policies, including but not limited to its Equal Employment Opportunity and Matter of Respect policy, which require that these types of opportunities be open to, and/or used by, all employees based on job-related qualifications or criteria, and not on race." *Id.* ¶ **3**.

Without waiving the above objections, NIKE again states that the concept of a "diverse slate" refers to sourcing guidelines for Talent Acquisition that first became available in 2018. The guidelines define a diverse slate as a pool of qualified candidates advancing to hiring manager and business interviews that consists of at least two women and one U.S. Racial and/or Ethnic Minority, as defined by EEO1 categories. A woman who identifies as a Racial and/or Ethnic Minority may satisfy both categories. NIKE's Functional Affirmative Action Plan Agreement with the OFCCP permits NIKE to implement Diverse Slates to address substantial disparity in the placement or utilization of minority groups or in the utilization of men or women of minority groups. And while Diverse Slates, where followed, were designed to broaden the funnel of qualified candidates applying to open positions, the guidelines did not alter NIKE's Equal Employment Opportunity hiring practices. All involved in assessing the qualifications of each candidate are directed that from presentation of candidates to hiring manager selection, NIKE's policy is to identify and select the most qualified talent regardless of race, ethnicity, gender, or other protected criteria. Interviewers and hiring managers are similarly bound by NIKE's EEO policy, which prohibits consideration of protected criteria. And, when a diverse slate is not viable in a certain hiring scenario, there is no prohibition against the hiring process moving forward with the qualified candidates available.

NIKE also refers the EEOC to **Bates Nos. NIKE (EEOC 551-2024-04996) 000259–66**.

43

Given NIKE's objections and its prior production of responsive documents and information, NIKE asks the EEOC to revoke this Request in its entirety.

8. *Produce all job vacancies where "Diverse Slates" was utilized from June 1, 2018, to the present.*

**<u>Response:</u>**

NIKE objects to the Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of the investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge.

NIKE further objects that the phrase "was utilized" is vague and ambiguous in context.

NIKE further objects to the temporal scope beginning on June 1, 2018, for the reasons set forth in Section III(C). Nike also objects on the grounds that June 1, 2018 is prior to the timeframe identified in the Charge (fiscal year 2020).

NIKE further objects on the grounds that the Request is vague and ambiguous as to how NIKE could "produce" "job vacancies."

NIKE further objects to the EEOC seeking this information by Subpoena even though the EEOC never requested this information through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for reasons stated in Section III(B)(2) above.

Given NIKE's objections, NIKE asks the EEOC to revoke this Request in its entirety.

9.    For Respondent's "DEI Mentorship Program", "Amplify Program", "CNEXT Accelerate Program", "Connected Leaders Academy: Mc Kinsey & Company Executive Leadership Program and McKinsey & Company's Black, Asian, and Hispanic Management Accelerators", "Marketing Vanguard Program", "Serena Williams Design Crew (SWDC) Program", "Converse All Star Design Team Program", "Nike Internship Program(s)", "Native American & Indigenous Leaders Program", "Human Resources Rotational Associate Program", "NikeUNITED Program", "ConverseUNITED Program", "Xcelerate Program", "Focused Leadership Development Program", "Leadership Education for Asian Pacifics", and "Leading Nike Program" identify and describe:

   a.    The dates Respondent utilized the program;
   b.    The purpose and / or goals of the program;
   c.    The departments and positions covered by the program;
   d.    Eligibility criteria for the program;
   e.    The name, job title, and department of each individual responsible for the operation of the program;
   f.    Any third-party vendors involved with the program, including the name, job title, phone number, and email address for Respondent's point of contact with the vendor;
   g.    Whether and how the program achieved its purpose; and
   h.    If Respondent no longer utilizes the program, the reasons for its termination and identification of the person(s) who decided to terminate the program.

**Response:**

NIKE objects to the Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of the investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The following "programs" identified in this Request are not mentioned, identified, or described in the Charge and thus exceed its scope: "Serena Williams Design Crew (SWDC) Program;" "Converse All Star Design Team Program;" "Nike Internship Programs;" "Human Resources Rotational Associate Program;" "NikeUNITED Program;" "ConverseUNITED Program;" "Xcelerate Program;" "Focused Leadership Development Program;" "Leadership Education for Asian Pacifics;" and "Leading Nike Program." The EEOC's unexplained expansion of this list, to encompass almost twice as many programs, underscores the overbroad, unduly burdensome, arbitrary, and capricious nature of this Request.

45

NIKE further objects to this Request on the grounds that certain of these "programs," including but not limited to CNEXT Accelerate, are not NIKE-created or NIKE-implemented programs. NIKE does not have possession, custody, or control of the information requested related to external third-party programs.

NIKE further objects to the EEOC seeking this information by Subpoena even though the EEOC never requested some of this information through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects that the Request is temporally overbroad insofar as it seeks information before the date of November 26, 2023, for the reasons set forth in Section III(C). Indeed, this Request contains *no* limitation as to time whatsoever, making it facially overbroad.

NIKE further objects that this Request is overbroad in geographic scope. NIKE has a global workforce and therefore this Request potentially seeks information related to individuals across the world.

NIKE further objects to this Request to the extent it seeks information that is protected from disclosure by the attorney-client privilege and/or the work product doctrine.

Nike further objects to the undefined terms and phrases "eligibility criteria," "responsible for the operation of," and "involved with the program" as vague and ambiguous in context.

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for reasons stated in Section III(B)(2) above.

