EXHIBIT E

## BEFORE THE UNITED STATES
## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**IN THE MATTER OF:**

**Commissioner Andrea R. Lucas,**

    **CHARGING PARTY,**

**v.**

**NIKE, Inc.,**

    **RESPONDENT.**

**SUBPOENA NO. SL-25-08**

**CHARGE NO. 551-2024-04996**

| | | | |
|---|---|---|---|
| PETITIONER: | NIKE, Inc.<br>One Bowerman Dr.<br>Beaverton, OR 97005 | BY: | Amanda A. Sonneborn<br>King & Spalding LLP<br>110 North Wacker Dr., Ste. 3800<br>Chicago, IL 60606 |

### DETERMINATION ON PETITION TO REVOKE SUBPOENA

NIKE, Inc. petitions the Equal Employment Opportunity Commission to revoke Subpoena No. SL-25-08, which was issued by the Commission's St. Louis District Office. The Commission issues this determination pursuant to 29 C.F.R. § 1601.16 and in accordance with Section 24.12 of the Compliance Manual. For the reasons set forth below, the petition is GRANTED IN PART and DENIED IN PART.

### BACKGROUND

On May 24, 2024, then-Commissioner (now Chair) Andrea R. Lucas signed and initiated a Charge of Discrimination against Respondent NIKE, Inc., alleging violations of Title VII of the Civil Rights Act of 1964, as amended. The charge alleged that since at least 2020, NIKE may have violated Title VII

> by engaging in a pattern or practice of disparate treatment against White employees,
> applicants, and training program participants in hiring, promotion, demotion, or
> separation decisions (including selection for layoffs); internship programs; and
> mentoring, leadership development, and other career development programs.

Charge of Discrimination at 1. The charge identified multiple alleged unlawful employment

practices, including NIKE's use of "race-based workforce representation quotas"; selecting

employees for separation and layoff based, in whole or in part, on race; providing access to

training, development opportunities, and mentoring to "racial and ethnic minorities" based, in

whole or in part, on race; and failing to interview, hire, or promote, and classifying or otherwise

discriminating against prospective and / or current employees and internship candidates based, in

whole or in part, on race. The charge alleged such potential violations generally and identified

some programs and public statements by NIKE as examples of potentially discriminatory

employment practices. The charge identified the potential aggrieved individuals as "all White

employees, former employees, prospective employees, and current and prospective training

program applicants and participants who have been, continue to be, or may be in the future

adversely affected by the unlawful employment practices complained of" in the charge.

As part of its investigation, the Commission sent Requests for Information to NIKE on

December 23, 2024, February 18, 2025, and June 6, 2025. These requests sought information

related to the charge allegations, including but not limited to information regarding (1) NIKE's

organizational structure; (2) programs utilized by NIKE in an effort to increase the representation

of racial and ethnic minorities in its U.S. workforce; (3) if / how NIKE tied executive

compensation to increased diversity and inclusion within its U.S. workforce; (4) employee

layoffs in 2024; and (5) employee demographic and pay data provided to select NIKE

executives. NIKE responded with extensive objections and statements claiming its compliance

with Title VII. NIKE provided some narrative responsive information and documents, but it failed to provide all information requested.

On September 30, 2025, the Commission served Subpoena No. SL-25-08 on NIKE. The subpoena sought: (1) documents or information showing NIKE's organizational structure from June 1, 2019 to the present; (2) information and documents related to layoffs of employees in NIKE's U.S. Corporate workforce from January 1, 2024 to the present; (3) documents related to NIKE's use of racial or ethnic minority worker data as a factor in setting executive compensation from June 1, 2019 to the present; (4) data, if maintained, regarding the employment of racial or ethnic minority employees within NIKE's U.S. Corporate workforce from June 1, 2019 to the present; (5) information regarding NIKE's "Diverse Slates" process and its use from June 1, 2018 to the present; (6) information about NIKE's utilization of sixteen employment-related programs and the individuals who applied to, were considered for, were accepted to / selected for, or were rejected from / not selected those programs; and (7) information related to NIKE's use of "representation data" as referred to in its FY20 Impact Report.

On October 7, 2025, NIKE filed the present petition to revoke or modify the Subpoena, reiterating many of its prior objections to providing the requested information. The petition asks the Commission to revoke the Subpoena or, in the alternative, to modify the Subpoena to limit its requests.

## ANALYSIS

### I.     Legal Standard

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2(a). Title VII obligates the Commission to investigate charges of discrimination. *See* 42 U.S.C. § 2000e-5(b) (the Commission "*shall* make an investigation" (emphasis added)); *Occidental Life Ins. Co. of Cal. v.*

*EEOC*, 432 U.S. 355, 359 (1977) ("The EEOC is . . . *required* to investigate the charge and determine whether there is reasonable cause to believe that it is true."). To this end, Congress endowed the Commission with broad investigatory powers. Title VII provides that the Commission "shall have access to . . . any evidence of any person being investigated or proceeded against that relates to unlawful employment practices . . . and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). The statute further empowers the Commission to issue subpoenas requiring the production of evidence. 42 U.S.C. § 2000e-9 (incorporating 29 U.S.C. § 161); *see also Univ. of Pa. v. EEOC*, 493 U.S. 182, 191 (1990).

