IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

          Applicant,

    v.

NIKE, INC.,

          Respondent.

Honorable Cristian Stevens

Case No. 04:26-mc-00128

**RESPONDENT NIKE, INC.'S OPPOSITION
TO THE EEOC'S APPLICATION TO SHOW CAUSE**

**Dated:** March 16, 2026

Respectfully submitted,

NIKE, INC.

By: _/s/ Jeff Jensen_

Amanda A. Sonneborn*
Andrew R. Cockroft*
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: (312) 995-6333
asonneborn@kslaw.com
acockroft@kslaw.com

Andrew Michaelson*
KING & SPALDING LLP
1290 6th Ave
14th floor
New York, NY 10104
Tel: (212) 556-2100
amichaelson@kslaw.com

Jeff B. Jensen #46745 (MO)
TORRIDON LAW PLLC
13354 Manchester Rd., Suite 210
St. Louis, Missouri 63131
Telephone: (314) 920-0138
jjensen@torridonlaw.com

Tara Helfman*
Genevieve M. Kelly*
TORRIDON LAW PLLC
801 Seventeenth Street NW,
Suite 1100
Washington, DC 20006
Tel: (202) 249-6900
thelfman@torridonlaw.com
gkelly@torridonlaw.com

*Pro hac vice motion pending or forthcoming

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..........................................................................................................................1

BACKGROUND ...........................................................................................................................2

      A.    NIKE's U.S. Corporate Workforce Consists of Thousands of Individuals .........................2

      B.    The Charge Seeks to Broadly Investigate NIKE's Employment Conduct .........................3

      C.    NIKE Cooperates, But Still Receives a Subpoena ...............................................................3

      D.    The EEOC's Determination Modifies the Subpoena ...........................................................4

      E.    NIKE Agrees to Provide Responsive Documents and Information, and Offers to Meet and Confer Regarding Each Request ...............................................................................4

      F.    The EEOC Files the Application Without Attempting to Meet and Confer ......................5

      G.    NIKE Continues Its Rolling Production ...............................................................................5

ARGUMENT ................................................................................................................................6

I.    The Court Should Deny the Application and Order the EEOC to Meet and Confer with NIKE ...........................................................................................................................6

II.    The Court Cannot Order Compliance "In Full" Because the Subpoena Requests are Vague, Overbroad, and/or Unduly Burdensome ............................................................7

      A.    Request Nos. 2(c-d) and 3(b-f) are Vague, Overbroad, and Unduly Burdensome ..............7

      B.    Request No. 5 Seeks Irrelevant Information, But NIKE Will Further Comply ................10

      C.    Request No. 6 Seeks Information That NIKE Has Already Produced to the EEOC .....11

      D.    Request No. 8 is Vague, Seeks Irrelevant Information, and is Overbroad .........................11

      E.    Request Nos. 10-11 are Vague, Overbroad, and Unduly Burdensome .............................13

III.    The EEOC is Not Entitled to Costs .............................................................................15

CONCLUSION ...........................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ASI, Inc. v. Aquawood, LLC,*
   No. CV 19-763, 2023 WL 7323322 (D. Minn. June 27, 2023)................................................6

*Bittner v. United States,*
   598 U.S. 85 (2023)...............................................................................................................13

*EEOC v. Forge Indus. Staffing Inc.,*
   No. 14-MC-00090, 2014 WL 6673574 (S.D. Ind. Nov. 24, 2014)………………………………9

*EEOC v. Morgan Stanley & Co.,*
   132 F. Supp. 2d 146 (S.D.N.Y. 2000).................................................................................9

*EEOC v. Packard Elec. Div., Gen. Motors Corp.,*
   569 F.2d 315 (5th Cir. 1978)...............................................................................................8

*EEOC v. Royal Caribbean Cruises, Ltd.,*
   771 F.3d 757 (11th Cir. 2014) .........................................................................................8, 9

*EEOC v. United Air Lines, Inc.,*
   287 F.3d 643 (7th Cir. 2002)...........................................................................................8, 13

*EEOC v. VisionPro Networks, Inc.,*
   No. 24-MC-00356, 2024 WL 3643818 (E.D.N.Y. Aug. 2, 2024) ......................................15