NIKE further objects to disclosing detailed personal information concerning "individuals" and "third-party vendors," as this would infringe upon the privacy rights of those individuals and entities, and NIKE further objects to the Request to the extent it seeks documents containing sensitive business information, including performance metrics and communications and private

information about third parties, and to the extent it encompasses documentation of confidential deliberations and other competitively sensitive business records wholly unrelated to any specific employment decision or alleged discriminatory practice at issue. Disclosure of such materials would infringe on privacy rights and implicate confidential business information. NIKE is not obligated to produce such materials absent a compelling showing of relevance and necessity, which the EEOC cannot make, and appropriate safeguards. *See, e.g.*, *Buergofol GmbH*, 2025 WL 1593079, at \*2; *Flat Branch Mortg., Inc.*, 2025 WL 1914164, at \*5 n.5; *Warner Chilcott Ltd.*, 2017 WL 4084045, at \*2; *Poulos*, 2010 WL 2640396, at \*3; *Litton Indus.*, 129 F.R.D. at 530.

NIKE further objects as unnecessary, duplicative, and unduly burdensome on the grounds that NIKE has previously provided substantive responses containing information and documents concerning several of the specific "programs" identified in this Request (in addition to others identified in prior RFIs), including "DEI Mentorship Program," "Amplify Program," "Marketing Vanguard Program," "CNEXT Accelerate Program," McKinsey & Company's Black Leadership Academy and Management Accelerators," sponsorship of or work with any third-party organizations or vendors focused on "targeted leadership development for Native American & Indigenous leaders," and the Human Resources Rotational Associate Program. NIKE again refers the EEOC to those prior responses and to the documents and attachments produced therewith.

Given NIKE's objections, NIKE asks the EEOC to revoke this Request in its entirety.

10.    *For each program identified in Request 9 above, produce a sortable database (such as Excel (.xls) or comma delimited file (.csv)), with the first database row containing the field or variable names of the requested information and each subsequent row containing the requested information for each individual, identifying all individuals who applied to, were considered for, were accepted to / selected for, or were rejected from / not selected for the program from June 1, 2019 through the present, including:*
       a.    *First name;*
       b.    *Last name;*
       c.    *Employee number or unique identifier;*
       d.    *Date of birth;*

  e.  *Race / Ethnicity;*
  f.  *Home address;*
  g.  *Mobile phone number;*
  h.  *Email address;*
  i.  *Date of hire, if applicable;*
  j.  *Date of separation, if applicable;*
  k.  *Reason for separation, if applicable;*
  l.  *Date of application to the program, if applicable;*
  m.  *Date of consideration for the program, if applicable;*
  n.  *Date of acceptance to / selection for the program, if applicable;*
  o.  *Date of rejection from / non-selection to the program, if applicable;*
  p.  *Positions held with Respondent, including dates in each position; and*
  q.  *Date each position was held with Respondent.*

**Response:**

NIKE objects to this Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of this investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The Request demands detailed information regarding every employee who "applied to, were considered for, were accepted to / selected for, or were rejected from / not selected" any of 16 "programs," many of which are not mentioned, identified, or described in the Charge and thus exceed its scope. And if, for example, a "program" was open to all NIKE employees and did not require applications from employees, this Request would implicate the entire employee population at NIKE because while some employees may have been "selected" for the "program," the rest of the employee population was "not selected."

NIKE further objects to undefined term "considered for" and "non-selection to" as vague and ambiguous in context.

NIKE further objects that this Request, like several prior requests, appears again to be a classic "fishing expedition," where because the underlying Charge lacks a single aggrieved individual, the EEOC appears to want NIKE to produce a list of employees who were not selected for one or more "programs," along with their personal contact details, so the EEOC can contact

them in the "idle hope" that they will find one who will say that they believe the reason for their treatment was discriminatory. *See, e.g.*, *United Air Lines, Inc.*, 287 F.3d at 653; *BASF Corp.*, 2003 WL 21219038, at *2. This approach is the opposite of a typical EEOC investigation. Judicial enforcement of this Request would be improper since it is "too indefinite" and "has been made for an illegitimate purpose." *Shell Oil Co.*, 466 U.S. at 72 n.26. Such a sweeping inquiry is not tethered to any specific employment practice alleged to be discriminatory and exceeds the EEOC's investigatory authority.

NIKE further objects to the EEOC seeking this information by Subpoena even though the EEOC never requested this information through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects that the Request is temporally overbroad insofar as it seeks information before the date of November 26, 2023, for the reasons set forth in Section III(C). Indeed, this Request contains *no* limitation as to time whatsoever, making it facially overbroad.

NIKE further objects that this Request is overbroad in geographic scope. NIKE has a global workforce and therefore this Request potentially seeks information related to individuals across the world.

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for reasons stated in Section III(B)(2) above.

NIKE further objects to the Request to the extent it seeks documents containing sensitive employee information. Disclosure of such materials would infringe on employee privacy rights and implicate confidential deliberations and other sensitive business information wholly unrelated to any specific employment decision or alleged discriminatory practice at issue. NIKE is not obligated to produce such materials absent a compelling showing of relevance and necessity,

which the EEOC cannot make, and appropriate safeguards. *See, e.g.*, *Buergofol GmbH*, 2025 WL 1593079, at *2; *Flat Branch Mortg., Inc.*, 2025 WL 1914164, at *5 n.5; *Warner Chilcott Ltd.*, 2017 WL 4084045, at *2; *Poulos*, 2010 WL 2640396, at *3; *Litton Indus.*, 129 F.R.D. at 530.

Given NIKE's objections, NIKE asks the EEOC to revoke this Request in its entirety.