A subpoena issued by the Commission is enforceable so long as the underlying charge is proper and the material requested is relevant unless the respondent establishes that the subpoena is too indefinite, has been issued for an illegitimate purpose, or is unduly burdensome. *McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017). In this context, "courts have generously construed the term 'relevant' and have afforded the Commission access to virtually any material that might cast light on the allegations against the employer." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68-69 (1984).

## II.     NIKE's General Objections

NIKE objects to the Subpoena generally on several grounds. None of these objections support revocation or modification.

### A.     The Subpoena is valid.

NIKE argues that the Subpoena should be revoked because the EEOC allegedly failed to exhaust procedures described at §24.1 of EEOC's Compliance Manual to obtain voluntary compliance, and because the Subpoena seeks information never before requested.

NIKE mischaracterizes and misinterprets §24.1(a), arguing the section contains mandatory prerequisites, including a so-called "meet and confer" requirement, to EEOC's

exercise of its subpoena power. The case law NIKE cites does not support its argument; moreover, NIKE's citation to *EEOC v. U.P.S.*, No. Civil No. 06-MC-42-MJD-SRN, 2006 WL 3712941, at *3 (D. Minn. Sept. 1, 2006) undermines its position. In *U.P.S.*, the court clarified that the "procedural requirements" that the EEOC must establish to enforce its administrative subpoena in district court are those set forth in 29 C.F.R. § 1601.16—requirements NIKE does not dispute the Commission satisfied.

The EEOC has broad authority to issue administrative subpoenas to obtain evidence relevant to a charge and discretion to revoke them. *See* 42 U.S.C.2000e–9; 29 U.S.C. § 161; 29 C.F.R. § 1601.16. While the Compliance Manual encourages investigators to seek evidence without a subpoena when possible, it makes clear that doing so is not a prerequisite to issuing one. *See* §24.12 ("The procedures in §24 are for EEOC staff use and lack of adherence to any procedures herein, not mandated by statute, *is not grounds for an appeal* . . . by filing a petition to revoke or modify.") (emphasis added). The Commission retains broad discretion to determine when compulsory process is appropriate, particularly where, as here, NIKE has not unequivocally provided the requested information. The Commission is not required to delay its investigation indefinitely in the face of partial or conditional cooperation.

Furthermore, it is irrelevant that the Subpoena seeks documents and information that the EEOC never previously requested from NIKE. Section 24.4(b) of the Compliance Manual contemplates that a comprehensive subpoena "seeking all the evidence needed to complete the investigation" may be necessary to avoid multiple subpoenas and time-consuming enforcement proceedings. *Id.* Even if the subpoena here does not seek *all* the evidence that may be needed to complete the investigation, the fact that it seeks some information not previously sought in requests for information does not make it improper or unenforceable.

**B.      The Subpoena is based on a valid charge.**

NIKE next argues the charge of discrimination is invalid and the subpoena is therefore unenforceable. Under Title VII, the EEOC has the right to examine and copy "any evidence . . . relevant to the charge under investigation." 42 U.S.C. § 2000e–8(a). "[T]he existence of a charge that meets the requirements set forth in § 706(b) . . . is a jurisdictional prerequisite to judicial enforcement of a subpoena issued by the EEOC." *Shell Oil Co.*, 466 U.S. at 65; *see also* 42 U.S.C. § 2000e–6(e) (requiring the EEOC to ensure its investigations comply with 42 U.S.C. § 2000e–5, which sets forth minimal requirements for valid charges).

Section 706 of Title VII requires that discrimination charges be in writing, under oath or affirmation, and in a form prescribed by the EEOC. 42 U.S.C. § 2000e–5(b). Under this authority, the EEOC issued a regulation mandating that each charge include "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(3). In *Shell Oil*, the Supreme Court examined the requirements of this regulation as applied to charges filed by Commissioners alleging a pattern or practice of discrimination violating Title VII. The Court identified four factors to consider:

> *Insofar as [she] is able*, the Commissioner *should* identify the groups of persons that [she] has reason to believe have been discriminated against [(for e.g., women)], the categories of employment positions from which they have been excluded, the methods by which the discrimination may have been effected, and the periods of time in which [she] suspects the discrimination to have been practiced.

*Shell Oil Co.*, 466 U.S. at 73 (emphasis added). "The charge is not a 'complaint' and does not commence a civil action"; rather, it serves to notify the EEOC of potential discriminatory conduct. *EEOC v. Frank's Nursery & Crafts, Inc.,* 177 F.3d 448, 455 (6th Cir. 1999) (citing *Shell Oil Co.*, 466 U.S. at 68).

In evaluating the sufficiency of the charge, the *Shell Oil* factors are to be applied pragmatically. *EEOC v. Quad/Graphics, Inc.,* 63 F.3d 642, 647 (7th Cir. 1995). "[T]he key inquiry must be whether the allegations in the charge, when assessed against these four factors, fulfill the legislative and regulatory command that the charging Commissioner identify as precisely as possible the appropriate area of inquiry to determine whether there is a violation of the Act." *Id*. (observing, for instance, that it would not be possible for a Commissioner to identify the specific job classifications affected where an employer maintained several thousand job titles).

NIKE contends that the charge does not satisfy Title VII's minimal requirements and, therefore, the Subpoena is invalid. The contention is mistaken. The charge in this case comports with the requirements embodied in the statute; the allegations are in writing and under oath. The only question is whether the charge complies with § 1601.12(a)(3)'s minimal requirements. As explained below, this question is answered in the affirmative.