*Fed. Exp. Corp. v. Holowecki,*
   552 U.S. 389 (2008)........................................................................................................7, 13

*FTC v. Shaffner,*
   626 F.2d 32 (7th Cir. 1980)..................................................................................................8

*In re Grand Jury Subpoena: Subpoena Duces Tecum,*
   829 F.2d 1291 (4th Cir. 1987) ..............................................................................................8

*Hammer v. Ashcroft,*
   383 F.3d 722 (8th Cir. 2004), *abrogated on other grounds by Ames v. Ohio Dep't of*
   *Youth Servs.,* 605 U.S. 303 (2025) ....................................................................................12

*Scobee v. USAA Cas. Ins. Co.,*
   No. 4:22-CV-488, 2023 WL 2837782 (E.D. Mo. Apr. 7, 2023) .........................................6

*Texas v. EEOC,*
   933 F.3d 433, 441 (5th Cir. 2019) .......................................................................................7

*Young v. United Parcel Serv., Inc.*,
    575 U.S. 206 (2015)............................................................................................................13

**Statutes**

28 U.S.C. § 161(2) ................................................................................................................7

42 U.S.C. § 2000e-5(k)........................................................................................................15

42 U.S.C. § 2000e-12(b) ......................................................................................................13

**INTRODUCTION**

Respondent NIKE, Inc. ("NIKE" or "Company") hereby opposes the Application of the Equal Employment Opportunity Commission ("EEOC" or "Commission") for an Order to Show Cause (the "Application").

Like the EEOC, NIKE stands firmly against discrimination.  To that end, it has sought to advance the cause of equality by, among other things, working to ensure that all of its employees and prospective employees have equal opportunity to excel.  The EEOC issued a subpoena to NIKE, Ex. N (the "Subpoena"), to discover facts concerning the Company's conduct in this space, and NIKE has been responsive to and cooperative with the EEOC's requests. Fundamentally, the Court should deny the Application because NIKE has been reasonably complying with the Subpoena and the EEOC has refused NIKE's offer to meet and confer regarding certain Subpoena requests that are vague and potentially burdensome.

The Application prematurely seeks an order from this Court mandating compliance "in full" with requests that NIKE produce documents and information concerning thousands of employment decisions and dozens of programs dating back to 2018, extending through a series of reductions in force ("RIFs") occurring in 2024, and continuing right up to the present.  The Subpoena consists of 12 separate requests (the "Requests").  In its initial response, NIKE produced approximately 13,000 pages of relevant documents and information concerning 10 Requests, indicated that it would continue to produce responsive materials on a rolling basis (which it has done), offered to meet and confer with the EEOC regarding any response that the Commission believed was incomplete, and additionally asked to meet and confer regarding certain requests that, as drafted, are unclear and burdensome.  The EEOC did not respond to NIKE's offer to meet and confer.  Instead, on February 4, 2026, just nine days after receiving NIKE's initial response, the EEOC filed the Application.

There is good reason to believe that a meet-and-confer would resolve the issues in dispute. The Application complains about NIKE's responses to seven Requests. *See* App. at 4-7. Of these, there appears to be no dispute regarding the scope of NIKE's compliance with two (Nos. 5 and 6), and as to the remaining five (Nos. 2, 3, 8, 10 and 11), NIKE simply needs clarity as to what, exactly, would satisfy the EEOC's needs and why certain information that has already been provided may be insufficient. As drafted, these five Requests are susceptible to multiple interpretations, some of which could result in undue burden and require significant time to complete. Through discussions, it may well be discovered that the EEOC is seeking narrower productions more quickly. That is why NIKE requested to meet and confer in each of its responses, why courts generally require parties to meet and confer before burdening them with disputes, and why a meet-and-confer here—rather than a premature, and potentially unnecessary Application—would make good sense.

Accordingly, in light of NIKE's good faith and ongoing efforts to comply with the Subpoena, NIKE respectfully requests that the Court order the parties to meet and confer and/or deny the Application as premature and for the reasons stated herein.[1]

## BACKGROUND

### A.      NIKE's U.S. Corporate Workforce Consists of Thousands of Individuals

NIKE is a global leader in the design and development of athletic footwear, apparel, equipment, accessories, and services. *See* Declaration of Michelle McCray ("McCray Decl.") ¶ 6. Just as NIKE takes pride in the unique perspectives, experiences, accomplishments, talents, styles, and ingenuity of the athletes and consumers who wear its products, NIKE celebrates those same attributes and contributions in its workforce. NIKE does not believe and has never believed that the qualities that make its employees great are predicated on race.