11.    *For each individual identified in response to Request 10 above, produce a copy of each individual's personnel file and all documents related to their application to, consideration for, acceptance to, selection for, rejection from, non-selection for, and participation in the program.*

**<u>Response:</u>**

NIKE objects to this Request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and disproportionate to the needs of this investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The Request seeks the complete personnel file of every individual who "applied to, were considered for, were accepted to / selected for, or were rejected from / not selected" any of 16 "programs," which is unreasonably broad and unduly burdensome, as it could include all NIKE employees, as well as "all documents" related to their involvement or non-involvement in those "programs." "All documents" related to every employee involved in those programs would already be massively overbroad and unduly burdensome, but to the extent this Request further seeks "all documents" concerning the *non*-selection of every employee who was not selected for these programs, this Request is fatally unclear as to what the EEOC seeks and "too indefinite" to be enforced. *Shell Oil Co.*, 466 U.S. at 72 n.26.

NIKE further objects to the Request on the grounds that many of the "programs" identified above are not mentioned, identified, or described in the Charge and thus exceed its scope.

NIKE further objects to undefined term "considered for" and "non-selection for" as vague and ambiguous in context.

This Request, like several prior requests, appears again to be a classic "fishing expedition," where because the underlying Charge lacks a single aggrieved individual, the EEOC appears to want NIKE to produce a list of employees who were not selected for one or more "programs," along with their personal contact details, so the EEOC can contact them in the "idle hope" that they will find one who will say that they believe the reason for their treatment was discriminatory, even though they never complained to the EEOC or to NIKE. *See, e.g.*, *United Air Lines, Inc.*, 287 F.3d at 653; *BASF Corp.*, 2003 WL 21219038, at \*2. This approach is the opposite of a typical EEOC investigation. Judicial enforcement of this Request would be improper since it is "has been made for an illegitimate purpose." *Shell Oil Co.*, 466 U.S. at 72 n.26. Such a sweeping inquiry is not tethered to any specific employment practice alleged to be discriminatory and exceeds the EEOC's investigatory authority.

NIKE further objects to the EEOC seeking this information by Subpoena even though the EEOC never requested this information through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects that the Request is temporally overbroad insofar as it seeks information before the date of November 26, 2023, for the reasons set forth in Section III(C). Indeed, this Request contains *no* limitation as to time whatsoever, making it facially overbroad.

NIKE further objects that, to the extent the Request is intended to seek information to support a disparate impact analysis, it is improper for reasons stated in Section III(B)(2) above.

NIKE further objects to the Request to the extent it seeks documents containing sensitive employee information, including personnel files of huge numbers, if not all, of, NIKE's employees. Disclosure of such materials and other documents sought by this Request would infringe employee privacy rights and implicate confidential deliberations and other sensitive business information

wholly unrelated to any specific employment decision or alleged discriminatory practice at issue. NIKE is not obligated to produce such materials absent a compelling showing of relevance and necessity, which the EEOC cannot make, and appropriate safeguards. *See, e.g.*, *Poulos*, 2010 WL 2640396, at *3 (limiting discovery of personnel files to "those of employees whose action or inaction has a *direct bearing* on the Plaintiff's claims" (emphasis added)); *see also, e.g.*, *Buergofol GmbH*, 2025 WL 1593079, at *2; *Flat Branch Mortg., Inc.*, 2025 WL 1914164, at *5 n.5; *Warner Chilcott Ltd.*, 2017 WL 4084045, at *2; *Litton Indus., Inc.*, 129 F.R.D. at 530.

     Given NIKE's objections, NIKE asks the EEOC to revoke this Request in its entirety.

12.    *Respondent's FY20 Impact Report states that Respondent "intend[ed] to give all of Respondent's Vice Presidents access to representation data with sharp accountability to deliver on their Diversity & Inclusion (D&I) plans." Related to that statement, identify and produce:*
    a.    *All training, guidance and instructions provided to all employees who were given access to the representation data;*
    b.    *Documents describing all other job positions which were provided access to the representation data;*
    c.    *Produce a copy of the representation data to which each Vice Presidents was given access; and*
    d.    *Produce a copy of the representation data to which any other employees were given access*.

**Response:**

     NIKE objects to the Request on the grounds that it is overbroad, unduly burdensome, and disproportionate to the needs of the investigation, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence regarding the Charge. The Request seeks, among other overbroad categories, "[a]ll training guidance and instructions provided to all employees who were given access to the representation data," regardless of whether such training, guidance, or instructions have anything to do with the allegations in the Charge.

NIKE further objects that the Request is temporally overbroad insofar as it seeks information only about FY20, long before applicable limitations period began on November 26, 2023, for the reasons set forth in Section III(C).

NIKE further objects to the EEOC seeking this information by Subpoena even though the EEOC never requested some of this information through an RFI before issuing this Subpoena—a violation of Section 24.1 of its Compliance Manual. *See supra* Section III(A).

NIKE further objects to this Request to the extent it seeks information that is protected from disclosure by the attorney-client privilege and/or the work product doctrine.

NIKE further objects to the Request to the extent it seeks documents containing sensitive employee information and to the extent it encompasses documentation of confidential deliberations and other competitively sensitive business records wholly unrelated to any specific employment decision or alleged discriminatory practice at issue. Disclosure of such materials would infringe on employee privacy rights and implicate confidential business information. NIKE is not obligated to produce such materials absent a compelling showing of relevance and necessity, which the EEOC cannot make, and appropriate safeguards. *See, e.g.*, *Buergofol GmbH*, 2025 WL 1593079, at *2; *Flat Branch Mortg., Inc.*, 2025 WL 1914164, at *5 n.5; *Warner Chilcott Ltd.*, 2017 WL 4084045, at *2; *Poulos*, 2010 WL 2640396, at *3; *Litton Indus., Inc.*, 129 F.R.D. at 530.