**(1) The content of the charge is sufficient.**

First, asserting vagueness and overbreadth, NIKE contends the charge is invalid because it allegedly fails to meet *Shell Oil's* basic requirements to identify the aggrieved persons, relevant job positions, and methods of discrimination. But a review of the charge shows that it describes, with sufficient particularity, the suspected illegality and therefore the investigative need. The charge identifies the groups affected by and methods of discrimination (e.g., White employees, applicants, and training program participants affected by employment decisions such as hiring, promotion, demotion, or separation); the type of discrimination (i.e., race (White) discrimination in violation of Title VII); and the time frame in which the alleged discrimination took place (i.e., NIKEs fiscal year 2020 and continuing thereafter). While the charge does not

identify individual victims, it describes them as "all White employees, former employees, prospective employees, and current and prospective training program applicants and participants who have been, continue to be, or may be in the future adversely affected by the [alleged] unlawful employment practices . . . ." The fact that the charge does not identify unascertained aggrieved persons or categories of employment positions affected—information uniquely in the possession of NIKE—does not make the charge deficient. *See Shell Oil Co*., 466 U.S. at 71, 73 (rejecting a requirement the charge specify "the persons injured, when and how," and finding that "[i]dentification of the job classifications at issue may be preferable, but it is not mandatory."); *Quad/Graphics, Inc.,* 63 F.3d at 648 (finding that Commissioner charge was not deficient for failing to identify affected job categories).

NIKE's assertion that the charge is overly broad is similarly unavailing. The breadth of the charge is a direct function of the scope of NIKE's implementation of its internal Diversity & Inclusion policy. To the extent that the policy was applied broadly, the Commission is entitled to investigate accordingly. Any resulting breadth in the charge is therefore attributable to NIKE's own practices, not to any defect in the charge itself.

**(2) The charge is not deficient for pursuit of a disparate impact claim.**

NIKE next argues that the charge is deficient and invalid because it is "based primarily on a disparate impact theory of discrimination"— a theory of liability which poses conflicts with the directives in the subsequently issued Executive Order 14281 (April 23, 2025). The charge primarily alleges a disparate treatment theory based on intentional discrimination against white individuals. NIKE fails to acknowledge that the disparate impact theory is alleged in the alternative and is not the exclusive theory contained in the charge. And NIKE does not argue that

the charge may not proceed on its theory of disparate treatment. Consequently, NIKE's argument concerning disparate impact does nothing to advance its appeal.

### C.    The statute of limitations does not limit the scope of the EEOC's pre-suit investigation.

NIKE objects to the temporal scope of the Subpoena, claiming the agency is limited to obtaining information from within the statute of limitations period, which NIKE alleges is 180 days prior to the charge date. NIKE is wrong on both counts. The EEOC is granted "a broad right of access to relevant evidence." *Univ. of Pa.*, 493 U.S. at 191; *see also McLane Co. v. EEOC*, 581 U.S. 72, 76 (2017). Information relevant to an investigation of discriminatory employment practices is not limited to the applicable statute of limitations. The EEOC may make "executive judgments about who to interview or what information to gather in the course of an investigation," including determining what information is relevant. *EEOC v. Blinded Veterans Ass'n*, 128 F. Supp. 3d 33, 45 (D.D.C. 2015) (citing *EEOC v. Keco Indus., Inc.*, 748 F.2d 1097, 1100 (6th Cir. 1984) ("[T]he nature and extent of an EEOC investigation into a discrimination claim is a matter within the discretion of that agency."); *Martin v. EEOC*, 19 F.Supp.3d 291, 303 (D.D.C. 2014) ("[T]he scope of an EEOC investigation is wholly within the discretion of that agency . . . .")). Moreover, the scope of the EEOC's investigatory power is distinct from its power to seek relief, which is limited by an applicable statute of limitations. *See, e.g., EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001) ("A party may not defeat agency authority to investigate with a claim that could be a defense if the agency subsequently decides to bring an action against it."); *EEOC v. Roadway Exp., Inc.*, 750 F.2d 40, 42 (6th Cir. 1984) (affirming district court's enforcement of two EEOC administrative subpoenas despite employer's argument that the charge was untimely because a subpoena enforcement action "is not the proper time to litigate the merits of a claim, either procedurally or substantively").

NIKE's cases do not compel a different result. In all but one, the EEOC had filed a federal action based on the underlying charge, and the courts were not addressing the EEOC's power to investigate pre-suit. *See EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271-72 (11th Cir. 2002) (establishing the statute of limitations for the EEOC's disparate treatment claims in a federal enforcement action); *EEOC v. FAPS, Inc.*, Civ. No. 10-3095, 2014 WL 4798802, at *24 (D.N.J. Sept. 26, 2014) (establishing the scope of discovery in a federal enforcement action); *EEOC v. Bloomberg L.P.*, 751 F. Supp. 2d 628, 645 (S.D.N.Y. 2010) (answering only the "narrow question" of the proper charge-filing period for a "pattern or practice" in a federal enforcement action). The only case NIKE cites that concerned the EEOC's pre-suit investigative authority, *EEOC v. Ocean City Police Dep't*, 820 F.2d 1378, 1380 (4th Cir. 1987) (en banc), *cert. granted, judgment vacated on other grounds*, 486 U.S. 1019 (1988), was vacated by the Supreme Court and involved a charge that was facially untimely.