---

[1] NIKE separately requests that the Court dismiss or transfer the Application for improper venue for the reasons stated in its Motion to Dismiss and/or Transfer filed contemporaneously herewith.

As of March 10, 2026, NIKE employed approximately 9,600 full-time employees in its U.S. corporate workforce.  *See id.* ¶ 9.  This figure does not include employees of NIKE subsidiaries.  *Id.*

Since January 1, 2024, NIKE has made more than 1,300 hiring decisions and experienced thousands of employment separations in its workforce, including approximately 1,700 separations coded as a "Reduction in Force."  *See id.* ¶¶ 10-11.

### B.    The Charge Seeks to Broadly Investigate NIKE's Employment Conduct

On May 24, 2024, then-Commissioner Andrea Lucas issued a Commissioner Charge of Discrimination against NIKE alleging that the Company discriminated against "White employees, applicants, and training program participants" with respect to all employment decisions, including "hiring, promotion, demotion, or separation decisions (including selection for layoffs); internship programs; and mentoring, leadership development, and other career development programs." Declaration of Andrew Cockroft ("Cockroft Decl."), Ex. A (the "Charge") at 1.  The Charge does not identify any specific positions at issue, does not identify any aggrieved individuals by name, and does not limit the alleged violative conduct to any specific employment practice or set of practices.  *See id.* at 1-2.

### C.    NIKE Cooperates, But Still Receives a Subpoena

Between May 28, 2024, and July 10, 2025, the EEOC served three sets of Requests for Information ("RFIs") on NIKE.  Cockroft Decl., Exs. B-I, M.  NIKE timely responded to each of the RFIs and produced approximately 1,000 pages of responsive documents to the EEOC.  Cockroft Decl. ¶ 15.

Between July 10, 2025 and September 30, 2025, the EEOC did not engage in meet-and-confer efforts—despite NIKE's repeated requests—nor did the EEOC identify any deficiencies in the information or documents NIKE provided in response to the RFIs.  Notwithstanding, on September 30, 2025, the EEOC served NIKE with the Subpoena.  *Id.*, Ex. N (the "Subpoena").

3

On October 7, 2025, NIKE filed its Petition to Revoke, requesting that the EEOC revoke the Subpoena in its entirety, while also providing written responses to each of the Requests. *Id.*, Ex. P. In its Petition, NIKE once again expressed its willingness and availability to meet and confer regarding the scope of potentially responsive additional documents. *Id.* at 3 n.3.

**D.   The EEOC's Determination Modifies the Subpoena**

On January 5, 2026, the EEOC issued a Determination on NIKE's Petition to Revoke. *Id.*, Ex. Q ("Determination"). Though the Determination does not revoke any Request entirely, the EEOC modified and clarified several Requests. For example, the Determination clarified that the Subpoena's use of the term "U.S. Corporate workforce" is not vague because NIKE itself defines the term to encompass "full-time employees who do not work in [Nike] retail stores, distribution centers (DCs) or Air Manufacturing Innovation (Air MI)." *Id.* at 21.

Even though the Determination narrowed the Subpoena in some respects, the Subpoena remains overly broad. For example, Request Nos. 2-4 seek documents as well as individualized information regarding every employee that was impacted by a reduction in force since January 1, 2024. *See* Subpoena at 3-4. Such individualized information includes the reasons (with undefined specificity) for including each individual in the layoff as well as the reasons (again, with undefined specificity) *any* retained employees were *not* laid off. *See id.* In other words, these Requests demand NIKE to justify every separation and retention for at least a two-year period encompassing a number of RIFs impacting, at various times, NIKE's entire U.S. Corporate workforce. *See id.*

**E.   NIKE Agrees to Provide Responsive Documents and Information, and Offers to Meet and Confer Regarding Each Request**

NIKE timely responded to the Subpoena on January 26-27, 2026, and produced approximately 13,000 pages of additional documents. Ex. T (the "Subpoena Response"); Cockroft Decl. ¶ 23. In its response, NIKE stated that it "is available and willing to meet and confer with the EEOC regarding its responses and document production[,]" and that NIKE will continue to produce

4

documents responsive to the Subpoena on a rolling basis, including a planned production of documents "the week of February 9, 2026[.]"  Ex. T, Subpoena Response at 2, 29.  Furthermore, in response to each Request, NIKE repeated its desire to meet and confer, "should the EEOC determine additional information is needed for a complete response."  *Id.* at 29.