Given NIKE's objections, NIKE asks the EEOC to revoke this Request in its entirety.

## V.   **CONCLUSION**

As NIKE has consistently demonstrated in its prior submissions, none of the policies or practices cited in the Charge were implemented with discriminatory intent or effect. To the contrary, NIKE's training, development, and mentoring opportunities are governed by its Equal Employment Opportunity and Matter of Respect policies, which require that such opportunities be

available to all employees based solely on job-related qualifications and criteria—without regard to race. Despite the length and scope of the investigation, the EEOC has not identified a single aggrieved individual allegedly harmed by the challenged practices.

In December 2024, the EEOC offered NIKE a settlement agreement, which NIKE accepted without admitting liability or fault. However, the EEOC subsequently transferred the investigation to another office, reassigned it to a new investigator, and unilaterally revoked the agreement—without explanation. Most recently, the EEOC transferred the case to its St. Louis District Office, without explanation. This transfer (in addition to the issuance of this Subpoena from that office) raises concerns of forum shopping.

Despite this, NIKE has consistently cooperated in good faith with the EEOC's investigation. NIKE has submitted multiple comprehensive responses, produced hundreds of pages of documents, and addressed each of the EEOC's inquiries with diligence and transparency. Nevertheless, the EEOC has repeatedly revisited previously addressed topics, expanded the scope of its inquiries without justification, and imposed burdens that are neither reasonable nor proportional to the Charge. Rather than engaging in meaningful meet-and-confer discussions or issuing a deficiency letter identifying any concerns with NIKE's prior responses, the EEOC has issued this Subpoena—a violation of the agency's own Compliance Manual. For the reasons set forth above, NIKE respectfully requests that the EEOC revoke the Subpoena in its entirety.

Dated: October 7, 2025

Respectfully submitted,

/s/

Amanda A. Sonneborn
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
Tel.: (312) 764-6940
Fax: (312) 995-6330
asonneborn@kslaw.com

*Attorney for NIKE, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 7th day of October 2025, I caused to be served the foregoing

**NIKE, INC.'S PETITION TO REVOKE OR MODIFY SUBPOENA** on the following via

email and EEOC Respondent Portal as follows:


/s/ _____
Erica Row


David Davis, District Director
Ahlam Abdellatif, Investigator
United States Equal Employment Opportunity Commission
St. Louis District Office
1222 Spruce St., Rm. 8.100
St. Louis, MO 63103
david.davis@eeoc.gov
ahlam.abdellatif@eeoc.gov

**ATTACHMENT A**

EEOC Form 136
(07/2024)

# UNITED STATES OF AMERICA

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# SUBPOENA

**TO:** Mr. Elliott J. Hill, President & CEO
NIKE, Inc.
One Bowerman Dr.
Beaverton, OR 97005

**NO.** SL-25-08

**IN THE MATTER OF:** Lucas v. NIKE, Inc.

**Charge No.** 551-2024-04996

Having failed to comply with previous request(s) made by or on behalf of the undersigned Commission official,  YOU ARE HEREBY REQUIRED AND DIRECTED TO:

☐ Testify before:          ☐ Produce and bring * or      ☒ Mail *  the documents described below to:

☐ Produce access to the evidence described below for the purpose of examination or copying to:

Ahlam, Abdellatif Investigator                          of the Equal Employment Opportunity Commission

**at** 1222 Spruce St., Rm. 8.100, St. Louis, MO 63103        **on** October 30, 2025        **at** 9:00        o'clock

The evidence required is

set forth on Exhibit 1, attached. Produce responsive information via the EEOC Respondent Portal at https://arc.eeoc.gov/rsp/login.jsf. For data that is too large to upload via the portal, please contact the Investigator for a Secure Share link for electronic data transfer.

To the extent Respondent maintains that it has already produced information required by this subpoena, identify the specific documents where the information may be found.

cc: via email to bkelley@littler.com
Mr. Bradford Kelley, Shareholder
Littler
815 Connecticut Ave., NW
Ste. 400
Washington, DC 20006-4046

This subpoena is issued pursuant to        ☒ (Title VII) 42 U.S.C. 2000e-9    ☐ (ADEA) 29 U.S.C. 626(a)    ☐ (EPA) 29 U.S.C.209

☐ (ADA) 42 U.S.C. 12117(a)    ☐ (GINA) 42 U.S.C. 2000ff-6    ☐ (PWFA) 42 U.S.C. § 2000gg-2(a)(1)

ISSUING OFFICIAL (Typed name, title and address)          ON BEHALF OF THE COMMISSION

David Davis, District Director
1222 Spruce, Rm 8.100
St. Louis, MO 63103

DAVID
DAVIS

Digitally signed by
DAVID DAVIS
Date: 2025.09.30
16:22:29 -05'00'

9/30/2025

Date

*NOTICE TO PERSON SUBPOENAED - The Commission will not pay witness fees or travel expenses for the delivery of required documents to a Commission office unless the box "Testify before" is also checked on the subpoena.

**CONFIDENTIAL**

## SUBPOENA
### PROOF OF SERVICE

I hereby certify that being over 18 years of age and not a party to or any way interested in these proceedings, I duly served a copy of the subpoena on the persons named in this subpoena.