Moreover, NIKE is incorrect in asserting that a 180-day statute of limitations applies to violations alleged in the charge. Because the charge was filed against NIKE in Oregon, which has a fair employment practices agency, the statute of limitations period before a timely charge is 300 days. *See* 42 U.S.C. § 2000e-5(e)(1) (time for filing charges is 300 days for states with fair employment practice agencies); 29 C.F.R. § 1601.13(e) ("A charge made by a member of the Commission shall be deemed filed upon receipt by the Commission office responsible for investigating the charge. The Commission will notify a FEP agency when an allegation of discrimination is made by a member of the Commission concerning an employment practice occurring within the jurisdiction of the FEP agency."). For these reasons, NIKE's timeliness objections are not persuasive.

10

**D.      The EEOC seeks relevant information and is not on a "fishing expedition."**

NIKE argues the Subpoena seeks irrelevant information and argues the EEOC is on a "fishing expedition" for evidence. But Congress conferred broad powers on the Commission to investigate charges of discrimination alleging violations of Title VII. Specifically, Title VII grants the EEOC access to "any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). "Since the enactment of Title VII, courts have generously construed the term 'relevant' and have afforded the Commission access to virtually any material that might cast light on the allegations against the employer." *Shell Oil Co.*, 466 U.S. at 68-69 (1984) (holding that the "relevancy" limitation on the EEOC's investigative authority is "not especially constraining."). *Accord EEOC v. Randstad*, 685 F.3d 433, 448 (4th Cir. 2012); *EEOC v. Schwan's Home Serv.*, 644 F.3d 742, 747 (8th Cir. 2011); *EEOC v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 639 F.3d, 366, 369 (7th Cir. 2011); *EEOC v. Kronos, Inc.*, 620 F.3d 287, 296 (3rd Cir. 2010); *EEOC v. Dillon Companies, Inc.*, 310 F.3d 1271, 1274 (10th Cir. 2002); *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 652 (7th Cir. 2002); *EEOC v. Roadway Exp., Inc.*, 750 F.2d at 43 (6th Cir. 1984); *EEOC v. Univ. of Pittsburgh*, 643 F.2d 983, 986 (3rd Cir. 1981). The EEOC does not need to present a "specific reason for disclosure" of the requested information. *Univ. of Pa.*, 493 U.S. at 194. Rather, "it is crucial that the Commission's ability to investigate charges of systemic discrimination not be impaired." *Shell Oil Co.*, 466 U.S. at 69.

Here, NIKE must produce information in response to the EEOC's subpoena because the EEOC seeks relevant information about NIKE's employment practices which might cast light on the allegations that NIKE engaged in unlawful disparate treatment. Despite NIKE's suggestion to

the contrary, the EEOC may subpoena information that was not previously requested in an administrative Request for Information when the respondent has not fully complied with such request and the agency reasonably believes the respondent will be uncooperative. *See* EEOC Compliance Manual, § 24.4(d). Moreover, NIKE's claim that the EEOC is engaged in a fishing expedition "fails to recognize that the EEOC's investigatory power is broader than the four corners of the charge; it encompasses not only the factual allegations contained in the charge, but also any information that is relevant to the charge." *Kronos Inc.*, 620 F.3d at 299.

Numerous courts have rejected arguments similar to NIKE's here. Seeking a broad range of information about NIKE's programs and practices does not transform the EEOC's investigation into an inappropriate "fishing expedition." Instead, courts have repeatedly recognized the relevance of information about matters not specifically mentioned in the charge, such as information about other job classifications, other departments, and related bases of discrimination. *See, e.g., EEOC v. Union Pac. R.R.*, 867 F.3d 843, 852 (7th Cir. 2017) (ruling that the EEOC was entitled to company-wide information about individuals who sought the position of assistant signalman, including computerized personnel information); *Randstad*, 685 F.3d at 450-51 (deferring to the Commission's opinion that data on the types of jobs into which workers were placed, even placements from offices other than the one where the charging party worked, might help the EEOC assess the requirement that employees be able to read and write English); *Schwan's Home Serv.*, 644 F.3d at 748 ("Because the EEOC's investigation into Milliren's charge of individual gender discrimination revealed potential systemic gender discrimination, the EEOC had the authority to subpoena information relevant to systemic gender discrimination even absent a valid systemic charge by Milliren"); *Kronos, Inc.*, 620 F.3d at 297-98 (holding that district court abused its discretion by narrowing the subpoena to certain

positions when grocery store used the assessment tool "in hiring for every retail position" and the data "may shed light on whether the Assessment has an adverse impact on persons with disabilities"; in addition, nationwide data would provide context for discrimination alleged to have occurred in West Virginia), *further construed in EEOC v. Kronos, Inc.*, 694 F.3d 351, 362-65 (3rd Cir. 2012). Here, the Subpoena seeks information necessary to assess whether and how NIKE's practices resulted in disparate treatment regarding employment opportunities for White workers. For example, and as discussed more fully below, the agency needs to understand NIKE's organizational structure and how it has changed over time (Request #1); information and data related to the company's 20204 layoffs to assess whether and how those layoffs were conducted in a way that discriminated against White workers (Requests #2-4); information related to whether and how NIKE tracked and used employee race and ethnicity data in setting executive compensation and / or reporting such measures to high level executives (Requests #5-6 and 12); and information regarding various programs and processes NIKE utilized under the guise of "DEI" that may have utilized employees' or applicants' racial or ethnic identity in a way that was either directly discriminatory or encouraged disparate treatment based on race or ethnicity (Requests #7-11). These topics are all directly related to the allegations in the Charge. Thus, the EEOC is not on a fishing expedition but seeks relevant information.