NIKE did not stand on objections with respect to any Request.  To the contrary, NIKE agreed to collect and produce documents on a rolling basis regarding each Request.  *See generally id.*

**F.      The EEOC Files the Application Without Attempting to Meet and Confer**

Nine days after receiving NIKE's responses, and without responding to NIKE's requests to meet and confer, the EEOC filed the Application.  The Application describes alleged deficiencies regarding Request Nos. 2(c)-2(d), 3(b)-3(f), 5-6, 8, and 10-11.  *See* App. at 4-7.  As noted, NIKE had sought to meet and confer regarding each of these Requests.

**G.      NIKE Continues Its Rolling Production**

Notwithstanding the filing of the Application, NIKE has continued its rolling production as promised in its response to the Subpoena.  Though NIKE had already provided responsive information and documents in its Subpoena Response, on February 13, 2026, NIKE produced additional documents responsive to Request Nos. 3(c) & 3(e).  *See* Cockroft Decl., Ex. U (the "First Supplemental Response").  On March 6, 2026, NIKE again provided supplemental information and produced additional documents responsive to Request Nos. 3(a), 3(b), 3(e), 3(f), 3(g), 9, 10, and 11.  *Id.*, Ex. V (the "Second Supplemental Response").  Collectively, these productions included over 1,300 pages of documents, and NIKE continues to move forward with collecting and producing documents and information responsive to the Subpoena.  Cockroft Decl. ¶ 27.

## **ARGUMENT**

**I.    The Court Should Deny the Application and Order the EEOC to Meet and Confer with NIKE**

NIKE expressly requested a meet-and-confer to provide the EEOC the opportunity to clarify its Requests so that NIKE may comply with them or, at the very least, so that the parties could reach an impasse before the EEOC initiates costly and disruptive Court proceedings. *See* Ex. T, Subpoena Response at 2, 29. Certain of the Requests are less than clear, *see infra*, and many of the alleged deficiencies identified by the EEOC could likely be resolved with a proper meet-and-confer call where the parties exchange information and narrow disputes. *See Scobee v. USAA Cas. Ins. Co.,* No. 4:22-CV-488, 2023 WL 2837782, at *1 (E.D. Mo. Apr. 7, 2023) ("Written correspondence is insufficient to satisfy this requirement for a good faith attempt to resolve the discovery dispute.") (collecting cases); *ASI, Inc. v. Aquawood, LLC*, No. CV 19-763, 2023 WL 7323322, at *4 (D. Minn. June 27, 2023) ("[T]he purpose of the meet and confer requirements is to prevent the unnecessary expenditure of judicial resources.").

NIKE's request is consistent with the EEOC's Compliance Manual, which advises EEOC personnel to meet and confer prior to seeking Court intervention. The Compliance Manual directs investigators to exhaust meet-and-confer efforts prior to initiating the subpoena process and prior to filing in Court precisely because subpoenas are disfavored discovery devices due to their expense. *See* EEOC Compliance Manual (Vol. 1) § 24.1 ("Ordinarily, use subpoenas only after other investigative methods have been attempted . . . Subpoenas are often more expensive than diligent pursuit of the evidence by other means[.]"); *see id.* § 24.1(d) (explaining that the EEOC may only initiate subpoena

6

proceedings "[i]f the respondent persists in its refusal," or when "the respondent has unequivocally refused to produce [documents or information]") (cross-references omitted).[2]

To promote judicial economy and minimize burdens on the court, it is generally required that parties meet and confer and reach an impasse before raising disputes with the court. Here, the applicable statute may well require it. *See* 28 U.S.C. § 161(2) (authorizing the EEOC to seek to enforce a subpoena only in cases of "contumacy or refusal to obey"). As explained, over the course of this nearly two-year investigation, NIKE has not refused to obey. Rather, NIKE has repeatedly demonstrated its willingness to comply with the informal request process as well as the Subpoena, and repeatedly invited meet-and-confer discussions with the EEOC. Accordingly, the Court should dismiss the Application and order the EEOC to meet and confer with NIKE so that the parties may narrow issues and, at that point, raise any remaining disputes for a Court's resolution.