☐ in person

☒ by certified mail

☐ by leaving a copy with a responsible person, at the principal office or place of business, to wit:

| | |
|---|---|
| Name | United Agent Group Inc. |
| Position | Registered Agent |
| Address | 5708 SE 136th Ave, Ste. 2, Portland, OR 97236 |

On    September 30, 2025
_____
(Mo, day & year)

DAVID DAVIS    Digitally signed by DAVID DAVIS
Date: 2025.09.30 16:22:55 -05'00'

*(Signature of person making service)*

District Director
_____
*(Official title, if any)*

| | |
|---|---|
| State | Missouri |
| Parish/County | City of St. Louis |

### CERTIFICATION OF ATTENDANCE

I certify that the person named herein was in attendance and satisfactorily produced the records requested or gave oral testimony at

_____

On    _____
*(Mo, day & year)*

_____
*(Signature of person making service)*

_____
*(Official title, if any)*

**CONFIDENTIAL**

EEOC Subpoena No. SL-25-08
Lucas v. NIKE, Inc., Charge No. 551-2024-04996
Exhibit 1, Page 1 of 4

## EXHIBIT 1

**Documents.** For purposes of this subpoena, "documents" includes any documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

**Layoff.** For purposes of this subpoena, "layoff" includes any separation of employment initiated by Respondent not due to any fault or misconduct of the employee, but because of business needs, such as lack of work, reduction in force, restructuring, or financial necessity.

**Program(s).** For purposes of this subpoena. As used herein, the terms "**program**" or "**programs**" mean any measures, activities, diversity and inclusion programs, diversity equity and inclusion programs, mentorships agendas, initiatives, endeavors, projects, strategic plans, efforts, systems, groups, organizations, or any other action Respondent has taken, or body Respondent has formed in furtherance of a stated diversity, equity, and/or inclusion goal.

1. Describe or produce documents that show Respondent's organizational structure from June 1, 2019 to the present, including all structural units (brands, divisions, functional units, design teams, etc.); hierarchical authority between units; dates of changes to unit structure; and the names, job titles, and dates in position of each unit head.

2. For each layoff of employees in Respondent's U.S. Corporate workforce from January 1, 2024 to the present, identify:
   a. The date each layoff was implemented;
   b. The departments and positions subjected to the layoff;
   c. For each position subjected to the layoff, the specific criteria and/or factors used to evaluate and select employees for layoff; and
   d. The names and job titles of the individuals who selected employees for layoff.

3. For each layoff identified in response to Request 2 above, produce:
   a. All documents related to implementation of the layoff, including but not limited to documents describing the layoff's purpose, scope, selection criteria, guidelines, and instructions to individuals selecting employees for layoff;
   b. All staffing plans, restructuring plans, and similar documents related to the layoff;
   c. All documents created during the process of evaluating and selecting employees for layoff, including but not limited to notes, memoranda, charts, tables, and lists;

**CONFIDENTIAL**

EEOC Subpoena No. SL-25-08
Lucas v. NIKE, Inc., Charge No. 551-2024-04996
Exhibit 1, Page 2 of 4

    d. For all employees in the departments and positions subjected to the layoff, all documents showing the relevant performance metrics and other criteria used to evaluate and select employees for layoff;

    e. All communications with employees selected for layoff regarding their selection;

    f. All documents regarding severance packages, rehire eligibility, and other options for benefits or alternative employment opportunities for employees selected for layoff; and

    g. All public statements by Respondent regarding the layoff.

4. For each layoff identified in response to Request 2 above, produce a sortable database (such as Excel (.xls) or comma delimited file (.csv)), with the first database row containing the field or variable names of the requested information and each subsequent row containing the requested information for each individual, identifying all employees considered or evaluated for potential layoff, including:

    a. First name;

    b. Last name;

    c. Employee number or unique identifier;

    d. Date of birth;

    e. Race / Ethnicity;

    f. Home address;

    g. Mobile phone number;

    h. Email address;

    i. Date of hire;

    j. Department at time of layoff implementation;

    k. Job title at time of layoff implementation;

    l. Whether selected for layoff;

    m. Reason for selection or non-selection for layoff;

    n. Date of layoff (if applicable);

    o. Current department (if applicable);

    p. Current job title (if applicable);

    q. Date of non-layoff separation (if applicable); and

    r. Reason for non-layoff separation (if applicable).

5. Produce all documents relating to Respondent's use of employment of racial or ethnic minority workers as a factor in setting executive compensation from June 1, 2019, to the present

6. To the extent Respondent has tracked or maintained data regarding the employment of racial or ethnic minority employees within its U.S. Corporate workforce, produce that data from June 1, 2019, to the present.

**CONFIDENTIAL**

EEOC Subpoena No. SL-25-08
Lucas v. NIKE, Inc., Charge No. 551-2024-04996
Exhibit 1, Page 3 of 4

7. Describe Respondent's "Diverse Slates" process, including when, why, and how it was implemented; how the process worked when it was implemented; any changes to the process since its implementation and why such changes were made; which positions the process applies to; and who oversees application of the process.

8. Produce all job vacancies where "Diverse Slates" was utilized from June 1, 2018, to the present.

9. For Respondent's "DEI Mentorship Program", "Amplify Program", "CNEXT Accelerate Program", "Connected Leaders Academy: Mc Kinsey & Company Executive Leadership Program and McKinsey & Company's Black, Asian, and Hispanic Management Accelerators", "Marketing Vanguard Program", "Serena Williams Design Crew (SWDC) Program", "Converse All Star Design Team Program", "Nike Internship Program(s)", "Native American & Indigenous Leaders Program", "Human Resources Rotational Associate Program", "NikeUNITED Program", "ConverseUNITED Program", "Xcelerate Program", "Focused Leadership Development  Program", "Leadership Education for Asian Pacifics", and "Leading Nike Program" identify and describe:
   a. The dates Respondent utilized the program;
   b. The purpose and / or goals of the program;
   c. The departments and positions covered by the program;
   d. Eligibility criteria for the program;
   e. The name, job title, and department of each individual responsible for the operation of  the program;
   f. Any third-party vendors involved with the program, including the name, job title, phone number, and email address for Respondent's point of contact with the vendor;
   g. Whether and how the program achieved its purpose; and
   h. If Respondent no longer utilizes the program, the reasons for its termination and identification of the person(s) who decided to terminate the program.