E.    **The general scope of the Subpoena is not overly broad or unduly burdensome.**

As stated, Title VII entitles the agency to "any evidence of any person being investigated" that "relates to unlawful employment practices" and "is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). For this purpose, relevancy is construed broadly, "afford[ing] the Commission access to virtually any material that might cast light on the allegations against the employer." *Shell Oil*, 466 U.S. at 68-69. Additionally, NIKE's assertion

13

that gathering the requested information would be unduly burdensome in light of its normal operating costs is not supported by sufficient data or evidence to meet the necessary standard. *See Quad/Graphics, Inc.*, 63 F.3d at 648-49 (employer failed to show undue burden because it failed to show compliance with subpoena would threaten normal business operations); *EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993) (employer failed to demonstrate that subpoena was unduly burdensome where it did not offer any specific estimate of cost involved or show how compliance would impact normal operations of employer); *EEOC v. Ferrellgas, L.P.*, 97 F.4th 338, 350 (6th Cir. 2024); *EEOC v. Md. Cup Corp.*, 785 F.2d 471, 479 (4th Cir. 1986); *EEOC v. Joon, LLC*, No. 3:18mc3836-WKW-GMB, 2019 WL 3002969, at *4 (M.D. Ala. March 4, 2019) (employer failed to quantify cost of subpoena compliance). With these principles in mind, the Commission finds that NIKE's overbreadth and burdensomeness arguments do not compel revocation.

The Commission does note, however, that the production process would be eased (and the risk of inefficiencies reduced) with more formal production guidance. Therefore, the Subpoena is modified to add the EEOC Form of Production / Load File Specifications attached hereto as Attachment A.

**F.    NIKE cannot refuse to disclose confidential or proprietary information in response to the EEOC's subpoena.**

NIKE must disclose relevant information in response to the EEOC's subpoena, even if it is confidential or proprietary. To the extent NIKE withholds any information because of attorney-client privilege or work product, it should produce a privilege log identifying the material it withholds with specificity.

With an EEOC subpoena, "confidentiality is no excuse for noncompliance since Title VII imposes criminal penalties for EEOC personnel who publicize information obtained in the course

of investigating charges of employment discrimination." *EEOC v. Bay Shipbuilding Corp.*, 668 F.2d 304, 312 (7th Cir. 1981). The Supreme Court has noted that though Title VII establishes no privilege to protect employees' privacy, "Congress did address situations in which an employer may have an interest in the confidentiality of its records" by making it unlawful under 42 U.S.C. § 2000e-8(e) for the Commission to disclose information obtained under its investigative authority. *Univ. of Pa.*, 493 U.S. at 191-192 (rejecting university's argument that the EEOC had to show more than relevance as a condition to obtain confidential, tenure-review materials); *see also EEOC v. St. John Hosp. & Med. Ctr.*, No. CIV.A. 12-50225, 2012 WL 3887626, at *3 (E.D. Mich. June 1, 2012), *report and recommendation adopted*, No. 12-50225, 2012 WL 3888072 (E.D. Mich. Sept. 7, 2012) (granting in part EEOC application to enforce administrative subpoena despite employer's concerns about confidentiality because "the statutory safeguards already in place are sufficient to protect the medical and personal contact information requested by the EEOC."); *accord EEOC v. Peterson, Howell & Heather, Inc.*, 702 F. Supp. 1213, 1219 (D. Md. 1989) (the EEOC's investigation of a Commissioner's Charge does not implicate the Fourth Amendment because the investigation is not a search into an area where society recognizes an expectation of privacy). To the extent NIKE is concerned about disclosure of confidential trade secret, commercial, or financial information, it may (and should) designate such materials in accordance with Section 83.4(e) of the Compliance Manual and 5 U.S.C. Section 552(b). Therefore, NIKE's refusal to provide relevant information "thwarts the EEOC's efforts to carry out the manifest intent of the Congress." *EEOC v. City of Orange, Tex.*, 905 F. Supp. 381, 382–83 (E.D. Tex. 1995) (enforcing EEOC subpoena and ordering the production of tapes despite state law designed to protect their confidentiality).

Finally, none of the cases NIKE cites to refuse to produce its confidential or proprietary information concerns an EEOC administrative subpoena. *See* Petition to Revoke at 25-26 (citing *Buergofol GmbH v. Omega Liner Co.*, No. 22-CV-04112, 2025 WL 1593079, at *2 (D.S.D. June 5, 2025); *Flat Branch Mortg., Inc. v. Fricke*, No. 23:04143-CV, 2025 WL 1914164, at *5 n.5 (W.D. Mo. Apr. 16, 2025), *report and recommendation adopted*, 2025 WL 1554964 (June 2, 2025); *Warner Chilcott Ltd. v. Express Scripts, Inc.*, No. 17MC250, 2017 WL 4084045, at *2 (E.D. Mo. Sept. 14, 2017); *Poulos v. Summit Hotel Props., LLC*, No. CIV 09-4062, 2010 WL 2640396, at *3 (D.S.D. July 1, 2010); and *Litton Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 530 (E.D. Wis. 1990)). Instead, each case concerns the proper scope of discovery under the Federal Rules of Civil Procedure between private parties. Thus, NIKE's cases are not applicable here.