## II. The Court Cannot Order Compliance "In Full" Because the Subpoena Requests are Vague, Overbroad, and/or Unduly Burdensome

The Application focuses on the adequacy of NIKE's responses to seven (of twelve) Requests, specifically, Request Nos. 2(c-d), 3 (b-f), 5, 6, 8, 10 and 11. NIKE addresses each in turn.

### A. Request Nos. 2(c-d) and 3(b-f) are Vague, Overbroad, and Unduly Burdensome

Request Nos. 2 and 3 (as well as 4) broadly seek information concerning each "layoff" of the "U.S. Corporate workforce" from January 1, 2024, to the present. During this time period, NIKE undertook numerous "layoffs" impacting every part of its "U.S. Corporate workforce" and resulting in the separations of approximately 1,700 employees. *See* McCray Decl. ¶ 10. The Court should not order that NIKE comply "in full" with these requests for the following reasons.

---

[2] The Compliance Manual binds the EEOC; it is not merely a suggestion for investigating Charges. *See Fed. Exp. Corp. v. Holowecki,* 552 U.S. 389, 399 (2008) (referring to the Compliance Manual as "binding on EEOC staff"); *see also Texas v. EEOC,* 933 F.3d 433, 441 (5th Cir. 2019) (same). Indeed, the Application itself cites the Compliance Manual as authority. *See, e.g.,* Application at 3 n.1, 15 (citing the EEOC's Compliance Manual).

*First*, Request No. 2(c) is too vague to be enforced as drafted. It requests that NIKE "identify," for each "position subjected to the layoff," the "specific criteria and/or factors used to evaluate and select employees for layoffs." NIKE is frankly not sure what that means. The Subpoena does not define the terms "criteria," "factors," or "evaluate," nor does it identify the level of "specific[ity]" requested. In the Determination, the EEOC explained that NIKE could comply with this Request by providing information regarding the factors that are used to code a layoff as a "Reduction in Force." *See* Determination at 21. But in the Application, the EEOC states that NIKE must also identify criteria specific to each individual explaining why that employee was included in a Reduction in Force. *See* App. at 4-5; *cf. In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1302 (4th Cir. 1987) ("A subpoena duces tecum should not require the recipient to determine at his own peril what he is to do, without clear guidelines for compliance"). To the extent the EEOC is asking NIKE to identify each and every reason that contributed to the decision to lay off approximately 1,700 employees, the request would be unduly burdensome.

*Second,* stepping back, Request Nos. 2 and 3 (along with Request No. 4) collectively present an undue burden. Courts have cautioned against the application of rigid rules in determining whether the burden of complying with a subpoena is reasonable in light of the subpoena's relevance to the charge. *See, e.g.*, *EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 763 (11th Cir. 2014). "'What is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question.'" *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002) (quoting *FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir. 1980)). Reviewing courts must "weigh such equitable criteria as reasonableness and oppressiveness," which "impl[ies] a balancing of hardships and benefits." *EEOC v. Packard Elec. Div., Gen. Motors Corp.*, 569 F.2d 315, 318 (5th Cir. 1978).

Because "[t]here is no single location or source that contains all documents concerning the company's employment decisions," NIKE would have to undertake significant data collection and

8

information gathering at the level of each relevant decisionmaker to respond to Request Nos. 2-4. *See* McCray Decl. ¶¶ 8, 28-30. NIKE would first need to identify all "layoff" decisions, all employees involved in any such "layoff" decision, as well as every single "document[] created during the process of evaluating and selecting employees for layoff." *Id.* ¶ 28. NIKE would then need to use this information to interview each current and former employee involved in any layoff decision to determine "the specific criteria and/or factors used to evaluate and select employees for layoff[.]" *Id.* As a part of these interviews, NIKE would also need to identify for each employee **not selected** for "layoff," the "[r]eason for . . . non-selection for layoff" and, if that employee was later terminated, the "[r]eason for non-layoff separation[.]" *Id.*