10. For each program identified in Request 9 above, produce a sortable database (such as Excel (.xls) or comma delimited file (.csv)), with the first database row containing the field or variable names of the requested information and each subsequent row containing the requested information for each individual, identifying all individuals who applied to, were considered for, were accepted to / selected for, or were rejected from / not selected for the program from June 1, 2019 through the present, including:
   a. First name;
   b. Last name;
   c. Employee number or unique identifier;
   d. Date of birth;
   e. Race / Ethnicity;
   f. Home address;
   g. Mobile phone number;

**CONFIDENTIAL**

EEOC Subpoena No. SL-25-08
Lucas v. NIKE, Inc., Charge No. 551-2024-04996
Exhibit 1, Page 4 of 4

h.  Email address;

i.  Date of hire, if applicable;

j.  Date of separation, if applicable;

k.  Reason for separation, if applicable;

l.  Date of application to the program, if applicable;

m. Date of consideration for the program, if applicable;

n.  Date of acceptance to / selection for the program, if applicable;

o.  Date of rejection from / non-selection to the program, if applicable;

p.  Positions held with Respondent, including dates in each position; and

q.  Date each position was held with Respondent.

11. For each individual identified in response to Request 10 above, produce a copy of  each
    individual's personnel file and all documents related to their application to, consideration for,
    acceptance to, selection for, rejection from, non-selection for, and participation in the
    program.

12. Respondent's FY20 Impact Report states that Respondent "intend[ed] to give all of
    Respondent's Vice Presidents access to representation data with sharp accountability to
    deliver on their Diversity & Inclusion (D&I) plans." Related to that statement, identify and
    produce:

    a.  All training, guidance and instructions provided to all employees who were given
        access to the representation data;

    b.  Documents describing all other job positions which were provided access to the
        representation data;

    c.  Produce a copy of the representation data to which each Vice Presidents was given
        access; and

    d.  Produce a copy of the representation data to which  any other employees were given
        access.

**ATTACHMENT B**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

Office of Commissioner
Andrea R. Lucas

### COMMISSIONER'S CHARGE

Pursuant to authority contained in Title VII of the Civil Rights Act of 1964, as amended (Title VII), I issue this Commissioner's Charge against the following employer:

NIKE, Inc.
One Bowerman Drive
Beaverton, OR 97005

I believe this employer is within the jurisdiction of the U.S. Equal Employment Opportunity Commission. I further believe that since at least NIKE's fiscal year 2020 and continuing thereafter, NIKE may have violated and may be continuing to violate Title VII by engaging in a pattern or practice of disparate treatment against White employees, applicants, and training program participants in hiring, promotion, demotion, or separation decisions (including selection for layoffs); internship programs; and mentoring, leadership development, and other career development programs. I believe NIKE may have taken these unlawful actions in an effort to create—in NIKE's own words—a "representative" workforce "equal to the consumer and communities [it] serve[s]," including pursuant to its two "2025 Targets" (30% representation of racial and ethnic minorities at Director Level and above in the United States, and 35% representation of racial and ethnic minorities in NIKE's U.S. corporate workforce) and other "Diversity, Equity, and Inclusion"-related objectives.

NIKE admits in its public documents that due to its actions since fiscal year 2020, NIKE not only met, but exceeded, its five-year 2025 Targets in only two years (by its fiscal year 2022), and that NIKE has continued to further increase its "representation of U.S. racial and ethnic minorities" beyond the Targets since then. In the three years since imposing its five-year 2025 Targets, NIKE admits that it increased "representation of U.S. racial and ethnic minorities" in its U.S. corporate workforce by 9% by increasing it from 32% to 41% (six percentage points above the Target); and at its Director+ level by 7.6% by increasing it from 26% to 34% (four percentage points above the Target).

Additionally, or alternatively, NIKE's practices may have had a disparate impact on White employees, prospective employees, and current and prospective training program applicants and participants.

Specifically, NIKE's unlawful employment practices may include, but are not limited to:

1. Establishing race-based workforce representation quotas, including by setting and publishing two 2025 Targets ("30% representation of racial and ethnic minorities at Director level and above in the U.S." and "35% representation of U.S. racial and ethnic minorities in our U.S. corporate workforce"); stating these "2025 Targets are not just aspirations" but rather "commitments" and "a call to action – with clear goals, strategies, and accountabilities;" providing "all" of NIKE's hundreds of "Vice Presidents access to representation data, with sharp accountability to deliver on their Diversity & Inclusion (D&I) plans," including the 2025 Targets; and tying "executive compensation to NIKE's progress" towards the 2025 Targets.

**CONFIDENTIAL**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

Office of Commissioner
Andrea R. Lucas

2.  Selecting employees for separation motivated, in whole or in part, by race (White), including during layoffs in 2020 and in currently ongoing layoffs in 2024.