### G. Enforcement of the Subpoena does not reflect any change in EEOC's interpretation of Title VII, nor does it violate NIKE's due process rights.

NIKE asserts that it should not have to comply with the subpoena because the Commission's investigation conflicts with it "own public statements, guidance, amicus briefs, and Strategic Enforcement Plan, all of which have supported and encouraged DEIA initiatives." NIKE claims this creates a due process issue that prevents the Commission from investigating the company's employment practices. But NIKE has not identified any fair notice issue, much less one rising to the level of creating a due process constitutional bar to an administrative investigation. Title VII on its face prohibits any unlawful employment practice "because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S. Code § 2000e-2(a). As *Ames* v. *Ohio Department of Youth,* 05 U.S. 303, 310 (2025), explains, Supreme Court caselaw has long been "clear that the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group." Rather, Title VII

provides the "same protections for every 'individual.'" *Id.* The Commission is entitled to investigate whether NIKE's employment practices violated this law.

NIKE develops no specific arguments in the Petition identifying the practices or policies that it implemented, nor does it identify any alleged specific statements by the Commission that supposedly led it to believe that its practices or policies were lawful under Title VII. At this stage, the Commission needs information from NIKE to understand the company's practices and determine whether they resulted in disparate treatment based on race or ethnicity. Any argument about constitutionality or administrative law issues is not yet ripe.[1]

To the extent NIKE relies on 42 U.S.C. § 2000e-12(b) and 29 C.F.R. § 1601.93, which provide that there will be no liability where a respondent "pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission," 42 U.S.C. § 2000e-12(b)(1), NIKE has not pointed to any specific "written interpretation or opinion of the Commission" on which it relied in adopting its DEI-related policies and practices. The regulation identifies three limited categories which qualify as a "written interpretation or opinion of the Commission." 29 C.F.R. § 1601.93" NIKE does not cite any such documents in the Petition.[2] Moreover, even if NIKE had developed these arguments, they would provide no basis for non-compliance with the Subpoena, as the

---

[1] The Commission disputes that a DEI program that treated individuals differently on the basis of race would provide any basis to shield NIKE from Title VII liability at the merits stage. But in all circumstances, the mere existence of a DEI program cannot act to shield an employer from investigation by the Commission.

[2] NIKE references its Position Statement but wholly fails to develop any argument in this Petition regarding any document cited in the Position Statement showing that any of those documents fall within 29 C.F.R. § 1601.93's ambit or otherwise provide a basis for non-compliance with the subpoena.

arguments would go to the merits of any ultimate suit and are not appropriately considered at the subpoena determination stage. *EEOC v. Roadway Express, Inc*., 750 F.2d at 42.

Therefore, NIKE's due process and change of position arguments provide no basis to revoke the subpoena.

### H.  NIKE's unfounded concerns about EEOC administrative management do not invalidate the Subpoena.

Last, NIKE suggests that the Subpoena is invalid because the EEOC transferred the investigation to its St. Louis District Office, which operates with employees whose duty stations include Missouri, Oklahoma, Kansas, and Noth Carolina. NIKE argues, in conclusory fashion and without citation to authority or evidence of tangible harm, that the transfer is a "procedural deficiency" that "serves no legitimate investigative purpose, [and] injects additional delays and unnecessary expenses." Finally, NIKE speculates that the motivation for EEOC's transfer is to "forum shop."

The agency's decision to transfer a charge investigation from one office to another is not a procedural deficiency. There is no procedural or other requirement that a charge of discrimination be investigated by an EEOC office that is located in close proximity to a respondent's headquarters or the employment actions at issue. Furthermore, it is not uncommon for EEOC to assign and reassign investigations among its field offices for a variety of reasons, including but not limited to balancing disproportionate workloads, avoiding conflicts of interest (whether actual or perceived), encouraging cross-district collaborations, and promoting efficiency. The reasons for transfer need not be made clear to NIKE or any respondent.

NIKE's speculation of forum shopping is too vague and remote to invite merit. The EEOC's investigation is not an adversary proceeding and the EEOC's cause determination is non-adjudicative and carries no determinative consequences; further, there is no indicia that the

agency's transfer of the charge was motivated by anticipatory litigation in a venue disadvantageous to NIKE. *See e.g. EEOC v. Keco Indus., Inc.*, 748 F.2d 1097, 1100 (6th Cir. 1984) (noting "EEOC's reasonable cause determination does not adjudicate rights and liabilities; it merely places the defendant on notice of the charges against him. If the charge is not meritorious, procedures are available to secure relief, i.e. a de novo trial in the district court."). NIKE's unfounded concerns about the location of the EEOC's assigned investigator does not merit revocation of the Subpoena.

## III.    NIKE's Request-Specific Objections

In addition to its general objections, NIKE also raises objections to specific Subpoena requests. None of these objections provide a valid basis for revoking the Subpoena, but some Subpoena requests will be modified or clarified, as set forth below.