On their face, these Requests ultimately ask NIKE to explain with "specificity" every single reason for every single layoff decision since January 1, 2024, as well as every decision to not include an employee in a layoff during that same time period. This would require substantial work hours away from NIKE's normal business and operations. *Id.* ¶¶ 30, 36. Courts have refused to enforce EEOC requests imposing similar burden. *See, e.g.*, *EEOC v. Morgan Stanley & Co.*, 132 F. Supp. 2d 146, 161–62 (S.D.N.Y. 2000) (declining to enforce subpoena for "all informal complaints" because compliance "would require a massive and unduly burdensome effort to interview practically everyone who works or recently has worked in a supervisory position, in order to determine whether any employees ever questioned the fairness of their treatment"); *Royal Caribbean Cruises, Ltd.*, 771 F.3d at 762 (declining to enforce unduly burdensome subpoena where "RCCL would be required to manually review and cross-reference paper documents relating to thousands of former employees . . . [and] be required to collect records from independent hiring partners concerning thousands of applicants who were not hired"); *EEOC v. Forge Indus. Staffing Inc.*, No. 14-MC-00090, 2014 WL 6673574, at *8 (S.D. Ind. Nov. 24, 2014) (holding subpoena imposed undue burden where "[c]ompliance with the subpoena would thus require

9

Respondent to 'manually review each employment application maintained in paper format at each of its office locations,' at an estimated time of '2,166 hours'").[3]

This Court should deny the EEOC's Application with respect to its Request Nos. 2 and 3.

**B.      Request No. 5 Seeks Irrelevant Information, But NIKE Will Further Comply**

Request No. 5 asks for NIKE to produce all documents relating to the alleged "use of employment of racial or ethnic minority workers as a factor in setting executive compensation from June 1, 2019, to the present." *See* Ex. T, Subpoena Response at 13.  NIKE has already responded by producing several documents concerning the "People & Planet modifier," an executive compensation metric that included a holistic assessment of NIKE's performance with respect to employee engagement and inclusion, leadership diversity, and sustainability. *Id.* at 15.  NIKE has further explained that the "People & Planet modifier" was the only manner in which executive compensation relied upon representation data in any way, is no longer in use, and that, in any event, it never resulted in a change of executive compensation during the relevant time period. *Id.*

Rather than agreeing to meet and confer with NIKE, the EEOC filed the Application and, for the first time, explained that NIKE will satisfy Request No. 5 upon producing additional documents explaining how the "People & Planet modifier" was calculated and the data on which the "People & Planet modifier" relies.  *See* App. at 6.  NIKE agrees to provide such non-privileged information in its possession.  Thus, this Request should be denied as moot.

---

[3] In responding to Request No. 4, NIKE referred the EEOC to a sortable report generated by NIKE's Workday system of U.S. Corporate employees whose separations were coded as "Reduction in Force" from January 1, 2024, to January 15, 2026.  *See* Ex. T, Subpoena Response at 13.  NIKE further explained its intent to collect and agreement to produce additional reports relating to reduction-in-force actions from January 1, 2024, that may be responsive to Request No. 4, and to do so on a rolling basis.  *See id.*  NIKE's response to Request No. 4 is not identified as deficient in the Application. *See* App. at 4-7.

### C.      Request No. 6 Seeks Information That NIKE Has Already Produced to the EEOC

Request No. 6 seeks data that NIKE maintained regarding the employment of "racial or ethnic minorities" from June 1, 2019, to the present. *See* App. at 6.  The Application incorrectly states that NIKE has not provided data responsive to Request No. 6 covering the period of time between June 1, 2019, and January 1, 2023. *Id.* at 7.  On the contrary, NIKE has produced tracking data covering June 1, 2019 to the present.  Indeed, this information was provided to the EEOC more than a year ago. *See* Cockroft Decl., Ex. C (providing data from FY18 to FY23).  Thus, the Application must be denied as moot with respect to Request No. 6.