3.  Providing access to training, development opportunities, and mentoring to "racial and ethnic minorities" based, in whole or in part, on race, in violation of Title VII's prohibitions on discriminating with respect to terms, conditions, or privileges of employment; limiting, segregating, or classifying employees for future employment opportunities or promotion; and discriminating in admission to any training program, including on-the-job training programs. Such programs involving disparate treatment or resulting in disparate impact against White individuals may include, but are not limited to:

    a.  The "Amplify" program, an "internal development program for high-potential . . URGs [under-represented groups] at the Director and Senior Director levels" and "Manager and Director levels;"

    b.  Corporate-provided access to external training and development programs, including McKinsey's Black, Asian, and Hispanic Management Accelerators programs for mid-level leaders; and McKinsey Academy for NIKE "Senior Directors, Vice Presidents and CNEXT platform emerging leaders;"

    c.  "[T]argeted leadership development for Native American and Indigenous leaders;"

    d.  A "DEI mentorship program for corporate employees in the U.S.," part of efforts to "develop[] and promot[e] internal talent across all levels and across all U.S. racial and ethnic minorities;" and,

    e.  The "Marketing Vanguard Program (MVP), built to accelerate the flow of graduate-level talent from diverse backgrounds and experiences" and "an HR rotational program modeled after MVP."

4.  Failing to interview, hire, or promote, classifying, or otherwise discriminating against prospective employees and/or current employees based, in whole or in part, on their race (White), including (a) during the implementation of, or as the result of, NIKE's "diverse slates process," including for "Director and above positions;" or (b) related to NIKE's "focus" on "underrepresented groups (URG)" and "U.S. racial and ethnic minorities" "play[ing] a critical role" or a "critical component in hiring for leadership roles," including at the "Director-level or above" and "at the Senior Director level."

5.  Failing to interview, failing to hire, and limiting, segregating, or classifying internship candidates (who, as interns, would constitute employees, prospective employees, or training program applicants) based, in whole or in part, on race, including by preferring internship candidates who were "U.S. racial and ethnic minorities," particularly Black, Hispanic, or Native American, and by implementing "[s]trategies to . . . select diverse candidates for our intern program."

     The above allegations are based on publicly available information regarding NIKE, including, but not limited to, NIKE's annual "Impact Reports," proxy statements and other securities filings, EEO-1 data (disclosed publicly by NIKE), and other documents and information published on NIKE's public website; public statements by NIKE and its leadership; and news reporting.

**CONFIDENTIAL**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

Office of Commissioner
Andrea R. Lucas

The aggrieved individuals include all White employees, former employees, prospective employees, and current and prospective training program applicants and participants who have been, continue to be, or may be in the future adversely affected by the unlawful employment practices complained of herein.

I, Andrea R. Lucas, a Commissioner of the Equal Employment Opportunity Commission, declare under penalty of perjury that I have cause to believe the foregoing is, to the best of my knowledge and belief, true and correct.

Executed on this 24th day of May 2024.

_Andrea R. Lucas_

Commissioner
U.S. Equal Employment Opportunity
Commission

**CONFIDENTIAL**

**ATTACHMENT C**

Docusign Envelope ID: 034A684E-2869-481E-A0E4-0CBEFE12B960

# UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

| | |
|---|---|
| Andrea R. Lucas, EEOC Chair, | EEOC Charge No. 551-2024-04996 |
| Charging Party, | Subpoena No. SL-25-08 |
| v. | |
| NIKE, Inc., | |
| Respondent. | |

## <u>DECLARATION OF MICHELLE MCCRAY</u>

1.      I am Michelle McCray and am employed at NIKE, Inc. ("NIKE" or "the Company") as its VP, Global People Solutions. I make this declaration in support of NIKE's Petition to Revoke the Subpoena Duces Tecum served by the Equal Employment Opportunity Commission ("EEOC") in the matter of *Acting Chair Andrea Lucas v. NIKE, Inc.*, EEOC Charge No. 551-2024-04996 (the "Charge").

2.      In January 2022, I first became employed at NIKE as its Senior Director, HRCOS Transformation Lead, within the Human Resources team. In January 2023, I was promoted to the VP, People Solutions – Teammate Experience and Delivery role, also in Human Resources. I have personal knowledge of the contents of this declaration based on my role at NIKE, or have knowledge based on my review of information and records gathered by NIKE personnel, and could testify thereto. Specifically, as a member of the Human Resources Leadership Team, I oversee and have personal knowledge of NIKE's employee records and human resources systems and processes.

1

CONFIDENTIAL

## Nike's Matrixed Structure

3.      NIKE is a corporation headquartered in Beaverton, Oregon and incorporated under the laws of the State of Oregon. NIKE is a global leader in the design, development, marketing, and selling of athletic footwear, apparel, equipment, accessories, and services.

4.      NIKE maintains a highly matrixed and cross-functional organizational structure. It does not have formally designated "departments," but rather generally is organized in terms of brands, geographies, functions, teams and/or other structures (e.g., sports or consumer type). Employees may have both direct and dotted-line reporting relationships.

5.      Employment decisions such as hiring, compensation, promotion, and termination, are typically made by the direct supervisor for a particular employee or position. Depending on the circumstances and position at issue, however, additional stakeholders may be involved in an employment decision. Accordingly, documents concerning a single employment decision may be located in multiple places within the company, in the possession of multiple custodians potentially located in different physical locations. There is no single location or source that contains all documents concerning the company's employment decisions.

6.      As of May 31, 2024, NIKE employed approximately 79,400 employees worldwide, including retail and part-time employees. Within the U.S., as of October 1, 2025, across multiple U.S. entities, there are more than 36,000 employees, including retail, part-time and temporary employees. Since January 1, 2024, across the same entities: (1) more than 25,000 hiring decisions have been made; and (2) more than 29,000 employment separations have occurred.

2

**Locations of Employment Records**

7.      There is no single document repository that stores all documents related to all employment decisions like hiring, compensation, promotion, and termination. There is also no single repository that houses complete personnel files for all NIKE employees. For longer-tenured NIKE employees, personnel records are spread across multiple electronic systems and databases, and portions of their personnel files exist only in physical form. NIKE uses several different databases and tracking systems to manage various human resources functions, including hiring and termination.