### A.    Subpoena Request #1: Documents or narrative description of NIKE's organizational structure and unit heads from June 1, 2019 to the present

In response to prior requests regarding this topic, NIKE did not produce any requested information, but only referred the EEOC to current corporate governance information on its website and a list of subsidiaries filed as an exhibit to the company's May 2024 SEC Form 10-K. In "Responses and Objections" to the Subpoena dated October 30, 2025[3], NIKE states it "will agree to produce Workday-generated reports reflecting the 'Senior Leadership Team' at 6-month intervals within the applicable limitations period." None of these responses are sufficient. The Commission seeks to understand NIKE's organizational structure, including but not limited to brands, divisions, functional units, design teams, and other units, and how that structure has

---

[3] While NIKE's October 30, 2025 "Responses and Objections" duplicated many arguments from its October 7, 2025 "Petition to Revoke or Modify", it also provided some additional information, as discussed in this section.

changed from June 1, 2019 to the present. It is possible that production of NIKE's "Workday-generated reports reflecting the 'Senior Leadership Team' at 6-month intervals" during this time period will adequately identify the heads of these units, but it is unclear that such reports will describe the organizational structure in a way that clarifies the hierarchical authority between units or identifies the dates of changes to unit structure. This request is relevant to the Commission's investigation because understanding NIKE's organizational structure will assist the Commission in analyzing information regarding NIKE's employment practices. It may also enable the agency to limit requests for additional information to certain units. The Subpoena is not intended to seek detailed information about NIKE units wholly located outside the United States, aside from such units' reporting relationship or reporting structure with units located within the United States. Thus, NIKE must produce the requested information, with this clarification regarding units wholly located outside the United States.

**B. Subpoena Requests #2-4: Documents and information related to layoffs of employees in NIKE's U.S. Corporate workforce from January 1, 2024 to the present**

In response to prior requests regarding this topic, NIKE produced limited information, including what appear to be training slides titled "Talent Assessment and Assignment Readiness for HRBPs" and dated February 2024. Presumably these slides were produced to show criteria used for making layoff decisions. In its October 30, 2025 "Responses and Objections", NIKE objects to producing the requested information, asserting that the terms "layoff" and "U.S. Corporate workforce" are undefined, and refers again to the "Talent Assessment" document. NIKE further states that it "interprets the term 'layoff' as a group reorganization or restructuring involving 10 or more employee changes or impacts" and that it "will agree to produce" limited information, including "dates of relevant group terminations", "a report of employees . . . who

20

were coded as 'Reduction in Force' in NIKE's database in connection with the relevant group reorganization or restructuring", "WARN notice(s), FAQs, and press release(s) (if any exist)", and "race/ethnicity data for the employees identified."

The Commission rejects NIKE's objection that the terms "layoff" and "U.S. Corporate workforce" are undefined. The Subpoena defines "layoff" as employee separations initiated "because of business needs, such as lack of work, reduction in force, restructuring, or financial necessity" and "not due to any fault or misconduct of the employee." And NIKE itself uses and has defined the term "U.S. Corporate workforce", including in its "FY23 Impact Report" where it states the term includes "all U.S.-based full-time employees who do not work in our retail stores, distribution centers (DCs) or Air Manufacturing Innovation (Air MI)."

Without information regarding NIKE's organizational and unit structure, it is not possible to assess whether information limited to "group reorganization[s] or restructuring[s] involving 10 or more employee changes or impacts" would fully respond to these requests. It is possible that information related to all employees coded as "Reduction in Force" in NIKE's database during the requested time period would constitute a full response, but the Commission cannot make such a determination without more information regarding the factors NIKE uses when deciding whether to use its "Reduction in Force" code. Moreover, WARN notices, FAQs, and press releases would not fully respond to Subpoena Request #3. And while the EEOC is pleased that NIKE intends to produce some requested employee data, all the data required by Subpoena Request # 4 must be produced.

For these reasons, the Commission modifies its definition of "Layoff" to refer to all employee reductions in force that resulted in one or more employee separations coded as

"Reduction in Force" in NIKE's database. With that definition, NIKE is required to produce all information sought in Subpoena Requests 2, 3, and 4.

### C. Subpoena Requests #5-6: Documents regarding NIKE's use of employee race or ethnicity data in setting executive compensation and related data

In response to prior requests regarding these topics, NIKE referred the EEOC to publicly available information, including annual proxy statements, SEC filings, and its investor relations website. It also referred to its "People and Planet modifier" as a factor that can affect executive compensation but states that the modifier was not applied because other metrics were not met. NIKE's October 30, 2025 "Responses and Objections" to the Subpoena repeat this information.

NIKE's general reference to large publicly available documents is inadequate; to the extent NIKE intends to submit information in such documents as responsive, it must refer to the specific pages or sections it relies on. Moreover, none of NIKE's responses explain the "People and Planet modifier", how it is calculated, or how it is applied. Regarding data NIKE maintained on its employment of racial or ethnic minority employees within its U.S. Corporate workforce, the company only referred the EEOC to prior filings with OFCCP and its EEO-1 reports. It is not plausible or likely that these filings reflect all data responsive to Subpoena Request 6.

NIKE has not stated any objections or provided sufficient information to justify revocation or modification of these requests. The information sought in Subpoena Request 5 is relevant to NIKE's use of race or ethnicity data in compensating executives over time. The information sought in Subpoena Request 6 is relevant to multiple charge allegations. NIKE is required to produce the requested information.