### D.      Request No. 8 is Vague, Seeks Irrelevant Information, and is Overbroad

Request No. 8 requires NIKE to produce "all job vacancies" where "Diverse Slates" were utilized from June 1, 2018 to the present.  Ex. T, Subpoena Response at 19-20.  NIKE has explained to the EEOC that the "Diverse Slates" process "applied to U.S. based Global Grade 50+ above roles at NIKE[,]" and that "there are no Diverse Slates practices or guidelines currently in effect for any U.S. Corporate employee roles." *Id.* at 20. NIKE further explained that "a diverse slate [is] a pool of qualified candidates that consists of at least two women and one U.S. Racial and/or Ethnic Minority." *Id.*  A diverse slate does not suggest or result in the exclusion of any candidate; hiring managers are instructed that "when a diverse slate is not viable in a certain hiring scenario, there is no prohibition against the hiring process moving forward with the qualified candidates available." *Id.*  Employees are prohibited from considering protected characteristics when making hiring and promotion decisions. *Id.*

Despite this explanation and information, the Application seeks an order requiring NIKE to "[p]roduce" all job vacancies where "Diverse Slates" were "utilized from June 1, 2018 to the present," pursuant to Request No. 8.  App. at 7. *First*, the EEOC's persistence that NIKE provide additional information renders the Request vague and ambiguous.  NIKE has already identified the positions for

11

which the "Diverse Slates" process applied: U.S. based Global Grade 50+ above roles at NIKE. It remains unclear how NIKE's answers to date are insufficient.

*Second*, the Request is overbroad and unduly burdensome to the extent it requires NIKE to manually review every job opening in the past eight years to determine whether a "Diverse Slate" was utilized (because, as noted, in the absence of a "Diverse Slate" the hiring process could move forward with the qualified candidates available). Such a manual review process would likely require NIKE to investigate thousands of individual decisions on a candidate-by-candidate level.

*Third*, Request No. 8 is overbroad and unduly burdensome because NIKE's "Diverse Slates" process—which, as a practical matter, sought to expand the pool of qualified candidates considered for an opening without excluding any qualified candidate—complied with both law and controlling EEOC guidance. The Eighth Circuit has held that an employer does not violate Title VII when it seeks to diversify an applicant pool by adding women and minority candidates. *See Hammer v. Ashcroft*, 383 F.3d 722, 725 (8th Cir. 2004) ("An inclusive recruitment effort enables employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment. This not only allows employers to obtain the best possible employees, but it 'is an excellent way to avoid lawsuits.' The only harm to white males is that they must compete against a larger pool of qualified applicants. This, of course, 'is not an appropriate objection,' and does not state a cognizable harm." (citations omitted)), *abrogated on other grounds by Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025).

Likewise, for nearly two decades, the EEOC Compliance Manual advised employers to adopt various "proactive measures designed to reduce the likelihood of Title VII violations and to address impediments to equal employment opportunity." *See* Cockroft Decl., Ex. X at 63-64. The first bullet point under the recommendations for recruiting, hiring, and promotion states that employers should "[r]ecruit, hire, and promote with EEO in mind, by implementing practices designed to widen and

12

**diversify the pool of candidates** considered for employment openings, including openings in upper-level management." *Id.* at 64 (emphasis in original).

A request is unduly broad and burdensome when there is no "realistic expectation" that it will result in the EEOC uncovering illegal conduct. *See United Air Lines, Inc.*, 287 F.3d at 653. Given that "Diverse Slates" complied with Eighth Circuit law and EEOC guidance, the Court should deny the Application as to Request No. 8. *See* 42 U.S.C. § 2000e-12(b) (stating that employers who act in conformity with the Commission's guidance shall not "be subject to any liability or punishment" and following existing guidance "shall be a bar to the action or proceeding[.]")[4]

### E.    Request Nos. 10-11 are Vague, Overbroad, and Unduly Burdensome

Request Nos. 10 and 11 relate to Request No. 9, which demands that NIKE provide certain information regarding more than a dozen different employee resource groups, internship programs, professional development and leadership programs, and mentorship programs identified by the EEOC. *See* Ex. T, Subpoena Response at 20-25. NIKE's response to Request No. 9 does not appear to be in dispute,[5] but the Application for an order of this Court mandating compliance "in full" with Request Nos. 10 and 11 must be denied because, as drafted, the Requests are vague, ambiguous and burdensome.