**Burden of Responding to the EEOC's Requests**

8.      I am familiar with the Commissioner's Charge received by NIKE on May 24, 2024. I understand that NIKE was served with the EEOC's Subpoena ("Subpoena") on October 1, 2025, which includes 12 enumerated requests (in addition to 58 sub-categories therein) for information and documents ("Requests"). I have reviewed these Requests, am familiar with the location of records that may be responsive to the Requests, and am competent to identify sources of information and documents potentially responsive to the Requests and assisting NIKE's attorneys in responding to the Requests.

9.      I understand that the Subpoena seeks information relating to "layoffs," which are defined by the Subpoena as "separation of employment initiated by Respondent not due to any fault or misconduct of the employee, but because of business needs, such as lack of work, reduction in force, restructuring, or financial necessity." I understand that Request Nos. 2-4 request documents and information from January 1, 2024 to the present relating to "specific criteria and/or factors used to evaluate and select employees for layoff," "staffing plans, restructuring plans, and similar documents related to the layoff," "all documents created during the process of evaluating

3

and selecting employees for employees," "documents regarding severance packages, rehire eligibility, and other options for benefits," and information related "non-layoff" separations. Because of the nature of NIKE's operations as well as the number of employment decisions conceivably implicated by the Subpoena's definition of "layoff" and "non-layoff" separations, in order to respond to these Request, NIKE, at a minimum, would need to execute the following steps:

a.      Collect, review, and compile data from multiple tracking systems, platforms, and databases to compile a list of "U.S. Corporate" employees and positions that have been terminated since January 1, 2024.

b.      Determine whether these terminations fall under the Subpoena's definition of "layoff."

c.      Interview representatives across the organization to determine:

   i.   who made each termination decision,

   ii.  the persons who participated or were involved in each termination decision,

   iii. the type of documents that the relevant group maintains relating to the termination,

   iv.  where and how those documents are maintained (physical or digital files or tracking system), and

   v.   all potential custodians of relevant documents.

d.      Collect the documents of all potential custodians, including former employees.

e.      Engage a vendor to collect and host all electronically stored information ("ESI").

**CONFIDENTIAL**

f.      Review all emails, correspondence, and documents (including digital and physical files) in order to identify every single "document[] created during the process of evaluating and selecting employee for layoff."

g.      Interview each employee involved in the decision to terminate a particular employee to determine "the specific criteria and/or factors used to evaluate and select employees for layoff."

h.      Once the above information is collected, for each "layoff" and "non-layoff" since January 1, 2024, NIKE would need to review, analyze, synthesize, organize, and prepare the requested sortable database (which currently does not exist) with the 18 sub-categories of information identified in Request No. 4.

i.      If the work described above were to take one hour for each separation, then complying with Request Nos. 2-4 for the 29,000 U.S. employee separations that have occurred since January 1, 2024, would take a single human resources employee a minimum of 29,000 work hours, or 3,625 full work days (approximately 14 years), away from their regular job duties and responsibilities for NIKE. Based on my knowledge and experience, however, I estimate that performing the work described above could require substantially more than one hour per separation decision. Even if vendors and attorneys were utilized, at additional costs to NIKE, to collect and review documents and ESI, a human resources employee may need to interview hundreds of relevant stakeholders and decisionmakers to determine what criteria or factors were used to evaluate and select employees regarding several thousands of employment separations.

10.     I understand that Request Nos. 9-11 seek documents related to 16 "programs" and specifically request information and documents identifying, among other things, the "[e]ligibility criteria for the program," identification of "each individual responsible for the operation of the

**CONFIDENTIAL**

program," "third-party vendors involved with the program," "whether and how the program achieved its purpose," and "reasons for its termination."

a.     I am not aware of a single NIKE human resources electronic database or system that collects, tracks, or maintains all of the information requested in Request No. 9—*i.e.*, purpose or goals of a "program"; eligibility criteria for a "program"; third-party vendors involved with a "program" (and their information); whether and how a "program" achieved its purpose; and the reasons for terminating a "program."

b.     I am not aware of a single NIKE human resources electronic database or system that collect, tracks, or maintains all of the information requested in Request No. 10 relating to "all individuals who applied to, were considered for, were accepted to /selected for, or were rejected from / not selected for" the identified "programs."

c.     Because I am not aware of a single source for the information requested in Request Nos. 9-11, in order to collect the requested information, NIKE would need to identify the source or location of documents related to each specific "program", interview stakeholders for that "program", and collect and review any information they may have relating to applicants and members dating back to June 1, 2019.

d.     I understand that some of the "programs" listed in Request No. 9 are or were open to all NIKE employees and do not or did not require an application. Because the request seeks information related to any individual who was selected or not selected for an identified "program", it is possible that NIKE would need to locate and provide information related to every former and current employee in any geographic location. As written, the request could therefore require NIKE to provide information for a minimum of approximately 80,000 employees worldwide, including retail, part-time and temporary employees, over a six-year period.

6

Docusign Envelope ID: 034A684E-2869-481E-A0E4-0CBEFE12B960

11.     Complying with Request Nos. 2-4 and 9-11 alone would burden NIKE's business and operations by causing NIKE to devote thousands of work hours across multiple functions to collect and review documents, interview witnesses, work with vendors and attorneys, and create the requested databases summarizing the requested information. Furthermore, business operations would be disrupted by requiring supervisors or managers at every level in all groups across the organization to respond to document and information requests and participate in hours of interviews regarding information and events dating back several years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 7, 2025, at Beaverton, Oregon.



Michelle McCray

CONFIDENTIAL