### D. Subpoena Requests #7-8: Documents and information related to NIKE's "Diverse Slates" process

In response to prior requests related to its "Diverse Slates" process and this Subpoena, NIKE provided a narrative description of "Diverse Slates" that partially responds to Subpoena Request 7. But NIKE failed to explain whether, how, or why the process has changed since it was implemented in 2018, which positions the process applies to, and who oversees application of the process. NIKE has failed to provide any response to Subpoena Request 8. Further, to the extent that NIKE asserts its Functional Affirmative Action Plan Agreement with OFCCP, that agreement simply constitutes an agreement that NIKE could organize its OFCCP regulatory compliance efforts based on functional business units and does not grant NIKE permission or regulatory approval to use "Diverse Slates" programs, nor does it prevent the EEOC from investigating NIKE's compliance with Title VII.

NIKE has not stated any objections or provided sufficient information to justify revocation or modification of these requests. The information sought is directly relevant to the Commission's investigation and must be produced.

### E. Subpoena Requests #9-11: Documents, information, and data related to various employee programs

In response to prior requests regarding these topics, NIKE produced narrative descriptions and limited documents related to Amplify, DEI Mentorship Program, Marketing Vanguard Program, and CNEXT. NIKE objects to Subpoena Request 9, 10, and 11 on the grounds that they are not geographically limited, and objects that certain phrases, such as "eligibility criteria," "responsible for the operation of," "involved with the program," "considered for," and "non-selection for" are undefined, vague, and ambiguous. NIKE also objects that some programs identified in Request 9 were open to all employees (or all United

States employees), and therefore providing a full response to Requests 10 and 11 would essentially require production of all of NIKE's employee data from June 1, 2019 to the present.

The Commission does not find that the terms "eligibility criteria," "responsible for the operation of," "involved with the program," "considered for," and "non-selection for" are undefined, vague, and ambiguous as used in these requests. But the Subpoena is not intended to seek information about programs utilized only outside the United States. Thus, to the extent NIKE asserts any programs identified in Request 9 are not available or do not apply to company employees in the United States, NIKE is directed to identify those programs by name and will not be expected to provide any other requested information related to those programs. In addition, the Subpoena is not intended to seek all of NIKE's U.S. employee data from June 1, 2019 to the present. To the extent NIKE asserts any programs identified in Request 9 applied or were available to all United States employees, it should provide that information in response to Request 9. NIKE need not respond to Requests 10 and 11 with respect to those specific programs. To the extent NIKE has already provided narrative descriptions of Amplify, DEI Mentorship Program, Marketing Vanguard Program, and CNEXT, it does not need to restate those descriptions.[4] Thus, NIKE must produce the information sought in Subpoena Requests 9, 10, and 11, as modified in this paragraph.

F. **Subpoena Request #12: Documents and information related to NIKE's statement in its FY20 Impact Report that the company Respondent "intend[ed]**

---

[4] NIKE states that it also produced information regarding McKinsey & Company's Black Leadership Academy and Management Accelerators, "sponsorship of or work with any third-party organizations or vendors focused on 'targeted leadership development for Native American & Indigenous leaders,'" and the Human Resources Rotational Associate Program. This information was not readily located in a review of NIKE's prior submissions. NIKE may refer the District Office to the specific documents to which it refers if it does not wish to re-produce that information.

> **to give all of Respondent's Vice Presidents access to representation data with sharp accountability to deliver on their Diversity & Inclusion (D&I) plans."**

NIKE's objections to this request are all general objections discussed in Section II and are rejected for the reasons stated above. But NIKE's objection regarding the temporal scope of this request suggests it may misunderstand the request. The request refers to NIKE's statement in its FY20 Impact Report—which was published March 10, 2021—that the company was *going to* give representation data to company vice presidents, not that it has already done so. Specifically, page 73 of the report states, "We *intend* to give all of NIKE's Vice Presidents access to representation data, with sharp accountability to deliver on their Diversity & Inclusion (D&I) plans." (emphasis added) Subpoena Request 12 seeks information NIKE provided to its vice presidents after publication of this report, in accordance with this commitment. NIKE might have provided that information to its vice presidents later in 2021, or in 2022, or even later; the information is relevant regardless, as discussed regarding Subpoena Requests 5 and 6 above. To the extent the "representation data" referred to in the FY20 Impact Report overlaps with the data NIKE tracked or maintained as described in Request 6, NIKE should so state and need not duplicate its production but should identify which data NIKE provided its vice presidents. With these clarifications, NIKE is required to produce the requested information.

## DETERMINATION

For the reasons set forth above, NIKE's Petition to Revoke or Modify is denied in part and granted in part. NIKE's request that the Commission revoke Subpoena SL-25-08 is DENIED. NIKE's request that the Commission modify Subpoena SL-25-08 is GRANTED IN PART as set forth herein. Accordingly, NIKE shall provide all documents and information requested in Subpoena SL-25-08, as modified herein, to Investigator Ahlam Abdellatif of the Equal Employment Opportunity Commission, following the Form of Production / Load File

Specifications attached hereto as Attachment A, within twenty-one (21) days of the date of this

Determination.

ON BEHALF OF THE COMMISSION:

RAYMOND WINDMILLER

Digitally signed by
RAYMOND WINDMILLER
Date: 2026.01.05
18:02:14 -05'00'

Date: _January 5, 2026_

Raymond Windmiller
Executive Officer
Executive Secretariat
Equal Employment Opportunity Commission