---

[4] Courts routinely hold that the EEOC's guidance binds the Commission and in investigators from taking positions contrary thereto. *See Holowecki*, 552 U.S. at 399; *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 225 (2015) (declining to rely on changes to the EEOC Compliance Manual promulgated during litigation, which adopted a position on which the EEOC's previous guidelines were silent and contradicted the EEOC's prior positions). Indeed, it raises serious due process concerns when an agency seeks to impose costs on a private party in contradiction to previous recommendations. *See Bittner v. United States*, 598 U.S. 85, 102–03 (2023) (explaining that government action generally "poses a serious fair-notice problem" where "[a] number of the government's own public guidance documents" seem to contradict the theory later advanced by the government).

[5] In its Subpoena Response, NIKE explained in response to Request No. 9 that it "is working to collect and agrees to produce responsive information as modified by the Determination for the remaining identified programs and will do so on a rolling basis." *See* Ex. T, Subpoena Response at 23. The Second Supplemental Response further explains that of the sixteen programs identified in Request No. 9, as many as five programs were available to all United States Corporate employees and eligibility to participate was not premised on protected characteristics, as many as three additional programs were not in operation in the relevant time period, and as many as three more programs were not created or administered by NIKE. *See* Second Supplemental Response at 4-7.

*First,* Request Nos. 10 and 11 are vague and ambiguous.  In the Determination, the EEOC explains that NIKE may avoid responding to them if NIKE "asserts" that any program identified in Request No. 9 is either "not available or do[es] not apply to company employees in the United States" or if the programs that "applied or were available to all United States employees."  Determination at 24.  However, the EEOC does not explain the level of specificity required for any such assertion by NIKE.  In the Subpoena Response, NIKE responded to Request No. 9 and explained that it had made these assertions regarding at least four of the programs in response to previously served RFIs. *See* Ex. T, Subpoena Response at 23 (referring to NIKE's May 6, 2025 response to previous RFIs); Cockroft Decl., Ex. G at 18 (explaining that the McKinsey & Company's Black Leadership Academy and Management Accelerators programs relating to leadership development for "Native American & Indigenous leaders", the Human Resources Rotational Associate Program, and the Amplify Program no longer existed, never started, or ended prior to November 26, 2023).  Despite this clarification, the EEOC filed the Application seeking compliance regarding all programs mentioned in Request No. 9.

*Second,* Request Nos. 10 and 11 must be denied as unduly burdensome.  Responding to these Requests "in full" would require NIKE to identify the source or location of physical or electronic documents related to each specific "program", interview stakeholders (which may include former employees and third-party vendors) for that "program", and collect and review any information they may have relating to applicants and participants dating back to June 1, 2019.  McCray Decl. ¶¶ 31-34. NIKE would then need to compile this information as requested by the EEOC.  *Id.*  Compliance with these Requests would require substantial work hours away from NIKE's normal business and operations.  McCray Decl. ¶¶ 35-36.  Thus, these Requests should be denied as unduly burdensome.

### III.   The EEOC is Not Entitled to Costs

The Court should deny the EEOC's request for "its costs incurred by instituting this action[.]" *See* Dkt. No. 1 at 5. *First,* there is no statutory authority for such a request. *See EEOC v. VisionPro Networks, Inc.*, No. 24-MC-00356, 2024 WL 3643818, at *12 (E.D.N.Y. Aug. 2, 2024) ("[T]he undersigned has not found a single case – nor has the EEOC cited any — in which costs were awarded in cases involving the EEOC." (collecting cases)).[6] *Second*, NIKE was complying with and seeks to continue to comply with the Subpoena, rendering this action entirely unnecessary. *Third,* the EEOC could have potentially avoided litigation altogether by agreeing to a meet-and-confer as NIKE requested. *See supra* Argument § I. A litigant that unnecessarily burdens the court with the premature filing of an unripe dispute should not be rewarded with costs.

### CONCLUSION

For the foregoing reasons, NIKE respectfully requests that the Court enter an order dismissing the Application and denying the EEOC's request for costs and/or compelling the EEOC to meet and confer with NIKE regarding any outstanding Requests.

---

[6] *See also* 42 U.S.C. § 2000e-5(k) ("In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, *other than the Commission* or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person." (emphasis added)).

15